UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION


UNITED STATES OF AMERICA,          )
                                   )
                    Plaintiff,     )   No. CR 11-388(A)-GAF
                                   )
          v.                       )
                                   )
YUSUF ABDALLAHI ABAKAR,            )
                                   )
                    Defendant.     )


TRANSCRIPT OF PROCEEDINGS

THE HONORABLE GARY ALLEN FEESS

U.S. DISTRICT JUDGE PRESIDING

LOS ANGELES, CALIFORNIA

DECEMBER 6, 2011


JURY TRIAL – DAY 1

EXCERPTED P.M. SESSION


BRIDGET R. MONTERO, CSR 10020, CRR
United States Courthouse
312 North Spring Street, Room 435
Los Angeles, California 90012
www.bridgetmontero.com
Internal File No. 11094

```
 1   APPEARANCES OF COUNSEL:

 2

 3   For the Plaintiff:

 4

 5   Office of the United States Attorney
     BY:  MELANIE SARTORIS
 6   1300 United States Courthouse
     312 North Spring Street
 7   Los Angeles, CA 90012

 8

 9   For the Defendant:

10

11   Law Offices of David R. Reed
     BY:  DAVID R. REED
12   3699 Wilshire Boulevard, Suite 850
     Los Angeles, CA 90010
13

14

15

16

17                            - - - - -

18

19

20

21

22

23

24

25
```

```
1                              INDEX

2

3                                        D     X    ReD    ReX

4    For the Plaintiff:

5

6    CONCEPCION FIGUEROA              4    49    63

7    JOHN HENSON                      65

8

9

10

11                          EXHIBIT INDEX

12            Exhibit No.              Received

13                       (None.)

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                TUESDAY, DECEMBER 6, 2011; 1:34 P.M.

 2                          - - - - -

 3

 4          (Begin excerpt.)

 5          THE COURT:  Call your first witness.

 6          MS. SARTORIS:  Thank you, Your Honor.  The

 7   government calls Conception Figueroa, retired United States

 8   Citizenship and Immigration Services officer.

 9          THE CLERK:  Please raise your right hand.

10          (The oath was administered.)

11          THE WITNESS:  I do.

12          THE CLERK:  Please have a seat.  Please state your

13   name, spelling your last name for the record.

14          THE WITNESS:  My name is Concepcion.  Last name is

15   Figueroa, F-I-G-U-E-R-O-A.

16          THE COURT:  Go ahead, Counsel.

17

18                   CONCEPCION FIGUEROA,

19   called as a witness in behalf of the Plaintiff, having been

20   first duly sworn, is examined and testifies as follows:

21

22                   DIRECT EXAMINATION

23   BY MS. SARTORIS:

24   Q.   Good afternoon, Ms. Figueroa.

25   A.   Good afternoon.
```

Figueroa – D

```
 1   Q.   What is it you do?

 2   A.   I'm retired right now.

 3   Q.   Where are you retired from?

 4   A.   I was -- how do you call this -- immigration services

 5   officer --

 6   Q.   And --

 7   A.   -- Homeland Security, USCIS.

 8   Q.   Thank you.

 9           When was it that you retired?

10   A.   September 30, this year.

11   Q.   And you just said a phrase; "CIS," I believe.  And does

12   that stand for customs immigration services?

13   A.   Citizenship Immigration Services.

14   Q.   Thank you.

15           What was that formerly referred to as?

16   A.   Immigration Naturalization Services.

17   Q.   Is that INS?

18   A.   Yes.

19   Q.   When was it you first started working -- for purposes

20   of the testimony, I'm going to ask you about CIS, but just

21   so you understand me, since I know the name changed over

22   time, when I say "CIS," I mean INS or CIS.  It was the same

23   place?

24   A.   Yes.

25   Q.   When did you first start working for CIS?
```

Figueroa – D

1    A.    I started working in 1996.

2    Q.    What was it you did?

3    A.    I was an immigration officer.

4    Q.    And how long did you do that?

5    A.    For citizenship, it was '96 to '97.

6    Q.    And then what did you do?

7    A.    And then I was transferred to adjudications.

8    Q.    What does that mean?

9    A.    Adjudications of -- for I-485, which is the permanent

10   residence.

11   Q.    So -- and how long did you do that?

12   A.    From '97 to 2006.

13   Q.    What does it mean to adjudicate something for lawful

14   permanent residence?

15   A.    We are the ones who adjudicate the applications that

16   they submitted to be a lawful permanent resident.

17   Q.    And you did that job from 1997 to 2006.  What did you

18   do after 2006?

19   A.    And then I was moved back to citizenship, 2007 to 2011.

20   Q.    What does that mean, "citizenship"?

21   A.    Now I was working on naturalization.

22   Q.    So were you adjudicating lawful permanent residence

23   applications in 2003 and in 2004?

24   A.    Yes.

25   Q.    And how many, if you have any idea or any estimate

Figueroa - D

```
 1   of -- how many such applications do you think you did over
 2   the years?
 3   A.   More than a thousand.
 4   Q.   More than a thousand.
 5        So is it fair to say that -- well, if I could ask
 6   you to turn to what's been marked as Government's Exhibit 1.
 7   It's in a black binder.  The entire binder is Exhibit 1.
 8   This is -- this document is a certified copy of excerpts of
 9   the defendant's A-File.
10        THE COURT:  Why don't we let the witness tell us
11   what the document is, Counsel.
12        MS. SARTORIS:  Okay.  Yes.
13   BY MS. SARTORIS:  (Continuing)
14   Q.   Do you have that exhibit in front of you?
15   A.   Okay.  What page are we looking at?
16   Q.   Why don't we start with the -- if you go to the blue
17   tab, Exhibit 1, the first page has that yellow exhibit
18   sticker.
19   A.   Okay.
20   Q.   But then there's the next page.  It says "United States
21   of America" on top.  Do you see that?
22   A.   This is the G-24.
23   Q.   Yes.
24        And then if you turn the page -- it's page number
25   2 -- it says "441" at the bottom.  What is that?
```

Figueroa – D

```
1   A.   This looks like the cover of the file.

2   Q.   Of what file?

3   A.   An A-File, an alien file.

4   Q.   And what is an alien file?

5   A.   Okay.  An alien is the number that is being given to an

6   application that is sent to the immigration services.

7   Q.   And if you look to the page before that, it says

8   "Certification of documents."

9   A.   Okay.

10  Q.   Now, if I ask you to turn to page 303 of this A-File --

11  A.   Yes.

12  Q.   -- do you recognize this document?

13  A.   Yes.

14  Q.   How do you recognize it?

15  A.   I have my signature on it.

16  Q.   Now, what is this document?

17  A.   This is the form I-485, which is the application to

18  adjust for permanent resident.

19  Q.   Could you explain what that means?

20  A.   Okay.  This is the application that is sent in by the

21  applicant in order to be a lawful permanent resident.

22  Q.   Who in this case is the applicant?

23  A.   The applicant is Yusuf Abakar.

24  Q.   What can you tell, from looking, if anything, at

25  Exhibit -- at page 303, what can you tell us about what this
```

```
 1    application tells you about why this person or under what

 2    authority this person was applying for to adjust status?

 3    A.   Okay.  Down on part two, it says "A," and it's "X."

 4    The application of Abakar for adjustment of status was sent

 5    in after a petition has been granted -- I mean, has been

 6    sent in by the sponsor.

 7              MS. SARTORIS:  Your Honor, with the Court's

 8    permission, I would like to publish page 303 of Exhibit 1 to

 9    the jury.

10              THE COURT:  All right.  Any objection, Mr. Reed?

11              MR. REED:  No, Your Honor.

12              THE COURT:  All right.  Go ahead.

13    BY MS. SARTORIS:  (Continuing)

14    Q.   Now, you mentioned that you recognize this document;

15    your signature is on it.  Where is your signature on this

16    document?

17    A.   On the one that says "Action block;" on the right-hand

18    side corner, below.

19    Q.   Is it that red --

20    A.   The red stamp.

21    Q.   Red stamp?

22    A.   Stamped red on it.

23    Q.   If I could ask you what -- now, do you have any

24    specific memory of this application?

25    A.   Not the person, not the applicant.
```

1   Q.   So how is it that you know -- and you can -- and I can

2   ask you to look.

3           This document -- page 303, 304, 305, and then

4   306 -- how is it you know that this is a document that

5   you've seen before?

6   A.   Because I remember -- this is my signature.  In all

7   those pages I have my handwriting on it, notations.

8   Q.   Now, you mentioned you don't have a specific memory of

9   this application.  But do you have a common practice when it

10  came to adjudicating form I-485 applications?

11  A.   Yes.

12  Q.   Could you explain that?

13  A.   Okay.  When we begin the adjudications, we have to put

14  the applicant under oath, in the first place, and then ask

15  them -- we have to review again:  "Is this your name," right

16  up here; "Is this your address," right here.

17  Q.   Just so the record is clear, are you looking at page

18  303 of Government's Exhibit 1?

19  A.   303.

20  Q.   303.

21          Okay.  So when you say -- when you're talking

22  about the name and the address, are you looking at -- where

23  are you looking on that document?

24  A.   The one, part one, information about you.  We have to

25  review what was on it:  Their names, their address, their

Figueroa – D

```
 1   birthdate, the country of birth, and the last time they
 2   arrive.  And then we have to go over and see the current
 3   status, INS status.
 4   Q.   And what -- what do you see when you look over and see
 5   the current status?
 6   A.   In the current status, the applicant entered the United
 7   States as a student, F-1.
 8   Q.   And if you look down at part two, what does that say on
 9   this application?
10   A.   The application was -- for the applicant, is an
11   immigrant petition, giving him an available immigrant visa
12   number and has been approved.
13   Q.   And do you know -- can you tell, by looking at this,
14   under what basis this application is seeking to get approved
15   for an LPR status?
16   A.   The applicant was married to a U.S. citizen.
17   Q.   And how can you tell that?
18   A.   When -- by looking at the I-130.
19   Q.   I might be able to help you out.  If I ask you to look
20   at page 432 of Government's Exhibit 1 --
21   A.   Yes.
22   Q.   -- do you recognize that document?
23   A.   Yes.
24   Q.   What is that?
25   A.   This is the petition for alien relative, which is the
```

Figueroa - D

1   form I-130.

2   Q.   What does that mean?  If you could just explain to the

3   jury what it means.

4   A.   This is notification from the -- in this case, this is

5   a spouse.  Okay?  Notification to the INS, petitioning for

6   an alien relative who is going to be a lawful permanent

7   resident.

8   Q.   So did you look at this document?

9   A.   Yes.

10  Q.   And how do you know that?

11  A.   My handwriting is there.  My signature is there.

12  Q.   And did you stamp this document?

13  A.   Yes.

14  Q.   Stamped it approved?

15  A.   Approve.

16  Q.   How does -- how does -- how did CIS or INS -- how did

17  CIS obtain these documents?

18  A.   The petitioner would -- how did -- would you repeat the

19  question again?

20  Q.   Who submits these documents to INS?

21  A.   The petitioner.

22  Q.   And that's the petition for alien relative on page 432?

23  A.   Yes.

24  Q.   And who submits the permanent resident or adjustment of

25  status application?  Where does that come from?

Figueroa - D

```
 1   A.    This form came from?  This is -- this came from -- I
 2   think at that time it was from Laguna Niguel, or they mail
 3   it to Laguna Niguel.
 4   Q.    Who is "they"?
 5   A.    The petitioner.
 6   Q.    Do you mean -- when you say -- who is the petitioner?
 7   I'm looking at page 303.
 8   A.    Yeah.  Petitioner is Morgann Blair Walker.
 9   Q.    Who -- so this is an application, signed.  Is this
10   application signed, page 303?
11   A.    303?
12   Q.    Yeah, page 303.
13   A.    Okay.
14   Q.    Now, go to page -- look at the application.  It starts
15   on page 303.  And that's the application to register
16   permanent residence or adjust status.
17   A.    Yes.
18   Q.    And there's a signature page on 306?
19   A.    Yes.
20   Q.    And see there, part four?  What does it say under the
21   signature section part four?
22   A.    Under the signature?
23   Q.    Where it says part four, signature, and then there's
24   writing underneath that bold line, what does that say?
25   A.    It says, "If you do not completely fill out this form
```

1    or fail to submit the required documents listed in the

2    instruction, you may not be found eligible for the requested

3    benefit and this application may be denied."

4    Q.    Okay.  So above that part where it starts "I certify,"

5    what is that statement?

6    A.    Where are we now?

7    Q.    Above the -- under the part four -- do you see where it

8    says "Part four, signature"?

9    A.    Yes.

10   Q.    Then it says, "I certify."  What does that say?

11   A.    "I certify under penalty of perjury, under the laws of

12   the United States of America, that this application and

13   evidence submitted with it is all true and correct.  I

14   authorize the release of any information from my records

15   which the INS needs to determine eligibility for the benefit

16   I am seeking."

17   Q.    And then you see there's a signature.  Who is it that

18   signs this document?

19   A.    This is the applicant, which is Yusuf Abdallahi

20   Abakar's signature.

21   Q.    So when you were -- if you could look at this document,

22   and if you could tell the jury where -- what documents --

23   this A-file that you identified is a big document with a lot

24   of pages, but you didn't -- did you review all of these

25   pages, or did you review a subsection of these pages?

Figueroa - D

```
 1    A.    I reviewed all the pages of this.

 2    Q.    All the pages, starting from where?

 3    A.    From page 303.

 4    Q.    And going until where?

 5    A.    306, including the attachment that was in the case.

 6    Q.    Okay.  What about all these documents that follow 306?

 7    A.    This is the biographical data, information about the

 8    applicant.

 9    Q.    If you keep going in this A-File, can you just tell the

10    Court where it is that -- where it is that you -- what

11    documents it was that you reviewed when you adjudicated this

12    application; the whole section.

13    A.    The whole section?

14    Q.    Yeah, all of the ones that you looked at.

15    A.    Okay.  This is biographical data.

16    Q.    So starting on page 303 and ending on what page?

17    A.    Ending on --

18    Q.    It might help you out to remind you that the petition

19    for alien relative starts on page 432.

20    A.    Yeah.  Is that included?

21    Q.    I'm asking you.

22    A.    Okay.  That one -- 343, I did not see this photo.  I

23    don't think I remember seeing that one.

24    Q.    Okay.  Do you remember seeing all the documents -- did

25    you look at all of the documents up until page 343?
```

Figueroa - D

1   A.   Yes.

2   Q.   Okay.

3   A.   And then I go all the way through the affidavit of

4   support.

5   Q.   Okay.  So then do you start on page 344?

6   A.   344.

7   Q.   And then how much further did you look?

8   A.   From there, 439.

9   Q.   With the exception of page 343, you reviewed, when you

10  adjudicated this application, pages 303 to 439?

11  A.   Yes.

12  Q.   Okay.  Could you explain to the jury what it is someone

13  needs to do to obtain permanent resident status based on the

14  marriage you said that this application was based on?

15  A.   First, we start with the I-130 petition.

16  Q.   And what page is that?

17  A.   432.

18  Q.   And what is it you look at there?

19  A.   This is the petitioner's notification to the

20  immigration services that an alien relative is being

21  petitioned to be a lawful permanent resident of the United

22  States.

23  Q.   And how do you know that this is -- what's the

24  relationship that this application is based on?

25  A.   When you go to -- says "relationship, the alien is my,"

Figueroa - D

```
 1    put the "X" on it, "husband."

 2    Q.   What is it you look at on this form when you're

 3    reviewing this application?

 4    A.   I look at information here that would make them

 5    eligible for a bona fide marriage.

 6    Q.   What does that mean?

 7    A.   That means that the applicant and the petitioner has

 8    been married.  In here, they were married less than two

 9    years, during my interview.  I look at the addresses of the

10    couple.

11    Q.   Why is it --

12    A.   Because it's important to determine that there is a

13    bona fide marriage.  They have to be living together.

14    Q.   What else do you look at?

15    A.   I looked up the address of the applicant.  Is it the

16    same as the address of the petitioner?  I look at the date

17    of birth.  I look at how the person entered the United

18    States, and also if there has been relative under

19    immigration proceedings.

20              And then when you go to page 33 --

21    Q.   433?

22    A.   Right -- I also have to look if the petitioner have

23    other petitions for other people or relative.  And then I

24    would look down at signature, if it was signed.  And then

25    date and phone number.
```

 1           MS. SARTORIS:  Your Honor, if I could just ask

 2   permission to publish any of the pages of this certified

 3   A-File to the jury, with -- with, perhaps, exception of one

 4   of them.

 5           THE COURT:  All right.  Other than as discussed

 6   earlier today, any objection, Mr. Reed?

 7           MR. REED:  No, Your Honor.

 8           THE COURT:  All right.  Go ahead.

 9   BY MS. SARTORIS:  (Continuing)

10   Q.   So looking at page 433, I think you were just talking

11   about that --

12   A.   Yes.

13   Q.   -- now, this document -- this page is signed, as well.

14   Who signed this document?

15   A.   It says Morgann Walker.

16   Q.   And that's the petitioner that signs that?

17   A.   That's the petitioner.

18   Q.   Is this document also signed under penalty of perjury?

19   A.   Yes.

20   Q.   So you look at this petition for alien relative.  Do

21   you look at anything else?

22   A.   At the bottom, it just says there is representation by

23   attorney.

24   Q.   So in addition to this petition for alien relative, do

25   you look at any -- is there any supporting -- do you look --

Figueroa - D

```
 1   do you also look at the I-485?  You already talked about

 2   that a little bit, the document that starts on page 303.

 3   A.    Okay.  Before I look at the 485, I have to make sure

 4   that the attachments -- attachment for the I-130 are there.

 5   Q.    Okay.

 6   A.    I have to make sure that the marriage certificate is

 7   attached.

 8   Q.    Do you see that here?

 9   A.    Yes.

10   Q.    And is that -- what page is that on?

11   A.    It's page 435.

12   Q.    And what else?

13   A.    I have to make sure that the petitioner is a U.S.

14   citizen, as it is stated on the I-130.  I have to look for

15   the birth certificate.

16   Q.    Do you see that in here?

17   A.    It's in 436.

18   Q.    What else?

19   A.    The biographical data of the petitioner.

20   Q.    What page is that?

21   A.    437.

22   Q.    What is it you're looking at there for the biographical

23   information?

24   A.    The consistency of the information is in the I-130, and

25   I also wanted to check if there was former marriages of the
```

Figueroa – D

```
 1   petitioner, if she has former marriage.  I have to look up
 2   their place of -- the last place of the residence where she
 3   was residing, is it consistent with that residence address
 4   that they have on the I-130.
 5   Q.   What do you see here for the address?
 6   A.   4123 Santa Rosalia Drive, Apartment A.
 7   Q.   Was it consistent with what you'd seen so far?
 8   A.   Yes.
 9   Q.   And then what -- could you explain what happens next?
10   A.   After looking at that, the relationship was already
11   established.
12   Q.   Meaning -- meaning what?
13   A.   On the I-130, the -- it was approved.  The relationship
14   between the husband and the wife has been established.
15   Q.   Meaning the marriage?
16   A.   The marriage.
17   Q.   Then what do you look at next?
18   A.   Then I have to go to the I-485, which is the adjustment
19   of status.
20   Q.   Okay.  Does that start on page 303?
21   A.   303.
22   Q.   So what is it you look at here?
23   A.   I look at the name of the applicant, just like I told
24   you, and all the information; the addresses and the date of
25   birth, are they consistent to the other application.
```

Figueroa - D

```
 1    Q.    Why do you care if they're consistent?

 2    A.    This is to establish the bona fides of the marriage and

 3    be able to be granted a lawful permanent resident.

 4    Q.    What else do you look at?

 5    A.    I look at his entry into the United States, did he has

 6    a legal entry.

 7    Q.    And did he here?

 8    A.    Yes.

 9    Q.    Okay.  Now, do you look at any of the documents that

10    are submitted in support of this application?

11    A.    Yes, I do.

12    Q.    So if I could ask you, first, to turn to page 307.

13    What's this document?

14    A.    This is the biographical data or biographical

15    information of the applicant.

16    Q.    And who is the applicant here?

17    A.    Yusuf Abdallahi Abakar.

18    Q.    What are you looking at here?

19    A.    I'm looking for consistency on his biographical data.

20    Was he -- did he have a correct date of birth?  Did this guy

21    have a previous marriage?  Was the marriage to Morgann

22    Walker dated correctly?  His address.

23    Q.    And why?

24    A.    Is it consistent.

25    Q.    Why is it you're looking for consistency in the date of
```

Figueroa – D

```
 1   the marriage and the address?
 2   A.   That is one of the criteria that we have to know that
 3   they are living together.
 4   Q.   Then if you flip through the pages of this, I see
 5   there's some medical documents.  We can skip past those, and
 6   I'll ask you to turn your attention to page 395.  What is
 7   this document?
 8   A.   This is his Franchise Tax Board -- this is a state tax
 9   notice.
10   Q.   What is this in here?
11   A.   It was one of the attachments that they have submitted,
12   together with the application, to register for permanent
13   status, stating that -- I mean, giving us the information
14   that they do live together.  This is their -- one of the
15   documents that we look for in the commingling of funds.
16   Q.   So you look for commingling of funds?
17   A.   Right.
18   Q.   And do you ask for documents from the applicant that
19   would represent that the funds were commingled?
20   A.   Yes.
21   Q.   Commingled with whom?
22   A.   With the petitioner.
23   Q.   Is that the citizen spouse?
24   A.   The U.S. citizen spouse.
25   Q.   And why is it that you look for commingled funds?
```

Figueroa – D

```
 1   A.    Because it is the policy that we have to look for, in
 2   order to determine the bona fide -- the marriage is bona
 3   fide.
 4   Q.    If I ask you to turn to page 400, what is this?
 5   A.    This is the lease agreement.
 6   Q.    What lease agreement?
 7   A.    This is the place where they live, the petitioner and
 8   the beneficiary.
 9   Q.    How did you get this document?
10   A.    This is already attached --
11   Q.    Attached --
12   A.    -- in the application.
13   Q.    Attached to the petition?
14   A.    Right.  As a backup.
15   Q.    And attached to the --
16   A.    Application.
17   Q.    -- the I-485?
18   A.    Right.
19   Q.    This is attached to the I-485?
20   A.    Yes.
21   Q.    Why is this submitted with the I-485?
22   A.    It's just to prove to us that they are living together.
23   Q.    And what did -- did you look at this document at that
24   time?  Would you have looked at it?
25   A.    Yes.  Yes.
```

Figueroa - D

```
 1   Q.    And what would you have looked for?

 2   A.    The names of the persons that are in that residence,

 3   the address of that residence, and the -- of course, the

 4   amount of how much they rent; and also at the bottom,

 5   signature of the owner and agent, signature of the renters.

 6   Q.    And why is it -- what names are you looking for on this

 7   document?

 8   A.    I'm looking for the name of the applicant and the name

 9   of the petitioner.

10   Q.    Why is that?

11   A.    It is to determine that they are living together in a

12   bona fide marriage.

13   Q.    Do you also look at the address?

14   A.    Yes.

15   Q.    What do you see here in this document as the address?

16   A.    It says 4123A, Santa Rosalia Drive, Los Angeles,

17   California, 90008.

18   Q.    Who are the renters on this application?

19   A.    This is Abdoul Kebbeh, Yusuf Abakar, and Morgann Blair

20   Walker.

21   Q.    You said you also look to see if the lease is signed?

22   A.    Yes.

23   Q.    That's Government's Exhibit 1, page 401.

24         What do you see here?

25   A.    I saw Abdoul Kebbeh's signature, Yusuf Abakar's
```

Figueroa - D

```
 1   signature, Morgann Blair Walker's signature, and signature

 2   of agent of the residence --

 3   Q.   So when you look at --

 4   A.   -- management.

 5   Q.   I'm sorry.

 6        When you look at this document, is there anything

 7   about it that gave you any pause or suspicion?

 8   A.   No.

 9   Q.   Did it look like a legitimate lease document to you?

10   A.   At that time, yes.

11   Q.   And then if you turn to page 402 -- before we move on

12   from that lease document, did you consider this document in

13   your decision to approve the I-485?

14   A.   Yes.

15   Q.   And why is that?

16   A.   This is a very important document to us.

17   Q.   Why?

18   A.   When we're reviewing, we have to know that the couple

19   is living together at the time of interview.

20   Q.   What if they're not living together?

21   A.   And we cannot approve a case if they're not living

22   together, unless if they told the officer that there is

23   specific reason why they cannot be living together.  For

24   example, if one party's employment is somewhere else, out of

25   state, that could be considered, but then we have to make
```

Figueroa - D

```
 1   notations on our record of what is going on.  And a lot more

 2   have to be done.

 3   Q.   What do you mean by a lot more has to be done?

 4   A.   A lot more of investigation has to be done.

 5   Q.   Investigation into what?

 6   A.   As to why they are not really living together, is the

 7   reason valid enough.

 8   Q.   Would you -- is it acceptable to just -- to not tell

 9   CIS if people are not living together?

10   A.   Then I cannot approve them.

11   Q.   Why is that?

12   A.   Because it has to be in the policy that -- we were

13   trained that the couple has to be together, sharing --

14   sharing together everything -- their funds, their

15   obligations -- and that's one of the training guidelines

16   that we have to follow.

17   Q.   Including the residence?

18   A.   The residence, yes.

19   Q.   And if they're not living together, they need to tell

20   CIS that?

21   A.   Right.  And they have to specify what reason.

22   Q.   And then CIS would do additional work to investigate?

23   A.   It's another work for us to do.

24   Q.   And are you investigating, ultimately, to determine if

25   it's a bona fide marriage?
```

Figueroa – D

```
 1   A.    Not us.  It's another area.  We send it to another
 2   department.
 3   Q.    To get investigated?
 4   A.    To get investigated.
 5   Q.    You would refer it for further investigation?
 6   A.    For further investigation.
 7   Q.    So turning to page 402 through 404, these appear to be
 8   some tax documents.  Are these documents you looked at?
 9   A.    Yes.
10   Q.    And why -- why do you have these tax documents?
11   A.    This is just proof of the commingling of funds.
12   Q.    Just so that we're clear, all of these documents we're
13   talking about, including the lease document, is that
14   something that CIS went out and obtained on its own, or is
15   that something that is submitted by the applicant?
16   A.    These are submitted by the applicant.
17   Q.    So when CIS is evaluating the application, is CIS
18   relying on the statements made and the documents submitted
19   by the applicant?
20   A.    Yes.
21   Q.    And if you turn to page 405, you see some gas company
22   bills from 405 to 410.  Why do you think -- why are these in
23   here?
24   A.    These are just proof sent by the applicant to prove
25   that they are sharing obligations together.
```

Figueroa - D

```
 1   Q.   So does CIS care that they have -- that the applicant

 2   has a gas company account?

 3   A.   Not all the time.

 4   Q.   What is it about this that would be significant to CIS,

 5   these -- this gas company documents?

 6   A.   This adds to prove that they are really in that

 7   residence.

 8   Q.   And do you see on this who -- who -- who -- it says on

 9   this -- these gas company statements, who the names are that

10   this bill -- these bills are in?

11   A.   It's Yusuf Abakar and Morgann Blair Walker.

12   Q.   And what's the address?

13   A.   4123 Santa Rosalia Drive, Apartment A, Los Angeles,

14   California.

15   Q.   And would the address here and the fact that the two

16   names are on here have been significant to you?

17   A.   Yes.  Because they're all consistent.

18   Q.   Would you have looked at that?

19   A.   Yes.

20   Q.   And for what purpose?

21   A.   This is also telling me that the applicants is closing

22   to being bona fides marriage, for having a bona fide

23   marriage.

24   Q.   If you turn to page 411, flip a couple pages to 416,

25   there's some Los Angeles Department of Water and Power bills
```

Figueroa – D

```
 1   in here.  Why are these in here?
 2   A.   That's also an additional to the obligation that the
 3   party has shared together.
 4   Q.   So these utility bills are in here.  And who are the
 5   names that are on these utility bills?
 6   A.   Yusuf Abdallahi Abakar and Morgann Blair Walker.
 7   Q.   What is the address?
 8   A.   4123 Santa Rosalia Drive, A.
 9   Q.   Why would you have looked at these bills?  Would you
10   have asked to see if they're current on their water and
11   power, or are you looking for the residence?
12   A.   I'm just looking for the residence.  This was not
13   asked.  It was already in the application.
14   Q.   The applicant submitted it to you?  You didn't ask for
15   it?
16   A.   Right.
17   Q.   Okay.  And if we turn to page 417, 418, there's some
18   Washington Mutual statements.  And they go through 427.
19   A.   Okay.
20   Q.   Why are these bank statements in here?
21   A.   This is proof that they have a commingling of funds.
22   They have bank accounts together, both names.  The address
23   of the couple is stated in there.
24   Q.   Are you looking -- what are you looking at for the
25   address?
```

Figueroa - D

```
 1   A.   4123 Santa Rosalia Drive, Apartment A, Los Angeles,
 2   California.
 3   Q.   And are you specifically looking at the address when
 4   you are looking at these documents?
 5   A.   I have to.
 6   Q.   And why is that?
 7   A.   I want to make sure that what is stated in the
 8   application and what they told me that they are reciting is
 9   correct.
10   Q.   Now, if I could ask you to look at page 428, was this
11   also submitted by the applicant?
12   A.   Yes.
13   Q.   And you'll see -- what is this on page 428?
14   A.   The applicant's driver's license and the petitioner's
15   identification card.
16   Q.   And what is the address on the applicant's driver's
17   license?
18   A.   The applicant's address is showing 4123 Santa Rosalia
19   Drive, Apartment A --
20   Q.   What about --
21   A.   -- Los Angeles.
22   Q.   I'm sorry.
23        What about the petitioner's driver's license?
24   A.   1847 Wellington Road, Los Angeles.
25   Q.   Now, that address is different?
```

Figueroa - D

```
 1   A.   That address is different because probably at that

 2   time, when she applied for this, she was not living in 4123

 3   because she was not married yet to the person.

 4   Q.   You're talking about when she applied for her --

 5   A.   For the petition.

 6   Q.   Could you explain --

 7   A.   I mean, when she applied for the California I.D., she

 8   was not yet married to the applicant, and she was not

 9   residing yet into that address.

10   Q.   Would you have looked to see when this California

11   identification card was applied for?

12   A.   I have to -- I look at the time when it says issued.

13   Q.   And what do you see?

14   A.   2002; 12-12, 2002.

15   Q.   And was that before or after the marriage?

16   A.   I think it's -- let me check the address.  Yes, that

17   was before.

18   Q.   So what would that -- would that be significant to you,

19   then, that this California identification card shows a

20   different address?

21   A.   Yes.

22   Q.   Why?  What do you mean by "yes"?

23   A.   It is significant to us to know their addresses on the

24   I.D.s that they have presented.  Also, it is significant to

25   us to know that the person pictured in this I.D. is the
```

Figueroa - D

```
1    person in front of you.
2    Q.   But in looking at this address, did it give you any
3    concerns that this address is different than -- because you
4    testified you look for consistency, and this address is
5    different.  Does that -- would that have given you any
6    concerns?
7    A.   No.
8    Q.   And why is that?
9    A.   Because when it was issued to the applicant, she was
10   not married, I mean, to the petitioner.  She was not married
11   yet to the applicant.  So it is possible that the issuance
12   of the I.D., they were not residing together.
13   Q.   And is that common, when you're adjudicating an I-485,
14   that the driver's license of the citizen spouse might
15   reflect an address that's different than on the
16   application's?
17   A.   Yes.
18   Q.   And why is that?
19   A.   Because at the time it was issued to them, they were
20   not living together at that time.
21   Q.   And are you also looking at the date of the marriage?
22   A.   And the date of the -- yeah, date of marriage.
23   Q.   If you look at page 429, what is this?
24   A.   This is the car registration, certificate of title.
25   Q.   Did you obtain this from the applicant?
```

Figueroa - D

```
 1   A.    Yes.
 2   Q.    And why do you -- why would you have obtained this from
 3   the applicant?
 4   A.    This is also an evidence of what they own together as
 5   husband and wife.  And you can see we have to check the
 6   applicant's name in there.  And the petitioner is shown.
 7   The address is shown, which is very consistent to everything
 8   else that was submitted to us.
 9   Q.    Then we get to the birth certificate and a couple other
10   pages, but, essentially, we just walked through those
11   pages -- we skipped some.  The jury will have them all in
12   the evidence room.  But you review all of these pages, along
13   with the I-485?
14   A.    I do.
15   Q.    And that's all part of your analysis of whether or not
16   it's a bona fide marriage?
17   A.    Yes.
18   Q.    And looking at these documents that we just looked at,
19   did -- is there anything that gives you any concern?
20   A.    At the time --
21   Q.    At the time.
22   A.    -- when I was reviewing these documents with them,
23   there was no evidence that there was -- it's significant for
24   us to determine that the marriage is not eligible.  At the
25   time they were interviewed -- or I interviewed this case, it
```

Figueroa - D

```
 1   was eligible.  It's a bona fide marriage to me.
 2   Q.   And what -- we'll get to the interview in a minute, but
 3   looking at the documents, is there anything about the
 4   documents that at the time would have given you a reason to
 5   question whether the marriage is bona fide?
 6   A.   No, I don't have.
 7   Q.   And why is that?
 8   A.   The consistency of everything else that is in there;
 9   their address, their marriage certificate, the commingling
10   of funds documents, the obligations shared by the couple,
11   they're all consistent.
12   Q.   Meaning the utility bills?
13   A.   Right.
14   Q.   Car title?
15   A.   Yes.
16   Q.   The lease?
17   A.   Yes.
18   Q.   Now, you mentioned that you put -- that there's an
19   interview.  Can you explain to the jury about the interview?
20   A.   I make notations on my -- on the applications that they
21   made --
22   Q.   So --
23   A.   -- I mean, they submitted.
24   Q.   May I -- just so we're all on the same page here, no
25   pun intended, what pages are you looking at right now?
```

Figueroa – D

```
 1   A.    Page 303.

 2   Q.    Page 303.  And that's the I-485 application to register

 3   permanent residence or adjust status?

 4   A.    Yes.

 5   Q.    So continue.

 6   A.    Okay.  On page 303 it says, "Applicant interviewed" on

 7   the right-hand side, upper column.  It was my name stamp on

 8   it, and the date I interviewed the applicant was May 18,

 9   2004.  Under what section of the law to fortify eligibility,

10   it was -- it has an approved visa petition, which means that

11   the I-130 was approved.

12   Q.    And when you say "under section of the law," what does

13   that mean?

14   A.    It is the application of the I-485 under section

15   245(A).

16   Q.    What is that?

17   A.    To adjust that adjustment of status.

18   Q.    And is that based on marriage or not?

19   A.    245(A), no, that's not based on marriage.  That's just

20   for adjustment of status.  The I-130 tells you if it's based

21   on marriage.

22   Q.    That's how you know it's based on marriage?

23   A.    Right.

24   Q.    So can you explain -- you talked about some markings,

25   and maybe we can just cover that.
```

Figueroa – D

```
 1              On this document, from page 303 to 306, there's
 2   various checkmarks and lines.  There's typed things and then
 3   there's handwritten things.
 4              Can you look at this and tell what -- did you --
 5   did you type any of the things on this page?
 6   A.   No.
 7   Q.   So with the exception of the signatures, what are the
 8   handwritten things?
 9   A.   I have my checkmarks, I have my line marks; and I would
10   say "No others," if there is no other information noted on
11   the document that was submitted.
12   Q.   So you're looking at page 304?
13   A.   Right.
14   Q.   And so that line across 304 and "no others" --
15   A.   Right.
16   Q.   -- is your writing?
17   A.   Right.
18   Q.   If you look at page 305 --
19   A.   They are the checkmarks of the questions that I was
20   interested in asking.
21   Q.   And so did you -- and then if we look to page -- I
22   guess if we go back up to page 303, you already talked about
23   some of the handwriting on there and the stamps that you
24   made.
25   A.   Yes.
```

Figueroa – D

1   Q.   So how is it that someone comes in -- you're talking

2   about an interview, but how does that interview take place?

3   How does a person know to come to an interview?

4   A.   A notice of interview was mailed to them prior to the

5   date of the interview, and they were scheduled for interview

6   on specific date.

7   Q.   And do you look at these documents in advance of the

8   interview?

9   A.   In this case, the only time that I have is before I

10   call them to my office.

11   Q.   Okay.  And then who is it you call into your office?

12   A.   I have to call the applicant, the petitioner.

13   Q.   Okay.  So in this case, who did you call into your

14   office?

15   A.   Yusuf Abdallahi Abakar and Morgann Walker.

16   Q.   And this is your office at CIS?

17   A.   Yes.

18   Q.   So did they come in together?  Would they have come in

19   together for the interview?

20   A.   Yes.

21   Q.   And can you explain the process, then?  When they walk

22   in the room, what happens, generally?

23   A.   When they walk in the room and they're inside my room,

24   I have to place them under oath.

25   Q.   And how -- what do you mean by that?

Figueroa - D

1  A.   They have to be -- to certify that all the answers that

2  they give me -- I mean, they have to put under oath that all

3  the answers that are given to the officers is true and

4  correct.

5  Q.   And you put them both under oath?

6  A.   Both of them have to be under oath.

7  Q.   Mr. Abakar and Ms. Walker?

8  A.   Ms. Walker and Abakar.

9  Q.   And then what happens?

10 A.   And then I start interviewing -- not yet.  Excuse me.

11 And then I have to ask for their I.D.

12 Q.   Okay.

13 A.   Okay.  After that, when they're already comfortable,

14 sitting down, I have to start with the I-130.

15 Q.   Okay.

16 A.   The petition first, to establish the marriage, the

17 validity of marriage; and then if the I-130 is approvable,

18 you put your stamp on it.

19 Q.   So turning to page 432, there's some typed information

20 on this page, there's a stamp, and there's handwritten

21 information.  Who -- did you do -- did you put any of the

22 typed information on this page?

23 A.   No.

24 Q.   And do you see some handwritten information?

25 A.   Yes.

Figueroa – D

1    Q.    Is that your handwriting?

2    A.    These are my handwriting.

3    Q.    Okay.  So "Marriage date" is your handwriting?

4    A.    Yes, that's my handwriting.

5    Q.    And how would it come to pass that you would have

6    written that there?

7    A.    Because there was no date of marriage.  Number 8 is

8    asking for date and place of present marriage.

9    Q.    So would you have asked that question during the

10   interview?  How did you get that information?

11   A.    On the biographical data and on the marriage

12   certificate.

13   Q.    And then up on the top, it says, "Section of law

14   201(B), spouse."  Is that checkmark yours?

15   A.    Yes.

16   Q.    And the stamp "Approved," is that yours?

17   A.    Yes.

18   Q.    And the signature is yours?

19   A.    Yes.

20   Q.    But you interviewed Ms. Walker regarding this petition

21   for alien relative at the same time as the defendant?

22   A.    Yes.

23   Q.    In the same room, at the same time?

24   A.    Yes.

25   Q.    Both of them under oath?

Figueroa - D

```
 1    A.    Yes.

 2    Q.    Okay.  Can you talk about the interview?

 3              THE COURT:  It's not a question, Counsel.  Calls

 4    for a narrative.  I'll sustain my own objection to it.

 5    Rephrase it.

 6    BY MS. SARTORIS:  (Continuing)

 7    Q.    After placing them under oath, and then you said that

 8    you looked at the petition for alien relative, did you ask

 9    questions about that petition?

10    A.    Yes.

11    Q.    What questions did you ask?

12    A.    Okay.  First is regarding the U.S. citizen, the

13    petitioner.  You go back -- and all the information that was

14    given there on the application -- and ask them their true

15    name, their correct address, their place of birth, their

16    date of birth, the date they got married.

17    Q.    So you would ask the petitioner and the applicant their

18    names, address; you would confirm that information with

19    them?

20    A.    Yes.

21    Q.    And then what?

22    A.    Then you go to the applicant, confirm that information,

23    and then you go to page 2.

24    Q.    Which is page --

25    A.    And check --
```

Figueroa – D

```
 1   Q.   I'm sorry.  Which is page 433?

 2   A.   433.

 3            Then you go back again and see if the petitioner

 4   had properly signed the document and dated.

 5   Q.   And under the -- what else happened during the

 6   under-oath interview?

 7   A.   You verify with them how they met.  You go over the

 8   time that the couple -- when they met, and do you have any

 9   documents regarding the bona fides of the I-130.

10   Q.   And you probably don't specifically remember the

11   answers to those questions as you sit here.

12            MR. REED:  Objection; leading.

13            THE COURT:  Sustained.

14   BY MS. SARTORIS:  (Continuing)

15   Q.   Do you --

16            THE COURT:  Sustained.

17   BY MS. SARTORIS:  (Continuing)

18   Q.   Do you remember the questions to the answers of that

19   particular interview or the answers to the questions for

20   that particular interview?

21   A.   I can't remember.

22   Q.   So -- but was it your common practice to ask those

23   questions?

24   A.   Yes.

25   Q.   And what would have happened if, during the interview,
```

Figueroa - D

```
 1   answers had been given that would have made you question the
 2   bona fide of the -- bona fides of the marriage?
 3   A.   Then that would be noted in my work sheet that is
 4   attached to the file.  That would have given me -- if there
 5   is anything derogatory, that would be a flag of a not
 6   eligible marriage.  Over here in my notation, I just
 7   requested for documents.
 8   Q.   Okay.  So when you say "over here," what page are you
 9   looking at?
10   A.   469.
11   Q.   469.  What is page 469?
12   A.   This is our processing work sheet.  Starts in 468.  And
13   just a review.  And we put the date of when they did the
14   interview, when we did the interview, and what comments can
15   I put there if there are something that we needed and if
16   there's something derogatory.
17   Q.   And that would include derogatory information from the
18   interview?
19   A.   Right.
20   Q.   So you mentioned that you asked about how they met.
21   A.   Oh, yes.
22   Q.   What other questions did you ask in your practice?
23   A.   I cannot really remember what my questions are during
24   that time, but my normal questioning to the applicant is how
25   they met, just a record of the family, how many brothers or
```

Figueroa - D

```
 1    sisters does she have.  You have to ask the questions based
 2    on the family of each side.
 3    Q.   So who do you ask the questions to about family
 4    members?  Who would you ask that to?
 5    A.   Okay.  I would ask the petitioner if he's aware of any
 6    other relationships that she knows regarding the applicant,
 7    and at the same time, I would also ask if she's aware if the
 8    applicant has any relatives in the United States.  Sometimes
 9    I would ask do you know the parents of this applicant; how
10    many brothers or sisters.
11    Q.   Why would you ask those kinds of questions?
12    A.   To determine a set of questions that would lead me to
13    understand that the petitioner really knows about --
14    something about the applicant.
15    Q.   So the -- the handwriting on pages 468 and 469, is that
16    your handwriting?
17    A.   Yes.
18    Q.   And what does it mean here where it says, on page 468,
19    "Continued 5-18-04"?
20    A.   That at the time I interviewed them in May 18, 2004, I
21    was not able to approve the case because I needed some
22    documents that are important.
23    Q.   And that's the under-oath interview that we just spoke
24    about?
25    A.   Yes.
```

Figueroa – D

```
 1    Q.   So can you tell, by looking at these documents, what
 2    documents you asked for on that date?
 3    A.   I asked for a copy of the birth certificate of Yusuf.
 4    Q.   How do you know that?
 5    A.   It's on page 475.
 6    Q.   On page 475.  What is page 475?
 7    A.   This is a request for document.
 8    Q.   And did you prepare this request?
 9    A.   Yes.
10    Q.   And did you give it to Yusuf Abakar?
11    A.   Yes.
12    Q.   Would you have done it on 5-18?
13    A.   5-18, 2004.
14    Q.   At the end of the interview?
15    A.   At the end of the interview.
16    Q.   And then did you receive the documents you requested?
17    A.   Yes.
18    Q.   How do you know that?
19    A.   It says, "Drop off."
20    Q.   What says drop off?
21    A.   It's on page 475.
22    Q.   What does that mean?
23    A.   That means that they drop off the documents.
24    Q.   Okay.  And is -- this request for documents, does it
25    start on page 475 and then end on page 476?
```

Figueroa – D

```
 1   A.    Yes.

 2   Q.    Now, looking at page 468, did there come a time when

 3   you approved this application?

 4   A.    Yes.

 5   Q.    Can you -- when was that?

 6   A.    It was approved on June 28, 2004.

 7   Q.    How do you know that?

 8   A.    It's noted on 468.

 9   Q.    Who noted it?

10   A.    Me.

11   Q.    Who approved it?

12   A.    Me.

13   Q.    What was that based on?

14   A.    The approval was based on the validity of all the

15   documents that were submitted to me that the marriage is

16   bona fide.

17   Q.    Did you -- would you have asked the applicants about

18   the marriage, why they got married?

19   A.    No, I don't think so.

20   Q.    You don't think you would have asked that?

21         What if a person is -- you're looking for a bona

22   fide marriage.  Would it count as a bona fide marriage if

23   someone was marrying someone in order to get access to an

24   immigration benefit?

25   A.    They cannot be approved.
```

Figueroa - D

```
 1   Q.    Why?
 2   A.    Because you just don't marry somebody in order to get
 3   an -- immigration benefits.  There's certain immigration --
 4   in order to obtain a benefit.
 5   Q.    Is that permitted?
 6   A.    That's not permitted.
 7   Q.    Is that a bona fide marriage?
 8   A.    No.
 9   Q.    What if the situation was the person was marrying
10   someone in order to stay in the country to complete their
11   education?
12   A.    That's not a bona fide marriage.
13   Q.    Why is that?
14   A.    Because of the reason -- it's circumventing reason;
15   just to circumvent immigration in order to get benefit.
16   Q.    Now, you mentioned if someone had a valid reason for
17   not living together, and I think the example you gave was
18   employment in another state, that might be a situation that
19   you would consider and still approve somebody to get a green
20   card or an LPR status.
21   A.    Right.  But they have to send me, also, documents
22   regarding that -- that has to have proof of what they had
23   told you in order to validate.
24   Q.    What if someone told you that they were not -- were not
25   living with their citizen spouse, but their citizen spouse,
```

```
 1    because their citizen spouse lived -- didn't like their
 2    roommate that they had, would that -- what would you think
 3    about that?
 4    A.   That's not a good marriage.
 5    Q.   Why is that?
 6    A.   Because a marriage, they have to be together all the
 7    time, without reasons -- that's another reason to circumvent
 8    immigration.
 9    Q.   Would it be a good reason if somebody lived in -- lived
10    in their -- in a family member's house that wasn't very far
11    away just because they liked to have their own room?
12    A.   That's not a good marriage.
13    Q.   Would that count as a bona fide marriage?  Is that the
14    kind of reason you're talking about when you're saying there
15    has to be a good reason?
16    A.   It has to be a good reason, valid reason.
17    Q.   What types of things might be a good or a valid reason?
18    A.   Okay.  Just like I told you.  It's, first of all,
19    employment.  You could be employed in New York and the
20    husband is here in LA, and you have all the documents to
21    document that.  But then once in awhile -- or sometime you
22    will still see each other and live together.  It's not just
23    totally being in New York and not seeing each other.  That's
24    a valid marriage we could consider.
25    Q.   So when you would look for backup, would you look for
```

Figueroa - D

```
 1   proof that the person worked in New York?

 2   A.   Yes.

 3   Q.   And had to live there?

 4   A.   Yes.

 5   Q.   Would the applicant to register for permanent resident

 6   status be required to tell you that information?

 7   A.   Yes.

 8   Q.   Now, a person -- you mentioned that you looked at the

 9   status, and the status was a student visa, the F-1 status.

10   A.   Yes.

11   Q.   Is a person able to work with a student visa?

12        THE COURT:  Counsel, what difference does that

13   make in this case?  I mean, you have asked a large majority

14   of questions that have nothing to do with the questions of

15   whether or not false statements were made.  That's what this

16   case is about.  It's a false statement case.

17        And this -- this meandering examination is not

18   moving the ball forward with any degree of speed.  You got

19   to move it.  You got to expedite your investigation -- your

20   interrogation at this point.  Do you understand?

21        MS. SARTORIS:  I do, Your Honor.

22        THE COURT:  Then do it.

23   BY MS. SARTORIS:  (Continuing)

24   Q.   If I may just ask that one question:  Is a person on a

25   student visa permitted to work?
```

Figueroa - X

```
 1          MR. REED:  Objection; relevancy.
 2          THE COURT:  Sustained.
 3          MS. SARTORIS:  Your Honor, may I be heard sidebar?
 4          THE COURT:  No.
 5          MS. SARTORIS:  I have no further questions.
 6          THE COURT:  Mr. Reed?
 7          MR. REED:  Thank you.
 8          Your Honor, I was thinking of using the ELMO, but
 9   in order to expedite the process, I was wondering if Agent
10   Hyland assisted me with respect to some of these documents,
11   since he's so good at the PowerPoint presentation.  Would
12   that be okay, Your Honor?
13          THE COURT:  Do you mind?
14          MR. HYLAND:  I don't mind.
15          MR. REED:  Thank you, Your Honor.
16                    CROSS-EXAMINATION
17   BY MR. REED:
18   Q.  Let's turn to page 303 of Exhibit 1.  Do you see that?
19   A.  Yes.
20   Q.  I think it's up on the screen, as well.
21          Now, is this the second type of document that you
22   would go through -- or the first type of document that you
23   would go through during this interview process with the two
24   people?
25   A.  This is the second-type document I have to go through.
```

1   Q.   The first one is to find out if there's a bona fide

2   marriage, correct?

3   A.   Yes.

4   Q.   And that was that I-30 [sic] document, correct?

5   A.   Yes.

6   Q.   And that appears on page 432, and we'll --

7   A.   Yes.

8   Q.   -- bring that up on the screen.

9            Now, on that 432 document, in order to determine

10  whether or not people are married, do they have to submit

11  all kinds of joint utility bills and things of that nature?

12  A.   Not yet.

13  Q.   Okay.  That comes second?

14  A.   That comes second, on the adjustment of status.

15  Q.   And, by the way, this process of becoming a permanent

16  resident, is that known as getting a green card, a permanent

17  residency card?

18  A.   They call it a green card.

19  Q.   People call it --

20  A.   They call it a green card.

21  Q.   Okay.  But this whole process comes before one would

22  apply for citizenship, correct?

23  A.   Yes, sir.

24  Q.   Now, before coming to court to testify today, did you

25  go through the entire Exhibit 1, and go through it to see if

Figueroa - X

1    you recognized any other documents in it besides just the

2    ones that you worked on?

3    A.   Just the ones that I work on.  There are things that I

4    look at, also.

5    Q.   There was other stuff in the --

6    A.   That I -- yeah, that I look at.

7    Q.   Okay.  You had nothing to do with the citizenship

8    application process, did you?

9    A.   No, sir.

10   Q.   Now, I'd like you to take a look at page -- if the

11   agent could assist me -- page 472.  Do you see that?  I

12   don't know if that's up on the screen.

13             Yes.  Thank you.

14             Do you see page 472?

15   A.   Yes, sir.

16   Q.   Is this a letter that commonly goes out to the

17   applicant and the petitioner to let them know when their

18   appointment is going to be at the INS?

19   A.   Supposed to be, yes.

20   Q.   You'll notice it says, "This interview will be

21   videotaped."  Did you notice that there on the letter?

22   A.   Yes, it does.

23   Q.   Did you review the videotape?

24   A.   No, I don't review the videotaping.

25   Q.   Why is there a discrepancy in this letter and you not

Figueroa - X

1   doing a videotape?

2   A.   This is generic.  This letter is generic.  And I am

3   doing the preliminary, which we do not do videotaping.

4   Q.   At all?  For any --

5   A.   Preliminary interviews.

6   Q.   Okay.  So this was not videotaped, in any case,

7   correct?

8   A.   No.

9   Q.   And you don't remember anything that was really said

10  between these two people when you interviewed them

11  concerning how they met, why they met, things of that

12  nature, right?

13  A.   No.

14  Q.   But whatever they said satisfied you that they were

15  married, correct?

16  A.   At that time of the interview.

17  Q.   Do you look for subtle things?  What I mean by that, is

18  do you look, while you're interviewing people, to see if

19  they're married, whether they're touching and kissing and

20  being affectionate to each other?

21  A.   Depends.  Some of them are really showing it to you,

22  but I don't ask for it.

23  Q.   All right.  Do you remember if that was occurring in

24  this case, whether or not the two -- the couple was

25  lovey-dovey?

```
 1   A.    I can't remember.

 2   Q.    Now, when you went through the I-30, you came to the

 3   conclusion that there was a bona fide marriage here.  Isn't

 4   that true?

 5   A.    Yes.

 6   Q.    Did you also ask for some -- you say you asked for some

 7   further information from Mr. Abakar to come at a later time,

 8   which was his birth certificate?

 9   A.    And the attachment for the affidavit of support from

10   the joint sponsor.

11   Q.    And the joint sponsor?

12   A.    In that he needs to be NSEERS at that time;

13   N-S-E-E-R-S.

14   Q.    Inserted?

15   A.    NSEERS.  You know, the process where there was -- in

16   2004, when they have to go through all this immigration

17   purposes from Middle Eastern countries.  They have to be

18   registered as they are here, as a student.

19   Q.    Well, let's talk about the sponsorship papers.

20   A.    Right.

21   Q.    You said you needed that in order to finalize the

22   resident card in this particular case?

23   A.    Right.

24   Q.    Where does that appear in all these documents that you

25   looked at?  Can you find it?
```

Figueroa - X

```
 1    A.   Yes.  Page 344.  I mean, that's 344 from the
 2    petitioner, which is showing me that she does not meet the
 3    requirement for submitting an affidavit of support.  She
 4    does not have enough income -- or no income.
 5    Q.   Now --
 6    A.   So what I did is for -- look at the joint sponsor,
 7    which was submitted by Rochelle Walker.
 8    Q.   Where is that?  What page?
 9    A.   Page 359.
10    Q.   359?
11    A.   Yes, sir.
12    Q.   So, to recap, the petitioner, who was Morgann Walker,
13    she submitted an affidavit of support, but she just didn't
14    have the income to support Mr. Abakar, correct?
15    A.   Yes, sir.
16    Q.   It wouldn't be approved if she was just a sponsor,
17    right?
18    A.   Yes, sir.
19    Q.   You needed somebody who was making some money in order
20    to be a sponsor.  Isn't that true?
21    A.   Yes.  To avoid public charge.
22    Q.   I didn't mean to interrupt you.  What did you say?
23    A.   To avoid being under public charge.
24    Q.   And who was the person who came to Mr. Abakar's rescue
25    to be his sponsor?
```

Figueroa – X

```
 1   A.    It's Rochelle Walker.

 2   Q.    Where does that appear?

 3   A.    On page 359.

 4   Q.    Now, is that a person who would come in for the

 5   interview, as well?

 6   A.    They don't have to.

 7   Q.    Now, you'll notice that this person, Rochelle Walker,

 8   submitted a petition of sponsorship in which she also

 9   included her tax returns.  Isn't that true?

10   A.    Yes, sir.

11   Q.    In order to prove to the INS that she was making good

12   enough money to sponsor Mr. Abakar, correct?

13   A.    Enough money to qualify for the affidavit of support.

14   Q.    You'll notice on page 373 --

15   A.    Yes.

16   Q.    -- that she personally signed this sponsorship

17   document.  Isn't that true?

18   A.    Yes.

19   Q.    Does this have to be signed under penalty of perjury?

20   A.    It does not say in this one.

21   Q.    But it has to be at least subscribed and sworn as true

22   before a notary?

23   A.    It has to be notarized.

24   Q.    And in support of that sponsorship document, she also,

25   I believe, submitted some proof that she was a teacher, her
```

Figueroa - X

```
 1    California tax returns, and things of that nature, didn't

 2    she?

 3    A.   Yes, sir.

 4    Q.   So she was helping her daughter along with this

 5    process, wasn't she?

 6              MS. SARTORIS:  Objection, Your Honor.

 7              MR. REED:  I'll withdraw it.

 8              THE COURT:  Excuse me?

 9              MR. REED:  I'll withdraw that question, Your

10    Honor.

11              THE COURT:  All right.

12    BY MR. REED:  (Continuing)

13    Q.   Who was Rochelle Walker?

14    A.   This, at that time -- I think this is the mother of

15    Morgann Walker.

16    Q.   How did you find that out?

17    A.   I asked them.  I would always ask what is the

18    relationship of this joint sponsor.

19    Q.   So it looked like Mother was helping out Daughter,

20    doesn't it?

21    A.   It looks like the mother submitted the document in

22    order to satisfy the affidavit of support.

23    Q.   Which would, in turn, assist the applicant; in this

24    case, Mr. Abakar, correct?

25    A.   Yes.
```

Figueroa – X

```
 1  Q.   And it would also assist the petitioner who is
 2  petitioning for the applicant, correct?
 3  A.   Yes.
 4  Q.   So she was involved in this process, wasn't she?
 5  A.   On the affidavit of support only.
 6  Q.   Okay.  Now let's turn to page 303, which is the second
 7  thing you go through, if I'm correct.  And the 303, that's
 8  the actual application to register permanent resident or
 9  adjust the status, true?
10  A.   Yes, sir.
11  Q.   Now, on this one, this one, as a general rule, has to
12  be supported with lots of documents that prove that there is
13  this commingling of assets and a common address; proof that
14  they're living together.  Isn't that true?
15  A.   It's true, yes.
16  Q.   And you looked through all of these documents at the
17  time, and you were satisfied --
18  A.   At that time I look at the consistency of the
19  documents, and I was satisfied at that time.
20  Q.   Now, I want to find out a little bit more about this
21  term "commingling."  If a -- you've become an expert in this
22  process of interviewing and approving these particular
23  applicants.  You've been doing it for many years.  Isn't
24  that correct?
25  A.   Yes, but I still made goofs sometimes.  Okay?  I'm a
```

Figueroa - X

1    human being.

2    Q.    Sure.

3          Now, here's the hypothetical that I want to give

4    to you.  If a couple is really married, a bona fide

5    marriage, and they're living together, actually living

6    together, and all the utility bills are in both the people's

7    names -- are you following me so far?

8    A.    Yes, sir.

9    Q.    -- the gas is in both their names, the electricity, the

10   Time Warner cable, whatever, tax returns are in both their

11   names -- are you following me so far?

12   A.    Yes, sir.

13   Q.    -- but let's just say that in real -- in reality, the

14   husband is the person who is working but the wife is not,

15   and by virtue of the husband paying the bills for these

16   joint utility registrations, does that disqualify a person

17   from becoming -- of gaining a green card?

18   A.    No.

19   Q.    That's because normally the -- one of the spouses is

20   working, right?

21   A.    Yes.

22   Q.    So the Immigration and Naturalization Service does not

23   require both people to pay 50-50 on these particular bills.

24   Isn't that true?

25   A.    Yes.  But --

1          MR. REED:  Well, Your Honor, I --

2          THE WITNESS:  -- there are other documents --

3          MR. REED:  I would move to strike any answer

4   after --

5          THE WITNESS:  Yes.

6          THE COURT:  All right.  Stricken.  Next question.

7   BY MR. REED:  (Continuing)

8   Q.   Normally, as a general rule, when people are applying

9   for residency status, do you try to ask questions of them as

10  to which person is the breadwinner amongst the couple, who

11  is making the money?  Do you ask those kinds of questions?

12  A.   Sometimes we do, but the documents that they are

13  submitting tells me already, so it's just redundant to ask

14  them again.  You see who is -- who has the job, and you will

15  see from the documents who doesn't.  Their income tax return

16  will tell you.

17  Q.   Okay.  So in this particular case, they did submit

18  income taxes, didn't they -- income tax returns?

19  A.   Yeah.

20  Q.   And it showed that Mr. Abakar was the breadwinner.

21  Isn't that true?

22  A.   Yes.

23  Q.   And can you take us to tax returns, just so that we can

24  review them real quickly?  And we'll finish with those

25  documents, at least.

Figueroa – X

 1              Where are the tax returns that Mr. Abakar
 2    submitted?  Would they have appeared -- 351, page 351?
 3    A.    351.
 4    Q.    Yes.  All the way through several other pages after
 5    that?
 6    A.    Yes.
 7    Q.    Okay.  So just because one person is the breadwinner
 8    doesn't disqualify them from getting a green card for a
 9    particular spouse, true?
10    A.    Yes, sir.
11              MR. REED:  I'm almost finished, Your Honor.  Can I
12    check my notes?
13              THE COURT:  Sure.
14    BY MR. REED:  (Continuing)
15    Q.    During the review process of this exhibit that you made
16    before coming to testify in this case, did it refresh your
17    recollection as to whether you conducted any other
18    interviews besides this one interview?
19    A.    Any other parties?
20    Q.    Did you ever do any other interviews of this couple at
21    any other time?
22    A.    No, I don't remember.
23    Q.    And that interview took place on May 18th, 2004,
24    correct?
25    A.    Yes.

Figueroa - X

```
 1   Q.   I'd like to show you one document and ask you some
 2   questions about that, and that is on page 435.  And that's a
 3   document that's submitted -- correct me if I'm wrong --
 4   during the process where you're trying to find out if the
 5   marriage is bona fide.  Is that right?
 6   A.   Yes.
 7   Q.   And here is the license and -- I mean, the actual
 8   marriage license of this couple.  Do you see that?
 9   A.   Yes.
10   Q.   Is that something that was submitted by Mr. Abakar in
11   this case?
12   A.   It was in -- yes, it is.
13   Q.   It was in the --
14   A.   It was submitted already in the file --
15   Q.   Right.
16   A.   -- when I got it.
17   Q.   So you didn't submit it, so he had to have been the
18   person submitting it, correct?
19   A.   He had to be, or the petitioner.  It was already in the
20   file.
21   Q.   Or the petitioner, Ms. Walker, correct?
22   A.   Right.
23   Q.   But what I'm asking you is this:  Do you inspect this
24   document to see if there's any kind of hanky panky with
25   respect to these marriage licenses, to see if they look
```

Figueroa - X

```
 1   real?
 2   A.   Yes, we do.
 3   Q.   Now, for example, do you ever inspect them to see if,
 4   for example, a marriage license is taken out on -- is
 5   issued, actually given to the couple, on one day and then
 6   the marriage ceremony takes place on the same day,
 7   indicating to you that this looks like a quickie marriage
 8   occurred.  Something is fishy.  Do you ever do that?
 9   A.   We check the dates.
10   Q.   You do?
11   A.   We do.
12   Q.   Why?
13   A.   Just like what you said.
14   Q.   Because it --
15   A.   It could be a sign.  You know, one day is a quickie
16   marriage.  So what?  Then you go further and ask questions.
17   Q.   Now, on this particular case, when was the marriage
18   license issued?
19   A.   Okay.  This one was issued May 19, 2003.
20   Q.   That's a couple weeks before the marriage even
21   occurred, isn't it?
22   A.   Yes, sir.
23   Q.   So this -- none of this situation where somebody is
24   getting the marriage license on the same day, going off to
25   be married on the same day, is there, in this case?
```

Figueroa – ReD

```
 1    A.    No.

 2    Q.    Isn't that true?

 3    A.    This is weeks before they got married.

 4    Q.    Well, 5-19 is just a little bit more than a week before

 5    June -- I believe the date was June --

 6    A.    30.

 7    Q.    -- June 30th.

 8          So it had been more than a week, right?

 9    A.    Yes.

10    Q.    One week would have been 7 plus 19.  That would have

11    been up to the 15th -- May 25th, correct?  Would you agree

12    with me?

13    A.    Yes.

14    Q.    So it would have been two weeks later that they got

15    married; a little bit -- maybe under two weeks?

16    A.    A little bit.

17          MR. REED:  I have no further questions.

18          THE COURT:  All right.  Any redirect?

19          MS. SARTORIS:  Just one brief, clarifying

20    question.

21                   REDIRECT EXAMINATION

22    BY MS. SARTORIS:

23    Q.    Defense counsel was asking you about the process when

24    you were trying to determine if the marriage was bona fide

25    in reference to the I-130 application.  But did that process
```

```
 1  continue as you evaluated the I-485 application documents,

 2  as well?

 3  A.   Could you repeat the question, please?

 4  Q.   When you were reviewing the I-485 documents -- document

 5  and the supporting materials, were you assessing whether or

 6  not the marriage was bona fide?

 7  A.   Yes.

 8  Q.   And during the interview, as well?

 9  A.   Yes.

10         MS. SARTORIS:  Thank you.  I have no further

11  questions.

12         MR. REED:  Nothing further.

13         THE COURT:  All right.  Call your next witness.

14         MS. SARTORIS:  The government calls John Henson,

15  USCIS Senior Adjudications Officer.

16         THE CLERK:  Please raise your right hand.

17         (The oath was administered.)

18         THE WITNESS:  I do.

19         THE CLERK:  Please have a seat.  Please state your

20  name, spelling your last name for the record.

21         THE WITNESS:  My name is John Henson, H-E-N-S-O-N.

22         THE COURT:  Go ahead, Counsel.

23         MS. SARTORIS:  Thank you, Your Honor.

24  /////

25  /////
```

```
 1                         JOHN HENSON,

 2   called as a witness in behalf of the Plaintiff, having been

 3   first duly sworn, is examined and testifies as follows:

 4

 5                      DIRECT EXAMINATION

 6   BY MS. SARTORIS:

 7   Q.   Good afternoon, Mr. Henson.

 8   A.   Good afternoon.

 9   Q.   What is your job?

10   A.   I'm a senior adjudications officer with United States

11   Citizenship and Immigration Services.  I work at the

12   California Service Center in Laguna Niguel.

13   Q.   And how long have you held a position as a United

14   States Citizenship and Immigrations Services officer?

15   A.   I began in October 2003.

16   Q.   And at that time, was that -- was USCIS referred to as

17   INS?

18   A.   No.  It was just after the breakup.

19   Q.   Okay.  So if I always refer to it as "CIS," you're not

20   going to be confused about what it is I'm talking about?

21   A.   No.

22   Q.   So could you briefly describe your background with CIS?

23   A.   I'm an adjudications officer.  I began in October 2003.

24   I adjudicate petitions and applications for immigration

25   benefits, which basically means someone is requesting a
```

Henson - D

1  benefit.  I will review that application or petition for

2  completion and eligibility, and either grant it or deny it,

3  based on the evidence.

4  Q.   And as part of your training and experience, was there

5  a time when you adjudicating I-751 petitions?

6  A.   Yes.  From 2004-2005 until August 2006 I adjudicated

7  751 petitions, and then again from November 2007 until

8  September 2008, I did it intermittently.

9  Q.   And what's your current petition?

10  A.   I'm a senior adjudications officer, which I'm

11  responsible for mentoring, training, answering questions,

12  researching, sometimes adjudicating more complex cases.

13  Q.   And do you see an exhibit book in front of you that's

14  marked Government's Exhibit 1?  Or it's just marked --

15  A.   Volume I of III?

16  Q.   Yes.

17       If I could ask you to turn your attention to page

18  251 of that exhibit.

19  A.   Okay.

20  Q.   Pages 251 and 252, what are those documents?

21  A.   This is the I-751, the petition to remove conditions on

22  residence.

23  Q.   And what is that?

24  A.   Basically, many people can obtain permanent residency

25  in the United States through marriage.  If that marriage is

Henson - D

1    less than two years at the time that the residence is

2    granted, they will have a permanent residence which is

3    conditional, which forces them to file this petition, which

4    allows USCIS to take a second look at the marriage, to make

5    sure that it was a bona fide marriage; that the parties did

6    not enter into the marriage for purposes of getting a green

7    card.

8    Q.   And what happens if this petition is approved?

9    A.   Once this petition is approved, the immigrant, or the

10   person that has the permanent residence, will get a

11   brand-new card.  They call is the tenure card, which is

12   permanent residence, without any conditions.

13   Q.   Now looking at this document on pages 251 and 252, did

14   you adjudicate this particular document?

15   A.   I did not.

16   Q.   So are you here testifying as an expert on the process?

17   A.   I am.

18   Q.   Now, could you explain, looking at the petition on page

19   251, what is it that the CIS adjudicator would be looking at

20   when evaluating this petition?

21   A.   Well, they should look at the whole petition in its

22   entirety including the name; the address; the basis for the

23   petition; whether they're still together; the addresses, of

24   course; whether it's signed by both the United States

25   citizen spouse and the permanent resident; making sure it's

1   complete and there's no missing information.

2   Q.    Then are there other documents submitted in, along with

3   this petition?

4   A.    Typically, there should be, including a copy of the

5   permanent resident's green card, evidence to show that the

6   marriage is bona fide.  For example, tax records, utility

7   bills, birth certificates of any children to the marriage.

8   Q.    And why do utility bills and tax records speak to the

9   bona fide marriage question at this stage, the 751 stage?

10  A.    For two reasons.  It could show that they're

11  commingling of funds, that they're both responsible for

12  bills, and it should also show that they're living in the

13  same residence.

14  Q.    Why is that important?

15  A.    Well, it's important that we have them -- that we see

16  them living at the same residence.  If we do not see that

17  they're living at the same residence, well, while it's not

18  disqualifying, it could be an indication that there is a

19  problem or that the marriage might not be bona fide.

20  Q.    What would happen if they were not living at the same

21  residence?

22  A.    Typically, we refer for further investigation, which is

23  we have the option to ask for more evidence.  We could refer

24  it to the district or we can refer it to the fraud

25  interview.

Henson - D

```
 1   Q.   So CIS would take additional steps to investigate or
 2   review the bona fide marriage?
 3   A.   We'd investigate further until we are assured that
 4   it's -- there's a perfectly good reason why they're living
 5   separate or confirm that the marriage is not bona fide.
 6   Q.   Is there someplace on this petition that if a person --
 7   that reflects where the people are married, this I-751
 8   petition?
 9   A.   I'm sorry.  Could you repeat that?
10   Q.   Could you point out where on the petition it talks
11   about where the people are married?  You said you look at
12   the addresses, of course, where they're living.
13   A.   Okay.
14   Q.   Sorry.
15   A.   On part one, they have the information, including the
16   address of the permanent resident, and then on the second
17   page on part four, it will have the address of the United
18   States citizen spouse.
19   Q.   So you said if people live separately, you might
20   consider it and investigate it.  Would the person -- would
21   people filling out this petition be required to provide
22   truthful information about the actual addresses?
23   A.   Always.  Actually, in fact, it's the law that they're
24   required to provide truthful information.
25   Q.   And why is it that truthful information is important?
```

1   A.   It's important for us to be able to address that

2   they're truly eligible for the benefit that they're asking

3   for.

4   Q.   So if someone doesn't provide truthful information

5   about an address where a citizen spouse is living, what does

6   that mean?

7   A.   It would suggest that there's fraud involved.

8   Q.   Looking at this application, specifically on page --

9   can you tell us what address the applicant, the permanent

10   resident, used?

11   A.   He used 4123 Santa Rosalia Drive, Apartment A, in Los

12   Angeles, California.

13   Q.   Is that in part one of page 251?

14   A.   Correct.

15   Q.   Then looking down on part two, there's a box that's

16   checked "A."  Who -- is that a box that CIS checks?

17   A.   I'm sorry.  Could you repeat that?

18   Q.   The box that's checked on part two of that same page --

19   A.   Correct.  That's checked by the applicant or the

20   petitioner themselves.  It's not checked by USCIS.

21   Q.   What does this box say?

22   A.   That's showing us that -- that the applicant, the

23   permanent resident, is applying for this benefit together

24   with his or her spouse; that they are not divorced.

25   Q.   Is a person required to check one of these boxes in

```
 1   part two in order to apply to petition to remove conditions?
 2   A.   Yes.  They have to have a basis for filing.
 3   Q.   And so is part A the basis for filing?
 4   A.   Correct.
 5   Q.   Looking further on part -- to part four, what
 6   information -- what does that information ask?  What does
 7   that mean?
 8   A.   That's the name and address of the United States
 9   citizen spouse who actually brought or actually petitioned
10   for the permanent resident.  We see here Morgann Ann Walker.
11   Her address is 4123 Santa Rosalia Drive in Los Angeles, as
12   well.
13   Q.   I'm sorry.  You said -- did you say Morgann Ann Walker?
14   A.   Yes.  Morgann Walker.  I'm sorry.
15   Q.   The address?
16   A.   4123 Santa Rosalia Drive, Los Angeles.
17   Q.   Is this document signed under penalty of perjury?
18   A.   It is.  There's a warning in part five, right under
19   where it requires the signature.
20   Q.   What does that say?
21   A.   It says, "I certify under penalty of perjury of the
22   laws of the United States that this petition and the
23   evidence submitted with it is all true and correct."
24             Do you wish I continue reading?
25   Q.   Yes.
```

Henson - D

```
 1   A.   "If conditional residence was based on a marriage, I
 2   further certify that the marriage was entered in accordance
 3   with the laws of the place where the marriage took place and
 4   was not for the purpose of procuring an immigration benefit.
 5   I also authorize the release of any information from my
 6   records that the Bureau of Citizenship and Immigration
 7   Services needs to determine eligibility for the benefit
 8   being sought."
 9   Q.   And who signs in this section?
10   A.   It's both the permanent resident and the United States
11   citizen spouse.
12   Q.   What's the date of this application?
13   A.   It was signed on March 13th, 2006.
14   Q.   Now, when someone is adjudicating a 751 petition, is
15   there an interview that takes place as part of this process?
16   A.   It is required.  However, it can be waived if the
17   initial adjudicator determines that the marriage was not
18   entered into for purposes of getting the immigration
19   benefit.
20   Q.   How -- how would the adjudicator come to that
21   conclusion?
22   A.   He or she would review all the documents of the
23   evidence submitted, like we talked about; tax returns, birth
24   certificates of children.  And if he or she is satisfied,
25   then he or she can approve the petition.
```

Henson - D

```
 1   Q.   Now, is the person reviewing it looking only at the
 2   documents that were submitted in support of the I-751
 3   petition specifically?
 4   A.   No.  The I-751 will come in the permanent resident
 5   permanent file.  We call it the A-File, which will have the
 6   previous immigration documents, which would be available for
 7   review.
 8   Q.   And is an adjudicator -- would an adjudicator look at
 9   those documents?
10   A.   They should.  And the purpose would be to determine if
11   there are any inconsistencies between what is being
12   submitted today and what was previously submitted with the
13   original documents.
14   Q.   What types of inconsistencies might they look for?
15   A.   For example, documents that are required to show where
16   the couple resided previously.  They may say today that they
17   lived in this residence from a certain date; however, at the
18   time of the adjudication of the permanent residence, it may
19   have a different date or different residence.
20   Q.   So through the I-751 petition, the information about
21   where the citizen spouse and the permanent -- the petitioner
22   resides, that is important to CIS?
23   A.   It is important.
24   Q.   And looking through -- if I could just draw your
25   attention, quickly, to some of the documents that are
```

Henson - D

1  submitted in support of this, there were tax documents that

2  you talked about.  Then you go to page 279.  There's a

3  triple A renewal card.  Why would this be submitted?

4  A.   They may be trying to show that they have a joint

5  residence and commingling of funds.

6  Q.   Those are the things that CIS is looking for?

7  A.   Correct.

8  Q.   What about -- the next page is a utility bill for the

9  gas company.  What does this show?

10  A.   It shows both names of the couple, both the United

11  States citizen and the -- and her spouse, the permanent

12  resident, and it's an attempt to show that they live in the

13  same residence.

14  Q.   In a couple of pages there's a Citibank document, a

15  Visa check, Washington Mutual documents.  Why -- there's

16  other Washington Mutual documents in here, too.  What are --

17  the bank information, what does that ask?  Why is that in

18  here?

19  A.   To show that they're commingling their funds; that

20  they're a couple where they're going to share not only their

21  life but their money.  I guess, if we can assume that if

22  they're sharing their money, they are sharing their life, as

23  well.

24  Q.   All the information that is evaluated when CIS

25  adjudicated and I-751 petition, where does that information

1   come from?

2   A.   Can you repeat the question?

3   Q.   Who provides the information to CIS?

4   A.   It's the permanent resident and his or her spouse.

5   Q.   In looking at this, can you tell if an interview was

6   conducted?

7   A.   It was not.

8   Q.   And how can you tell that?

9   A.   Going back to page 251, in the box on the left, there's

10  certain information that's for CIS use only.  There's a box

11  which indicates "Petitioner interviewed on" and it's blank.

12  Q.   So if the petitioner had been interviewed, there would

13  be a date?

14  A.   There should be, yes.  It should be checked with a

15  date.

16  Q.   Looking at this, can you tell if CIS -- looking at page

17  251, can you tell if the CIS approved or denied this

18  petition?

19  A.   It was approved.

20  Q.   How do you know that?

21  A.   There's an approval stamp, the USCIS approval stamp,

22  that is signed by the officer who, in fact, approved it.

23  Q.   And when was it approved?

24  A.   May 24th, 2006.

25  Q.   You talked about how the person has to certify that

Henson - D

```
 1    they're not applying for the purpose of procuring an
 2    immigration benefit.  That's in part of the signature
 3    section that you read?
 4    A.   Correct.
 5    Q.   Is a person permitted to file an application to remove
 6    conditions on residence for the purpose of completing their
 7    education?
 8    A.   No, because education as a citizen in the United States
 9    is an immigration benefit.
10    Q.   What about for the purpose of avoiding deportation?
11    A.   That, again, is an immigration benefit, and it would
12    not be permitted.
13    Q.   What about the purpose of solely allowing a person to
14    stay in the United States?
15    A.   Again, that's an immigration benefit, and it would not
16    be permitted.
17    Q.   What would happen if CIS determined the marriage was
18    not bona fide?
19    A.   It would be denied ultimately, the petition, the 751.
20         MS. SARTORIS:  Thank you, Your Honor.  I have no
21    further questions.
22         THE COURT:  How long are you going to be?
23         MR. REED:  I'm not going to be any time at all,
24    Your Honor.  I have no questions.
25         THE COURT:  Okay.  Fine.  Thank you.
```

```
 1              All right.  You may step down.  Thank you.

 2              All right.  Ladies and gentlemen, then, we will

 3    recess for the day at this point.  We will resume tomorrow

 4    morning at 8:30.  I'll remind you, over the course of the

 5    evening, that you should not discuss the case between or

 6    amongst yourselves or with any other person.  You should not

 7    form or express any opinions on the matters pending before

 8    this court.  You should not read, listen to, or watch any

 9    reports that might exist regarding the case, or conduct any

10    independent investigation research or inquiry.

11              The jury is excused until 8:30 tomorrow morning.

12    We'll be in recess.

13              THE CLERK:  All rise.

14              (Proceedings concluded at 5:08 p.m.)

15              (End excerpt.)

16

17                     C E R T I F I C A T E

18

19         I hereby certify that the foregoing is a true and

20    correct transcript from the stenographic record of the

21    proceedings in the foregoing matter.

22

23    /s/Bridget R. Montero
      Bridget R. Montero               Date:  January 20, 2012
24    Official Court Reporter
      CSR No. 10020
25
```