UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION


UNITED STATES OF AMERICA,           )
                                    )
                   Plaintiff,       )   No. CR 11-388(A)-GAF
                                    )
          v.                        )
                                    )
YUSUF ABDALLAHI ABAKAR,             )
                                    )
                   Defendant.       )


TRANSCRIPT OF PROCEEDINGS

THE HONORABLE GARY ALLEN FEESS

U.S. DISTRICT JUDGE PRESIDING

LOS ANGELES, CALIFORNIA

DECEMBER 7, 2011


JURY TRIAL – DAY 2

EXCERPTED P.M. SESSION


BRIDGET R. MONTERO, CSR 10020, CRR
United States Courthouse
312 North Spring Street, Room 435
Los Angeles, California 90012
www.bridgetmontero.com
Internal File No. 11095

```
 1   APPEARANCES OF COUNSEL:

 2

 3   For the Plaintiff:

 4

 5   Office of the United States Attorney
     BY:  MELANIE SARTORIS
 6   1300 United States Courthouse
     312 North Spring Street
 7   Los Angeles, CA 90012

 8

 9   For the Defendant:

10

11   Law Offices of David R. Reed
     BY:  DAVID R. REED
12   3699 Wilshire Boulevard, Suite 850
     Los Angeles, CA 90010
13

14

15

16

17                              - - - - -

18

19

20

21

22

23

24

25
```

```
1                              INDEX

2

3                                    D     X    ReD    ReX

4    For the Plaintiff:

5

6    DARRELL WALKER                                      163

7    JAMES BAKER, JR.            165   174   180

8    PA OMAR NJIE                182   186   190

9    MORGANN WALKER              191   223

10

11

12                         EXHIBIT INDEX

13           Exhibit No.              Received

14

15            46                        171
              47                        173
16          90 - 96                     191
             100                        191
17           101                        191
          104 - 109                     191
18            45                        212

19

20

21                      - - - - -

22

23

24

25
```

D. Walker – ReX

```
 1              WEDNESDAY, DECEMBER 7; 2011; 1:11 P.M.

 2                        - - - - -

 3

 4         (Begin excerpt.)

 5         THE CLERK:  Please be seated and come to order.

 6    This United States District Court is again in session.

 7         THE COURT:  All right.  Mr. Walker is back for a

 8    question or two.  And we have all of the jurors back and in

 9    their seats for day two, session three.

10         Mr. Reed.

11

12                    DARRELL WALKER,

13    called as a witness in behalf of the Plaintiff, having been

14    previously duly sworn, is examined and testifies as follows:

15

16                  RECROSS EXAMINATION

17    BY MR. REED:

18    Q.   Mr. Walker, do you remember your son, Brandon, driving

19    around in a Honda Accord?

20    A.   Yes.

21    Q.   And do you have personal knowledge with respect to

22    where he got that car?

23    A.   I bought him a Honda at some point.

24    Q.   Is that the one that he was driving around?

25    A.   That's the only one I know of.
```

D. Walker – ReX

```
 1   Q.   And did that Honda break down --
 2            THE COURT:  Could we get a year or time frame?
 3   BY MR. REED:  (Continuing)
 4   Q.   What year was it that you bought him a Honda?
 5   A.   I don't know.  I don't remember.  I'd say 12 years ago,
 6   maybe.
 7   Q.   One other area that I wanted to ask you about, and
 8   that's a student loan that Morgann took out to go to
 9   college.  Did you have anything to do with obtaining a
10   student loan for her while she went to college in Atalanta?
11   A.   I believe so.
12   Q.   Did you have anything to do with paying off the student
13   loan after she came back?
14   A.   Not sure what you mean by "anything to do with."
15   Q.   Did you make any payments on the student loan?
16   A.   Yes.
17   Q.   Were you aware, personally, of whether anybody else was
18   paying down that loan?
19   A.   No, I wasn't.
20            MR. REED:  I have no further questions.
21            THE COURT:  Anything further from the government?
22            MS. SARTORIS:  No, Your Honor.
23            THE COURT:  All right.  Call your next witness.
24            MS. SARTORIS:  The government calls James Baker --
25   James Baker, Jr.
```

Baker – D

```
 1                THE COURT:  Mr. Reed, I can almost hear you up
 2   here.  You might want to keep your private conversations
 3   private.
 4                MR. REED:  Oh, sorry.
 5                THE CLERK:  Raise your right hand.
 6                (The oath was administered.)
 7                THE WITNESS:  Yeah.
 8                THE CLERK:  Please have a seat.
 9                Please state your name, spelling your last name
10   for the record.
11                THE WITNESS:  James O. Baker, Jr., B-A-K-E-R.
12                THE COURT:  Go ahead, Counsel.
13                MS. SARTORIS:  Thank you, Your Honor.
14
15                          JAMES BAKER, JR.
16   called as a witness in behalf of the Plaintiff, having been
17   first duly sworn, is examined and testifies as follows:
18
19                        DIRECT EXAMINATION
20   BY MS. SARTORIS:
21   Q.   Good afternoon, Mr. Baker.
22   A.   Hi.
23   Q.   Hi.
24                Do you know someone named Morgann Blair Walker?
25   A.   Yes.
```

Baker – D

```
 1    Q.    And how do you know her?

 2    A.    She's my niece.

 3    Q.    Was there a time when you lived with her?

 4    A.    Yes.

 5    Q.    Do you know when it was when you first began to live

 6    with her?

 7    A.    '02, I think.

 8    Q.    What's your time frame for thinking it was '02?

 9    A.    It was right after my mother passed, and my father

10    asked me to move in to take care of his business and help

11    him.

12    Q.    So you moved in to -- in with your father after your

13    mother passed?

14    A.    Yes.

15    Q.    And what was that address?

16    A.    3920 Sixth Avenue.

17    Q.    And your recollection of the year your mother passed is

18    which year?

19    A.    '02, I believe.

20    Q.    Are you sure about that?

21    A.    No.

22    Q.    It's just your best estimate?

23    A.    Yes.

24    Q.    So from the time your mother passed until when did you

25    live at the Sixth Avenue address?
```

Baker – D

```
 1   A.   Up until last year, in -- I believe it was June, when
 2   my father passed.
 3   Q.   June of 2011 or 2010?
 4   A.   2010.
 5   Q.   And then during that time period, from when your mother
 6   passed until sometime after your father passed, were you
 7   living at the -- 3920 Sixth Avenue the entire time?
 8   A.   Yes.
 9   Q.   And who else were you living with?
10   A.   My niece and the defendant.
11   Q.   So you said the defendant, but maybe you could point
12   who it is you're talking about and describe what he's
13   wearing.
14   A.   He's wearing a black suit and gray tie.
15        THE COURT:   Indicating the defendant, for the
16   record.
17   BY MS. SARTORIS:   (Continuing)
18   Q.   So starting with your niece, when did she move into the
19   Sixth Avenue address?
20   A.   She moved in right before I did.
21   Q.   And how do you know that?
22   A.   Because she was there when I got there.
23   Q.   Fair enough.
24        And was -- did she live there with you the entire
25   time at the Sixth Avenue address --
```

Baker - D

```
 1   A.    Yes.

 2   Q.    -- until your father passed?

 3   A.    Yes.

 4   Q.    And now moving to the defendant, when was it that he

 5   first came to live at the Sixth Avenue address?

 6   A.    Near the beginning of -010.

 7   Q.    Beginning in the year of 2010 sometime?

 8   A.    Yeah, yeah.

 9   Q.    And how long did he --

10   A.    Well, it might have been at the end of 2009, but right

11   around that time period.

12   Q.    How long did he live there?

13   A.    Until my father passed.

14   Q.    So did everybody move out of the Sixth Avenue address

15   after your father passed?

16   A.    Yes.

17   Q.    And why was that?

18   A.    So I could get the house ready to be sold.

19   Q.    And could you tell us about the conversation you had

20   with the defendant about him moving into the Sixth Avenue

21   address?

22   A.    Moving in?

23   Q.    Yes.

24   A.    He wanted to know if I had a room available for him to

25   rent.
```

Baker - D

```
 1   Q.   And did you?

 2   A.   Yes.

 3   Q.   And did you talk about whether or not he would pay you

 4   rent?

 5   A.   Yes.

 6   Q.   What was the agreement you reached?

 7   A.   That he'd pay $400 a month; basically $100 a week.

 8   Q.   Did he pay that?

 9   A.   Yes.

10   Q.   Who did he -- did he pay it to you?

11   A.   Yes.

12   Q.   Now, Morgann was already living there.  Is that right?

13   A.   Yes.

14   Q.   So when the defendant asked for a room to rent, he

15   meant a room different than Morgann's?

16   A.   Yes.

17   Q.   And did you rent him a room?

18   A.   Yes.

19   Q.   Was it different than Morgann's?

20   A.   Yes.  It was right across from her.

21   Q.   And where was your room at the time?

22   A.   At the very back of the upstairs.

23   Q.   So if I could ask you -- there's an exhibit book --

24   there's a couple of them, but one of them says III of III on

25   it.
```

Baker – D

```
 1    A.    Okay.

 2    Q.    Could you turn in that book to the blue tab that's

 3    marked 46, Exhibit 46?

 4    A.    Yeah.

 5    Q.    And if you turn to the page that has the yellow tab, it

 6    has a map.  Do you see that map?

 7    A.    Yes.

 8    Q.    Do you recognize -- look at the "A" on the map.

 9    There's a bubble with an "A" on it.

10    A.    Yeah.

11    Q.    Do you recognize the location of that?

12    A.    Yeah.  That's where my house was.

13    Q.    That's the Sixth Avenue address you were talking about?

14    A.    Yes.

15    Q.    If you turn the page, there's a picture.  Do you see

16    that?

17    A.    Yeah.

18    Q.    Do you see the picture behind the map on --

19    A.    Yes.

20    Q.    Do you recognize that picture?

21    A.    Yes.  That's the house.

22          MS. SARTORIS:  Your Honor, I'd like to move

23    Exhibit 46 into evidence.

24          THE COURT:  Any objection?

25          MR. REED:  No, Your Honor.
```

Baker - D

```
 1              THE COURT:  It's received.

 2              (Exhibit 46 received.)

 3              MS. SARTORIS:  Thank you.

 4    BY MS. SARTORIS:  (Continuing)

 5    Q.   So, Mr. Baker, when you moved into the address -- the

 6    Sixth Avenue address, looking at the picture of the house,

 7    just looking at the picture of the house --

 8    A.   Yeah.

 9    Q.   -- can you describe where -- did Morgann Walker -- the

10    entire time she was living there, did she have her own room?

11    A.   Yes.

12    Q.   Where was her room when you first moved in?

13    A.   When I first moved in, it was downstairs to the left,

14    and then as -- then as my father got his health decline, I

15    had him -- I moved him into that room and her upstairs, in

16    the room right next to the chimney there.

17    Q.   So is -- the first room you're talking about, is it a

18    room on the bottom left-hand floor that would be behind that

19    tree?

20    A.   Yes.

21    Q.   And then when your father's health declined, she moved

22    upstairs into the -- is it the window that's on the top

23    right?

24    A.   Yes.

25    Q.   Next to the chimney?  Yes?
```

Baker - D

```
1    A.    Yes.

2    Q.    And that was her room?

3    A.    Yes.

4    Q.    Was that the room until the day she moved out?

5    A.    Yes.

6    Q.    And then you mentioned at some point the defendant

7    approached you at the end of -- beginning of last year --

8    beginning of 2010, end of 2009 time period --

9    A.    Yeah.

10   Q.    -- and asked if he could rent a room from you.

11              What room did you rent to him?

12   A.    You can't really see it.  It's all the way to the left,

13   on the top floor.

14   Q.    Okay.  And the window -- is there a window that's

15   obscured by that tree?

16   A.    Yes.

17   Q.    So if I could ask you to look at Exhibit 47, it's the

18   next exhibit.

19   A.    Yeah.

20   Q.    You'll see -- do you recognize this picture?

21   A.    Yes.

22   Q.    What is it?

23   A.    A picture of the house and my truck.

24   Q.    That's your truck, the Total Service truck?

25   A.    Yeah.
```

Baker - D

1           MS. SARTORIS:  Your Honor, I'd like to move

2    Exhibit 47 into evidence.

3           THE COURT:  Any objection?

4           MR. REED:  No, Your Honor.

5           THE COURT:  Received.

6           (Exhibit 47 received.)

7    BY MS. SARTORIS:  (Continuing)

8    Q.   You'll see on this Exhibit 47, there's a blue circle

9    that says "Morgann" next to it.  Do you see that?

10   A.   Yes.

11   Q.   Who lived in that room?

12   A.   Morgann.

13   Q.   And is that the room you've just described when you

14   were talking about the other exhibit?

15   A.   Yes.

16   Q.   And then looking to the red circle, the room -- the

17   window that is circled with the red circle, who lived in

18   that room?  Starting at the beginning of last year or the

19   end -- beginning of 2010 or the end of 2009, who lived in

20   that room?

21   A.   The defendant.

22   Q.   And your -- now, the top floor of this house, was it

23   all bedrooms?

24   A.   Yeah.  Bedrooms and one bathroom.

25   Q.   And you also lived on this floor?

Baker - X

1    A.    Yes.

2    Q.    Your room was on this second floor, as well?

3    A.    Yes.

4    Q.    But there's no -- is there a window that matches your

5    room?

6    A.    Not that you can see from the front.  My room was all

7    the way to the back, on the left-hand side.

8              MS. SARTORIS:  Okay.  I have no further questions.

9              THE COURT:  Cross-examination.

10                       CROSS-EXAMINATION

11   BY MR. REED:

12   Q.    Good afternoon, Mr. Baker.

13   A.    Hi.

14   Q.    Now, when you moved into the residence there on Sixth

15   Street --

16   A.    Sixth Avenue.

17   Q.    Sixth Avenue?

18   A.    Yeah.

19   Q.    Can you tell us what year that was when you actually

20   moved in?

21   A.    '02.

22   Q.    And you believe that Morgann was living there before

23   you moved in?

24   A.    Yes.

25   Q.    That would have been in '02, correct?

Baker - X

```
 1   A.    Yes.
 2   Q.    She wouldn't have been living at this address on
 3   Wellington Street, would she?  She would have been living
 4   there at the Sixth Avenue residence, right?
 5   A.    Yes.
 6   Q.    Have you ever been to her biological parents' residence
 7   on Wellington Street?
 8   A.    On Wellington?  No.
 9   Q.    Did you ever meet her biological father, Darrell?
10   A.    Yeah.  Years ago.
11   Q.    Did he ever come to family events there at the Sixth
12   Avenue residence between 2004 --
13   A.    No.
14   Q.    -- and 2009?
15   A.    Only the -- my mother's and father's funeral, and I
16   don't think he came to my father's.
17   Q.    So he wouldn't have come over there approximately once
18   every month between that time period, correct?
19   A.    No.
20   Q.    Now, in 2002, when you moved in -- I want to focus on
21   the time period between 2002 and 2009 now, okay?
22   A.    Yeah.
23   Q.    That's about seven years' long, right?
24   A.    Uh-huh.
25   Q.    Did Mr. Abakar come over to the Sixth Avenue residence
```

Baker - X

```
 1    from time to time during that window period?
 2    A.   Yes.
 3    Q.   How often would he come over?
 4    A.   I really couldn't tell you, because I worked for
 5    myself, and I was taking care of my father, so I would be
 6    gone before anyone else got up, normally, and I wouldn't get
 7    back until in the evening.  So I really, you know, couldn't
 8    say who was coming and who was going there.
 9    Q.   Did you have personal knowledge that he was helping to
10    care for your mother while she was ill?
11    A.   No, because I wasn't around then.
12    Q.   How about your father, did he come over and --
13    A.   Yeah.
14    Q.   Tell us about that.
15    A.   Well, he would help out if I wasn't there.  I believe
16    he helped out a few times, but I couldn't swear to it.
17    Q.   Was he there when your father passed away?
18    A.   Yes.
19    Q.   He was the person who tried to revive him, along with
20    Morgann, wasn't he?
21    A.   No.  I was.
22    Q.   Was he there present, though, at the time?
23    A.   Yes.
24    Q.   And then the paramedics came and they couldn't revive
25    your dad?
```

Baker - X

```
 1   A.   Yes.

 2   Q.   Did he help hold the telephone to give instructions

 3   about the CPR?

 4            MS. SARTORIS:  Objection, Your Honor.

 5            THE COURT:  Overruled.

 6            THE WITNESS:  I really -- that -- that particular

 7   time was like a flash in my mind.  I wasn't concentrating on

 8   nothing but Pop, so I --

 9   BY MR. REED:  (Continuing)

10   Q.   Would he --

11   A.   -- couldn't tell who was doing what.  All I know is

12   Morgann came up and told me Pop wasn't breathing.  I came

13   down.  I told them to call 911, and told them to lay him on

14   the floor and start CPR.

15   Q.   Now, before your dad died, did Mr. Abakar come over to

16   the Sixth Avenue residence --

17   A.   Yes.

18   Q.   -- for family --

19   A.   Yes.

20   Q.   Tell us about those.

21   A.   He would come over for family dinners, you know, on

22   holidays.

23   Q.   Things like Christmas?

24   A.   Yeah.

25   Q.   Would Morgann be with him?
```

Baker - X

1   A.   Well, Christmas, we didn't have.  Christmas we had at

2   my sister's.

3   Q.   What holidays did he come over for?

4   A.   He would come over for all of them.

5   Q.   Except Christmas?

6   A.   I don't know.  He might have come over to my sister's

7   for Christmas.  See, I suffer from post-traumatic stress, so

8   all events, if people are in one room, I'm in another.  You

9   know, I -- I don't socialize.

10  Q.   But you would see him, correct?

11  A.   Yeah.

12  Q.   And would you see him with Morgann during these holiday

13  events?

14  A.   No.  I -- I couldn't tell you if he was with her or

15  not, because at events like that, everyone was just

16  socializing.

17  Q.   Now, besides holiday events, he would come over to help

18  with the upkeep at the Sixth Avenue residence during this

19  window period?

20  A.   He would come over to my other sister's house and help.

21  Q.   Which house is that, the Hubert Avenue house?

22  A.   Yes.

23  Q.   And what types of things would he do at your sister's

24  house?

25  A.   Well, I don't know.  I know he helped my sister out

Baker - X

```
 1    quite a bit.  But, like I say, I'm -- I'm only around when I
 2    have to be around, and I wasn't -- I would see him over
 3    there, if I went to drop something off, or had her son
 4    working for me and drop him off or something, I would see
 5    him there.
 6    Q.   And was that frequently that you would see him there?
 7    A.   No.
 8    Q.   When you would see him there, do you know whether or
 9    not he did any of the cooking for the family?
10    A.   I don't know.
11    Q.   And is your sister Rochelle Walker?  Is that her name?
12    A.   Yes.
13    Q.   And Rochelle Walker is the mother of Morgann.  Isn't
14    that true?
15    A.   Yes.
16    Q.   Did Mr. Abakar ever come over to the Sixth Avenue house
17    between 2002 and 2009 and cook?
18    A.   No.  He -- when he was staying there, he cooked quite a
19    bit, because, like I said, I wasn't there to do anything but
20    take care of Pop, so majority of the time, I wasn't there.
21    Q.   Well, you're involved in some kind of food bank, aren't
22    you?
23    A.   Yes.
24    Q.   Did Mr. Abakar help you with that mission?
25    A.   Yes, he did.
```

 1          MS. SARTORIS:  Objection.

 2          THE COURT:  Sustained.  I'll leave the "Yes" in,

 3   but move on.

 4   BY MR. REED:  (Continuing)

 5   Q.   Besides these activities that Mr. Abakar engaged in

 6   with your family over there on Sixth Avenue, what other

 7   types of things did he do to help with your family?

 8   A.   I really don't know of anything else, offhand.

 9          MR. REED:  Okay.  I have no further questions,

10   Your Honor.

11          THE COURT:  Anything further from the government?

12          MS. SARTORIS:  Just briefly.

13                  REDIRECT EXAMINATION

14   BY MS. SARTORIS:

15   Q.   Did you ever see Morgann and the defendant kissing?

16   A.   No.

17   Q.   Did you ever see them hugging?

18   A.   No.

19   Q.   Did Morgann keep her belongings at the house?

20   A.   Yes.

21   Q.   The entire time you lived there?

22   A.   Yes.

23   Q.   Did she have belongings in the garage?

24   A.   Yes.

25   Q.   Did she keep her clothes and things in her room?

Baker – ReD

```
 1   A.    Yes.

 2   Q.    When Mr. Abakar moved in, did he move his belongings

 3   into his room?

 4   A.    Yes.

 5   Q.    Did Morgann receive mail at the house?

 6   A.    Yes.

 7   Q.    The entire time that she lived there with you?

 8   A.    Yes.

 9             MS. SARTORIS:  I have no further questions.

10             MR. REED:  Nothing further, Your Honor.

11             THE COURT:  All right.  Thank you.  You may step

12   down.  Thank you, sir.

13             THE WITNESS:  All right.

14             THE COURT:  You're excused.

15             All right.  Call your next witness.

16             MS. SARTORIS:  Your Honor, the government calls Pa

17   Omar Njie.

18             THE CLERK:  Please raise your right hand.

19             (The oath was administered.)

20             THE WITNESS:  I do.

21             THE CLERK:  Please have a seat.  Please state your

22   name, spelling your last name for the record.

23             THE WITNESS:  Pa Omar Njie.  P-A, O-M-A-R,

24   N-J-I-E.

25             THE COURT:  Go ahead, Counsel.
```

Njie - D

```
 1                        PA OMAR NJIE,

 2   called as a witness in behalf of the Plaintiff, having been

 3   first duly sworn, is examined and testifies as follows:

 4

 5                      DIRECT EXAMINATION

 6   BY MS. SARTORIS:

 7   Q.   Good afternoon, Mr. Njie.

 8   A.   Good afternoon.

 9   Q.   Are you familiar with an address, 4123 Santa Rosalia

10   Avenue, Apartment A?

11   A.   The street name I am, but not the number.

12   Q.   Not the exact apartment?

13   A.   Uh-huh.

14   Q.   There's an exhibit binder, and it's marked II of III.

15   I'm sorry.  Look for III of III.  Do you have that in front

16   of you?

17   A.   Yes.

18   Q.   If you could turn your attention to Exhibit No. 49.

19   There's a map on the front and a picture that follows.  Does

20   that look familiar to you?

21   A.   Yes.

22   Q.   How do you know this location?

23   A.   I have a friend that lives in an apartment there.

24   Q.   Who --

25   A.   Used to live over there.
```

Njie - D

```
1    Q.   Who is your friend?

2    A.   His name is Abdoul Aziz Kebbeh.

3    Q.   What period of time did he live there during your

4    friendship?

5    A.   I've known him from 2006 -- late 2005, 2006, until this

6    year, around February is when he moved.

7    Q.   Okay.  And was there a time when he moved within that

8    complex from one apartment to another?

9    A.   Yes.  The building, I think, right next to it.

10   Q.   When was that; do you recall?

11   A.   Probably maybe -- around maybe late last year or

12   earlier this year.

13   Q.   So from 2005, when you -- is that when you first became

14   friends with him?

15   A.   Yes.

16   Q.   From 2005 until 2010, was he living in the same

17   apartment?

18   A.   Yes, he was.

19   Q.   And did you know -- did he have any roommates?

20   A.   Yes, he did.

21   Q.   Do you see any of his roommates here in this courtroom

22   today?

23   A.   Yes.

24   Q.   Could you point and describe who that person is?

25   A.   Right there.  He's right there.
```

1   Q.   Can you describe what he's wearing?

2          THE COURT:  What's he wearing?

3          THE WITNESS:  He's wearing black, a black suit.

4          THE COURT:  Indicating the defendant, for the

5   record.

6   BY MS. SARTORIS:  (Continuing)

7   Q.   Did he have any other roommates?

8   A.   He was the only roommate, that I know of, at that time.

9   Q.   And were you good friends --

10  A.   With.

11  Q.   -- with Mr. Kebbeh?

12  A.   Yes.

13  Q.   Would you go to the apartment frequently?

14  A.   Maybe once a week or maybe twice a month, yeah.

15  Q.   If I could ask you to look at -- did Mr. Kebbeh ever

16  mention living with a -- having a woman live there?

17         MR. REED:  Objection; calls for hearsay.

18         THE COURT:  I'm going to sustain that objection.

19  BY MS. SARTORIS:  (Continuing)

20  Q.   If I could ask you to look at Exhibit 100.  Do you have

21  it in front of you, Exhibit 100?  It's a picture.

22         Do you recognize the person in that picture?

23  A.   No, I don't.

24  Q.   Have you ever seen her before?

25  A.   No.

Njie - D

```
1   Q.   When you were at the apartment, did you ever see the
2   defendant with any women, or any women with him?
3   A.   Yes.
4   Q.   And do you know who that might have been?
5   A.   Yes.  I know her.
6   Q.   Did you talk to her?
7   A.   Yes.
8   Q.   What was her name?
9   A.   I believe her name was Monica, I believe.
10  Q.   How did you know her?
11  A.   I met her the -- met her there before, and also at work
12  I met her.  While I was going to school -- I think she was a
13  volunteer at my job, so I met her at work, too.
14  Q.   You knew her from both locations?
15  A.   Uh-huh.
16            THE COURT:  Is that yes?
17            THE WITNESS:  Yes.
18            THE COURT:  You need to answer out loud.
19            THE WITNESS:  Yes.
20  BY MS. SARTORIS:  (Continuing)
21  Q.   That picture, Exhibit 100, is not her?
22  A.   No, it's not her.
23  Q.   Do you know her last name?
24  A.   No, I don't.
25  Q.   You know her first name is Monica?
```

```
 1   A.   Yes.  I know her as Monica.
 2           MS. SARTORIS:  I have no further questions.
 3           THE COURT:  Mr. Reed?
 4                       CROSS-EXAMINATION
 5   BY MR. REED:
 6   Q.   Good afternoon.
 7   A.   Good afternoon.  How are you?
 8   Q.   I want to focus on the time period between 2003 and
 9   2005.
10   A.   Okay.
11   Q.   Okay?
12   A.   Uh-huh.
13   Q.   Were you friends with Mr. Kebbeh at that time?
14   A.   I was not.
15   Q.   So I assume that you would not go over to the apartment
16   over there at Rosalia during that particular time.
17   A.   No.
18   Q.   You started to go over there after 2005.  Is that
19   right?
20   A.   Yes.
21   Q.   And you would go over, you say, once a week, maybe
22   twice a month?
23   A.   Yes.
24   Q.   Sometimes not even once during month, correct?
25   A.   Yes.
```

Njie - X

```
 1    Q.   And when you would go over there, would you go over
 2    there for the primary purpose of visiting your friend,
 3    Kebbeh?
 4    A.   Yes.
 5    Q.   He was more of your friend than Mr. Abakar, was he?
 6    A.   Yes.
 7    Q.   Did you become friends with Mr. Abakar at all?
 8    A.   Not -- no.  No, we were not friends.
 9    Q.   When you and Mr. Kebbeh would visit, would you be in
10    the living room, visiting with him?
11    A.   Yes.
12    Q.   Would you ever go visit and go into Mr. Kebbeh's
13    bedroom?
14    A.   No.
15    Q.   Would you ever go into the bedroom of Mr. Abakar?
16    A.   No.
17    Q.   Did you ever inspect the closets in Mr. Abakar's
18    bedroom?
19    A.   No.
20    Q.   You don't know if there was women's clothes in there or
21    anything, do you?
22    A.   No.  I wouldn't know, no.
23    Q.   Did you inspect the closets at all inside that
24    apartment to see if there was women's clothing?
25    A.   No.
```

Njie - X

```
 1   Q.   That wasn't your business, right?

 2   A.   No.

 3             MS. SARTORIS:  Objection; argumentative.

 4             THE COURT:  Overruled.

 5   BY MR. REED:  (Continuing)

 6   Q.   You were just there to visit Mr. Kebbeh?

 7   A.   Yes.

 8   Q.   Now, how long would these visits normally last?

 9   A.   Anywhere from 6:00 p.m. to sometimes maybe 11:00 p.m.,

10   yeah.

11   Q.   Not during the day?

12   A.   No.

13   Q.   Why is that?

14   A.   Because normally we were working, so we don't have time

15   to hang out during the day.

16   Q.   Did Mr. Kebbeh work, to your knowledge?

17   A.   Yes.

18   Q.   Did Mr. Abakar work, to your knowledge?

19   A.   I believe, yes, he was working.

20   Q.   As a truck driver or a delivery driver of some sort?

21   A.   Yes, at one time I do believe he was.

22   Q.   This person by the name of Monica, did you first see

23   her start to show up close to 2009?

24   A.   Actually, I don't know the exact year.  No, I can't say

25   exact for sure.
```

1   Q.   You can't say exactly when you started to see her?

2   A.   Yes.  Because I started going there maybe around 2005.

3   I might have seen her then or not.  I don't know exactly

4   when I had seen her.  I can't say what year it was.

5   Q.   Could it have been closer to 2009 that you saw this

6   Monica person?

7   A.   It's possible.  I don't know the exact year.

8   Q.   Now, when you saw Monica, was she over there at the

9   apartment?

10  A.   Yes.

11  Q.   And when she was over there at the apartment, were her

12  and Mr. Abakar in a separate room?

13  A.   I wouldn't know.  I just saw her there, and I knew they

14  were together as friends, or whatever there was.

15  Q.   They were just friends, correct?

16  A.   I don't know.  I just saw them together.  I don't know

17  why they were together.

18  Q.   Did you see them in the living room area together?

19  A.   Yes, sometimes.

20  Q.   You didn't know what the nature of her relationship was

21  with Mr. Abakar, correct?

22  A.   No.

23            MR. REED:  I have no further questions.

24            THE COURT:  Anything further from the government?

25            MS. SARTORIS:  Just one question.

```
 1                    REDIRECT EXAMINATION
 2   BY MS. SARTORIS:
 3   Q.   Did you see Monica there on more than one occasion?
 4   A.   Yes.
 5   Q.   And you said you also knew her from work.  Can you
 6   estimate when it was you think you may have first seen her
 7   there?
 8   A.   No.  Honestly, I can't.  I mean, I never even pay no
 9   mind to when that was, honestly.
10           MS. SARTORIS:  All right.  Thank you.  No further
11   questions.
12           THE COURT:  Anything further, Mr. Reed?
13           MR. REED:  No, Your Honor.
14           THE COURT:  All right.  You may step down, sir.
15   Thank you.
16           Call your next witness.
17           MS. SARTORIS:  The government calls Morgann
18   Walker.
19           MR. McKESSON:  Excuse me, Your Honor.  May I sit
20   right here?
21           THE CLERK:  Please raise your right hand.
22           (The oath was administered.)
23           THE WITNESS:  Yeah.
24           THE CLERK:  Please have a seat.  Please state your
25   name, spelling your last name for the record.
```

M. Walker – D

```
 1                THE WITNESS:  Morgann Walker, W-A-L-K-E-R.

 2                THE COURT:  Go ahead, Counsel.

 3                MS. SARTORIS:  Thank you.

 4                Your Honor, I'd like to introduce certified DMV

 5      records, Governments Exhibits No. 90 through 96, 100, 101,

 6      and 104 to 109 into evidence.

 7                THE COURT:  All right.  You've seen those,

 8      Mr. Reed?

 9                MR. REED:  Yes, Your Honor.  No objection.

10                THE COURT:  Any objection?

11                All right.  They're received.

12                (Exhibits 90 – 96, 100, 101, 104 – 109 received.)

13

14                     MORGANN WALKER,

15      called as a witness in behalf of the Plaintiff, having been

16      first duly sworn, is examined and testifies as follows:

17

18                     DIRECT EXAMINATION

19      BY MS. SARTORIS:

20      Q.   Good afternoon, Ms. Walker.

21      A.   Hi.

22      Q.   It's hard to see you around the --

23      A.   Shall I scoot over?

24      Q.   Do you recognize anybody -- do you know the man sitting

25      over here at the table in the dark suit?
```

M. Walker - D

1    A.    Yes.

2    Q.    And who is that?

3    A.    Yusuf Abakar.

4    Q.    How do you know him?

5    A.    He's my husband.

6    Q.    Now, can you -- when did you first meet Mr. Abakar?

7    A.    The latter part of 2002 or early part of 2003.

8    Q.    What was the circumstance under which you met him?

9    A.    I met him as a friend of my stepfather.

10   Q.    Who is your stepfather?

11   A.    Aziz Kebbeh; Abdoul Aziz Kebbeh.

12   Q.    Could you describe your relationship in 2002, 2003, for

13   the months when you first met him?

14   A.    I met him as a friend of my stepfather, and I would

15   just see him at family events.

16   Q.    Would he come to family events with you during that

17   time period?

18   A.    When I first met him?

19   Q.    Yeah.  I'm looking at the 2002-2003 time period.

20   A.    He wouldn't go with me, but he would be there.

21   Q.    Would it be fair to call him a family friend?

22   A.    Yes.  Absolutely.

23   Q.    Did he become your friend?

24   A.    Yes.

25   Q.    And did there come a time when you discussed getting

M. Walker – D

1   married?

2   A.   Yes.

3   Q.   Before that time, was he anything more to you than a

4   friend?

5   A.   No.

6   Q.   Did you have a romantic relationship with him?

7   A.   No.

8   Q.   Did you go on dates with him?

9   A.   No.

10   Q.   Did you live with him?

11   A.   No.

12   Q.   So from before you were married, you never lived with

13   him?

14   A.   No.

15   Q.   And then can you tell me about the -- how it came about

16   that you discussed getting married?

17   A.   I believe we went to dinner and discussed it.

18   Q.   Could you describe that event?

19   A.   We went out to dinner, and in the course of dinner,

20   Yusuf brought up the need to renew his school visa.

21   Q.   What did he say -- what did he say to you, if you

22   recall?

23   A.   I believe he told me his school visa was set to expire,

24   and he was concerned about not being able to continue on his

25   education.

M. Walker - D

1   Q.   Did you know him to be in school?

2   A.   Yes.

3   Q.   So what did he say next?

4   A.   He asked if I would be willing to get married in order

5   for him to either renew or get a new school visa to stay and

6   be able to finish school.

7   Q.   And at the time, did you believe that he needed your

8   help to get married in order to complete school?

9   A.   Well, I knew that he didn't have any other way of

10  renewing the visa unless he got married and could legally

11  stay and finish school.

12  Q.   And how do you know that?  What's your -- where did you

13  get your information on the immigration rules?

14          MR. REED:  Objection.  No foundation, Your Honor.

15          THE COURT:  Lay a foundation.

16          Sustained.

17  BY MS. SARTORIS:  (Continuing)

18  Q.   Do you have -- did you have at the time any knowledge

19  about the immigration process?

20  A.   No.

21  Q.   Did you immigrate yourself?

22  A.   No.

23  Q.   So when your friend asked you -- when you said you

24  understood that he had to marry you in order to complete

25  school, what are you basing your understanding on?

M. Walker – D

```
 1   A.   Basing it upon what he told me; that if he was married,

 2   he could stay -- he could get a new visa and be able to stay

 3   and finish his education.

 4   Q.   Otherwise what would happen?

 5   A.   Under the -- I understood that he wouldn't be able to

 6   finish -- stay in school, and that's what he desired.

 7   Q.   So during that dinner, and he asked you to marry him so

 8   that he could stay in school, what did you say?

 9   A.   I told him that I would think about it.

10   Q.   And did you?

11   A.   Yes.

12   Q.   Did there come a time when you talked with him about it

13   again?

14   A.   Yes.

15   Q.   When was that?

16   A.   About maybe a month later, after the initial

17   conversation.

18   Q.   What happened?

19   A.   He showed up at my mother's home, and upon getting

20   there asked me if I had thought about what we had talked

21   about at dinner.

22   Q.   This was at your mother's home?

23   A.   Yes.

24   Q.   Now, did he call you before that and ask you if you had

25   thought about it?
```

M. Walker - D

```
 1   A.    No.

 2   Q.    So can you describe what happened at your mother's

 3   home, during that meeting?

 4   A.    Well, he was there as a regular visit, but upon seeing

 5   him there, he asked me, on the porch, I believe, if I

 6   could --

 7   Q.    What do you mean?  I'm sorry.

 8   A.    -- if I considered --

 9   Q.    What do you mean, he was there on a regular visit?

10   A.    I think he was coming by to see a family.  It wasn't an

11   intended visit for that purpose.  He was there and happened

12   to ask me at that time.

13   Q.    Was he there to see you specifically?

14   A.    Not that I believe, no.

15   Q.    Was he friends with your mother?

16   A.    Yes.

17   Q.    Were they good friends?

18   A.    Yeah.

19         THE COURT:  Excuse me.  Point of clarification.

20   Biological mother or stepmother?

21         THE WITNESS:  Biological mother.

22         THE COURT:  Rochelle Walker?

23         THE WITNESS:  Yes.

24         THE COURT:  Go ahead.

25         MS. SARTORIS:  Thank you, Your Honor.
```

```
 1   BY MS. SARTORIS:   (Continuing)
 2   Q.   Where was your biological mother, Rochelle Walker,
 3   living at that time?
 4   A.   At 3951 Hubert Avenue.
 5   Q.   And the defendant asked you to marry him during that
 6   dinner -- where were you living at that time?
 7   A.   At 1847 Wellington Road.
 8   Q.   Who were you living with?
 9   A.   My father.
10   Q.   Was anyone else living there?
11   A.   My stepmother and my three younger siblings.
12   Q.   What's the name of your father?
13   A.   Darrell Walker.
14   Q.   And your stepmother?
15   A.   Laura Walker.
16   Q.   How long had you been living there?
17   A.   Two and a half years, at that point.
18   Q.   Was it -- did you --
19   A.   I had come back from college in 2001.
20   Q.   After college you moved into the Wellington address?
21   A.   Right.
22   Q.   With your stepmother and your father?
23   A.   Right.
24   Q.   Did you stay in a guesthouse in the back?
25   A.   Yes.
```

```
 1   Q.   And then what year was it that you had this
 2   conversation about marrying the defendant?
 3   A.   In 2003.
 4   Q.   And where were you living?
 5   A.   1847 Wellington Road.
 6   Q.   So going back to when you said you were at your
 7   biological mother's house on Hubert Avenue, and the
 8   defendant saw you there and asked if you had thought about
 9   the marriage, what could you tell us about that
10   conversation?
11   A.   We saw each other.  He asked if I thought about what we
12   had spoke about at dinner.  I told him yes.  And I told him
13   that I agreed.
14   Q.   Why did you agree?
15   A.   Because I wanted to help him finish school.
16   Q.   Did you -- did you have feelings for him?  Were you in
17   love with him?
18   A.   No.
19   Q.   Were you friends with him?
20   A.   Absolutely.
21   Q.   Did you have any kind of a romantic relationship with
22   him when you agreed to marry him?
23   A.   No.
24   Q.   Had you ever been on a romantic date?
25   A.   No.
```

M. Walker - D

```
 1   Q.   Had you ever spent the day together, an entire day --
 2   A.   No.
 3   Q.   -- the two of you?
 4   A.   No.
 5   Q.   What about the night, have you ever slept in his bed or
 6   in a bed together?
 7   A.   No.
 8   Q.   Did you have any kind of a physical relationship with
 9   him before you agreed to marry him?
10   A.   No.
11   Q.   So then what happened?
12   A.   Once I agreed, that was the extent of the conversation.
13   And he said that he would make -- he would find a time that
14   fit both of our schedules.  I was in school at the time.
15   And that was it.
16   Q.   What were you in school for?
17   A.   Cosmetology.
18   Q.   So did there come a time when you picked out a wedding
19   ring?
20   A.   Yes.
21   Q.   And could you describe that?
22   A.   The ring?
23   Q.   Yes.  When you -- how you came to pick it out.
24   A.   We went to a jewelry store in the Beverly Center, I
25   believe, and looked at rings.  I told him the ring that I
```

M. Walker - D

1   liked and he purchased it.

2   Q.   Did he give it to you?

3   A.   Yes.

4   Q.   And so how -- what happened after you had that

5   conversation?  Did you at some point set a date to get

6   married?

7   A.   No.

8   Q.   Okay.  So during that conversation, you didn't -- but

9   at any time did you ever decide on what day you would get

10  married?

11  A.   No.

12  Q.   Did you get married to him?

13  A.   Yes.

14  Q.   How did that come about?  How did you choose the day,

15  or how did -- could you tell us about the conversation you

16  had with the defendant when you chose the day that you would

17  get married?

18  A.   We never decided on a day to get married.  It was

19  pretty much at his discretion on what day would fit both of

20  our schedules.  He called me the day before, which would

21  have been June 29th, and made me aware that he had arranged

22  for us to go to the Norwalk justice of the peace, and we

23  went the following day on my lunch break from school.

24  Q.   So can you describe the day that you got married?

25  A.   A regular day.  I got up.  Went to school.  During my

```
 1    lunch break, I took an extended lunch break and left.  We

 2    went to Norwalk.  We got married.  Then I think we had a

 3    brief lunch and I went back to school.

 4    Q.   Did he pick you up at school?

 5    A.   Yes.

 6    Q.   Did you wear a wedding dress?

 7    A.   No.

 8    Q.   Was anyone there for your wedding?

 9    A.   No.

10    Q.   No friends?

11    A.   No.

12    Q.   Any family members?

13    A.   No.

14    Q.   Did you tell any family members that you were going to

15    marry him that day?

16    A.   No.

17    Q.   Did you tell anybody you were going to marry him that

18    day?

19    A.   No.

20    Q.   So could you describe the ceremony?

21    A.   It was just me and the officiate, the person who

22    oversaw the marriage, and just got married.

23    Q.   Did you -- did there come a time when the officiate

24    said, "You may kiss the bride"?

25    A.   Yes.
```

1   Q.   Could you describe that?

2   A.   Awkward.

3   Q.   Why?

4   A.   Because there wasn't any romantic feelings, so I didn't

5   kiss him.

6   Q.   What did you do instead?

7   A.   I gave him a hug.

8   Q.   Then you went to lunch?

9   A.   Yes.

10   Q.   And back to school?

11   A.   Yes.

12   Q.   He dropped you off at school?

13   A.   Yes.

14   Q.   Do you know where he was going from there?

15   A.   No.

16   Q.   And when you finished, did you go to class that day --

17   the rest of the day?

18   A.   I didn't have any more classes.  I filled out my

19   paperwork and clocked out, so that I could get my hours for

20   the day.  And class was over at that point, by the time I

21   got back.

22   Q.   What did you do next?

23   A.   I went to my mother's home.

24   Q.   Which mother?

25   A.   My biological mother, Rochelle Walker.

M. Walker - D

```
1    Q.    And what did you do there?

2    A.    I waited until she got home and told her I got married.

3    Q.    Did you see -- was the defendant there?

4    A.    No.

5    Q.    Did you see him that night?

6    A.    No.

7    Q.    Did you sleep over where he was that night?

8    A.    No.

9    Q.    Do you recall where it was you stayed that night?

10   A.    I stayed in my back apartment at 1847 Wellington Road.

11   Q.    So at the house with your father and stepmother?

12   A.    Yes.

13   Q.    And where did you sleep the next night?

14   A.    The next night?  I slept at 1847 Wellington Road the

15   next night.

16   Q.    Did you -- did you go to San Diego with the defendant?

17   A.    Yes; on Sunday.

18   Q.    Can you describe how that came about, that you went to

19   San Diego with him on Sunday?

20   A.    He picked me up on Sunday morning.  I think we had

21   decided Saturday evening that we are going to go to San

22   Diego for the day, and he picked me up Sunday morning and we

23   went to San Diego.

24   Q.    Did you take pictures?

25   A.    Yes.
```

M. Walker – D

```
 1    Q.   Why did you take pictures?

 2    A.   Well, supposed to be our honeymoon.  It would be our

 3    first time ever spending the entire day together, so we were

 4    just taking pictures everywhere we went.

 5    Q.   What did you do with those pictures?

 6    A.   Those pictures were put into the album that we

 7    presented in the initial interview with immigration.

 8    Q.   Who put them in an album?

 9    A.   Yusuf.

10    Q.   Who physically has the pictures?

11    A.   Yusuf.

12    Q.   Did you have copies of the pictures?

13    A.   No.

14    Q.   So this wedding album, you never even had a copy of it?

15    A.   No.

16    Q.   But it was presented to CIS, to immigration --

17    A.   Yeah.

18    Q.   -- as pictures from your honeymoon?

19    A.   Right.

20    Q.   Had you ever spent a day with him before that and

21    taken -- took a bunch of pictures?

22    A.    No.  We had taken pictures at restaurants or family

23    functions or gatherings, but no, that day, in particular, we

24    took, like, pictures all day, so that had never happened

25    before.
```

M. Walker – D

```
1   Q.   Did that ever happen since?

2   A.   That we've taken pictures, yes.

3   Q.   All day, like that.

4   A.   No, no.

5   Q.   After you got married, did -- were you aware where he

6   was living at the time that you got married?

7   A.   Yes.

8   Q.   Do you happen to know the address?

9   A.   4123 Santa Rosalia.

10  Q.   Had you been there before?

11  A.   Yes.

12  Q.   And had you been there romantically or as friends?

13  A.   As friends.

14  Q.   Did you ever move into Santa Rosalia after you got

15  married?

16  A.   No.

17  Q.   Did you stay there, ever?

18  A.   Like, spend the night?

19  Q.   Yeah.

20  A.   No.

21  Q.   After you got married, you never spent the night at

22  Santa Rosalia?

23  A.   No.

24  Q.   Would you go there from time to time?

25  A.   Yes.
```

M. Walker - D

```
1   Q.   You wouldn't go there and stay for a couple days or a
2   week?
3   A.   Not overnight.  I would go and come back and leave and
4   come back the next day, but I didn't generally spend the
5   night there.
6   Q.   Well, did you ever or not generally?
7   A.   I never spent the night there.  I would come and stay,
8   off and on, for maybe a week or two weeks at a, time just
9   checking back and forth.
10  Q.   So you would sometimes spend time there, but you never
11  slept over?
12  A.   Right.
13  Q.   Did you ever sleep in the same room with Mr. Abakar?
14  A.   No.
15  Q.   Did you ever anywhere?
16  A.   No.
17  Q.   Did you ever have a physical relationship with
18  Mr. Abakar?
19  A.   No.
20  Q.   Did you -- after you got married, did you date other
21  people?
22  A.   Yes.
23  Q.   Now, if I could ask you to look at Government's --
24  there's a binder that says Volume III of III.  Do you see
25  that?
```

M. Walker – D

```
 1   A.    Yes.
 2   Q.    If I could ask you to turn to page -- to the exhibit
 3   marked 44.  Do you recognize this?
 4   A.    Yes.
 5   Q.    What is it?
 6   A.    That is my father's old home.
 7   Q.    And is this the Wellington address where you lived?
 8   A.    Yes.
 9   Q.    Can you -- did there come a time where you moved out of
10   this address?
11   A.    Yes.
12   Q.    And when was that?
13   A.    2005, I believe.
14   Q.    What was -- was there something that happened that
15   caused you to move, or a life event or any kind of marker
16   for when you moved?
17   A.    Well, it was about that time that I started having
18   arguments and disagreements with my stepmother and it
19   started to affect the relationship I had with my father.
20   Q.    So you decided you wanted to move?
21   A.    Right.
22   Q.    Where did you move to?
23   A.    I moved to my grandparents' home, 3920 Sixth Avenue.
24   Q.    If I could ask -- so how sure are you about 2005?  Are
25   you sure or is that an estimate?
```

M. Walker - D

```
 1    A.    It's an estimate.
 2    Q.    If I could ask -- let me ask you this:  Were you living
 3    in this Wellington Road address after you were married --
 4    A.    Yes.
 5    Q.    -- for some period of time after you were married?
 6    A.    Yes.
 7    Q.    And then at some point you moved out?
 8    A.    Right.
 9    Q.    If I could ask you to look at Exhibit 45 -- I'm sorry,
10    Exhibit 46.  Do you recognize this?
11    A.    Yes.
12    Q.    What is this?
13    A.    This is my grandfather's home.
14    Q.    Is this the home -- did you ever move into here?
15    A.    Yes.
16    Q.    And where did you move -- where did you move from when
17    you moved into here?
18    A.    I moved from my father's home at 1847 Wellington Road.
19    Q.    Into this home, which is in Government's Exhibit 46?
20    A.    Yes.
21    Q.    And it's the Sixth Avenue address?
22    A.    Yes.
23    Q.    Okay.  When you moved in, who was living there?
24    A.    My grandfather was there.  My grandmother had just been
25    hospitalized and moved to a rehab facility, so it was just
```

M. Walker – D

```
 1   my grandfather staying there.
 2   Q.   Okay.  And when you first moved in, when your
 3   grandmother was still alive but she was ill, what room did
 4   you stay in?
 5   A.   The master bedroom in the upper left hand.
 6   Q.   Did there come a time when you switched rooms?
 7   A.   Yes.
 8   Q.   And when was that?
 9   A.   Once my uncle moved in, I moved to the living room,
10   converted into a bedroom, downstairs, directly downstairs.
11   Q.   If you look at this exhibit, well, Exhibit 46, could
12   you describe the location of the first room you had on Sixth
13   Avenue?
14   A.   Where it's located on the picture?
15   Q.   Yeah.  If you could just describe it.
16   A.   It's actually covered by the tree.
17   Q.   Is it on the first floor or second floor?
18   A.   Second floor.
19   Q.   And there's a window that's covered by the tree?
20   A.   Yes.  And it had a balcony.
21   Q.   It had a balcony?
22   A.   Uh-huh.
23   Q.   When your uncle moved in and you moved to the living
24   room converted to a bedroom, where is that in this picture?
25   A.   It's also covered by the tree.  It's directly
```

M. Walker – D

```
 1   downstairs.
 2   Q.   On the left, behind the tree, is where your next room
 3   was?
 4   A.   Yes.
 5   Q.   So your uncle lived there and your grandfather?
 6   A.   Yes.
 7   Q.   And did your uncle move in after your grandmother
 8   passed away?
 9          MR. REED:  Objection; leading.
10          THE COURT:  Overruled.  It's foundational.
11          Go ahead.
12          THE WITNESS:  Yes.
13   BY MS. SARTORIS:  (Continuing)
14   Q.   Do you know what year that was?
15   A.   My grandmother passed away in the latter part of 2005.
16   Q.   That's your best estimate?
17   A.   Yeah.
18   Q.   Are you sure about that or is it an estimate?
19   A.   It's an estimate.
20   Q.   But you're sure your uncle moved in after your
21   grandmother passed away?
22   A.   Yes.
23   Q.   And you were already living there with your
24   grandfather?
25   A.   Yes.
```

M. Walker – D

```
 1   Q.   If I could ask you to look at Exhibit 47 -- well,
 2   before we get to 47, go back to 46.  I apologize.
 3           Did there come a time when you moved out?  Did you
 4   ever move out of Sixth Avenue and into another location?
 5   A.   Yes.  In 2010 -- 2011.  Sorry.
 6   Q.   Approximately when in 2011?
 7   A.   In March.
 8   Q.   Of this year?
 9   A.   Yes.
10   Q.   And what caused you to move in 2011 of this year -- or
11   March of this year?
12   A.   My grandfather passed away and the house was going to
13   be sold.
14   Q.   So that's when you moved out of this address?
15   A.   Yes.
16   Q.   And where did you move into?
17   A.   I moved to my mother's home.
18   Q.   Your biological mother?
19   A.   Yeah, my biological mother.
20   Q.   If I could ask you to look at Exhibit 45 -- there's no
21   45.  Do have you an Exhibit 45 in front of you?
22   A.   I do.
23   Q.   Do you recognize -- it's a map, on the front, with a
24   red bubble.  Do you -- do you recognize what this red bubble
25   is?
```

M. Walker - D

```
1   A.   Yeah.  That's my mother's home.

2   Q.   Rochelle Walker?

3   A.   Yes.

4   Q.   If you turn the page, do you see a house?  Is that --

5   is that -- do you recognize that?

6   A.   Yes.  It's my biological mother's home.

7   Q.   Is that the location where you moved into after leaving

8   the Sixth Avenue address?

9   A.   Yes.

10          MS. SARTORIS:  I'd like to move Exhibit 45 into

11  evidence.

12          THE COURT:  Any objection?

13          MR. REED:  No objection.

14          THE COURT:  It's received.

15          (Exhibit 45 received.)

16  BY MS. SARTORIS:  (Continuing)

17  Q.   Now, did there come a time when -- did you ever move

18  into the Santa Rosalia address with the defendant?

19  A.   No.

20  Q.   Did there come a time when you moved -- when you

21  brought any belongings over there?

22  A.   Yes.

23  Q.   Could you describe that?

24  A.   I had come to the house to -- I had come to the house

25  on Santa Rosalia to visit Yusuf, as he had asked me to, and
```

1    we were going to renew the lease and have me -- have it

2    amended with my name on it.  And after doing that, he asked

3    that I bring over items to the house and leave them there.

4    Q.   Okay.  So we'll come back to the lease, but let me ask:

5    When was this?

6    A.   2006.

7    Q.   What was the conversation about bringing stuff into

8    the -- Santa Rosalia in 2006 and leaving it there?  How did

9    it -- what did he say to you?

10   A.   He asked me to gather some things of some of mine,

11   belongings, and bring them over to the house to leave just

12   in case we had an apartment walk-through or were visited by

13   any officials that expected me to live there.

14   Q.   Did he ask you to move all of your belongings into the

15   apartment?

16   A.   No.

17   Q.   Did he ask you to move into the apartment?

18   A.   No.

19   Q.   Just some of your things?  He just asked you to bring

20   some of your things over?

21   A.   Yes.

22   Q.   So what type -- what did you do?

23   A.   I gathered clothing and other things of mine that I

24   don't generally use often, and I brought them over to the

25   house -- or I actually sent them with him to the house.

M. Walker – D

```
 1   Q.   You moved it from where to where?  You brought those --
 2   where were those belongings?
 3   A.   At my house on 3920 Sixth Avenue, my grandfather's
 4   home, I moved them from there to the house at 4123 Santa
 5   Rosalia.
 6   Q.   You gave the defendant some of the belongings to bring
 7   to the apartment?
 8   A.   Yes.
 9   Q.   How much was it?  One bag?  Two bags?
10   A.   One bag.
11   Q.   One bag.
12        What kind of stuff was in there?
13   A.   A pair of tennis shoes, I think lotion and a perfume
14   set, and I think a sweater.
15   Q.   Now, you also mentioned that in 2006, when you talked
16   about when he asked you to move stuff into the apartment,
17   you also were going to sign a lease.  Can you talk about
18   that conversation, how that came about?
19   A.   He wanted to have the lease amended and add my name to
20   it, and he had a meeting set up with the leasing agent that
21   was doing the new document or new lease -- or amended lease,
22   sorry, and I just came to sign, basically.
23   Q.   So did you physically go into the leasing office?
24   A.   Yes.
25   Q.   And this was in 2006?
```

M. Walker – D

```
 1   A.    Yes.
 2   Q.    Are you sure it wasn't 2003?
 3   A.    Yes, I'm sure.
 4   Q.    It wasn't the year you got married?
 5   A.    No.
 6   Q.    You didn't sign -- get on the lease before you were
 7   married?
 8   A.    No.
 9   Q.    So in 2006, can you describe what happened when you
10   went to the leasing office?
11   A.    I arrived there with Yusuf, and we met with the leasing
12   agent, Sharif (ph), and she had the document prepared
13   already.  I just signed and went back to the car.
14   Q.    And Sharif is a man or a woman?
15   A.    A woman.
16   Q.    Are you sure it was a woman that you met with?
17   A.    Yes.
18   Q.    Did you ever meet with a man in the leasing office?
19   A.    No.
20   Q.    If I could ask you -- could you describe the lease that
21   you signed?  Was it -- how many pages was it?
22   A.    It was one page.  It had text at the top, and the lines
23   for signing were at the bottom, and it was pretty much like
24   an "X" by where she wanted me to sign.  I just signed.
25   Q.    Are you sure it was one page?
```

M. Walker – D

```
1    A.    Yes.

2    Q.    Did you have ever initial any pages?

3    A.    Not that I remember.

4    Q.    Was Mr. Kebbeh with you?

5    A.    No.

6    Q.    There's an exhibit binder that says I of III.  If I

7    could ask you to turn to pages 400 and 401 of Government's

8    Exhibit 1.  Do you have that in front of you?

9    A.    Yes.

10   Q.    Looking at these documents, do you recognize this

11   document as the lease you signed in 2006?

12   A.    No.

13   Q.    How can you be sure?

14   A.    Because this isn't the lease that I signed.

15   Q.    Now, if you look at page 401, you'll see down there, it

16   says Morgann Blair Walker, and there's a signature.  Is that

17   your signature?

18   A.    Yes.

19   Q.    Then looking over here at the date, it says 2-24, 2003.

20   Are you sure you didn't sign a lease on 2-24 in 2003?

21   A.    I don't remember signing a lease in 2003.

22   Q.    When did you get married?

23   A.    In 2003.

24   Q.    What month?

25   A.    In June.
```

M. Walker – D

```
 1   Q.   Did you sign a lease before you got married in 2003?
 2   A.   No.
 3   Q.   How did it come to pass that your signature is on this
 4   document?
 5   A.   I must have signed without knowing what I was signing.
 6   Q.   How would that happen?
 7   A.   Yusuf would regularly bring me papers that needed to be
 8   signed and just show me where to sign.  I never read over
 9   them.
10   Q.   Why would you sign papers that someone gives you to
11   sign without reading them?
12   A.   Because it was my husband.
13   Q.   And were you -- were you signing other kinds of papers
14   for him, immigration-type papers?
15   A.   Yes.
16   Q.   After the time you were married, did the defendant buy
17   you a car?
18   A.   No.
19   Q.   Did he buy you a Honda -- Honda?
20   A.   No.
21   Q.   Did you ever open a credit card together or bank
22   account?
23   A.   Yes.
24   Q.   Could you describe that?
25   A.   We opened a Washington Mutual, which is now Chase,
```

M. Walker - D

1    account together.

2    Q.   Do you know when you did that?

3    A.   No.

4    Q.   Can you -- who used that account?

5    A.   That was my account, so I used it.

6    Q.   Did the defendant use it?

7    A.   No.

8    Q.   Why did you open an account with him?

9    A.   I needed a bank account, and he needed for us to have a

10   joint bank account, so --

11   Q.   What did he need you to have a joint bank account for?

12   A.   For the interview.

13   Q.   What interview?

14   A.   The immigration interview.  We needed to have a bank

15   account together.

16   Q.   Did he tell you that?

17   A.   Yes.

18   Q.   What else did he tell you about that?

19   A.   Well, he told me that we needed to have the pictures

20   from the wedding, and other pictures of us together with

21   family, for the interview, and he told me that we needed to

22   state that we lived together for the interview.

23   Q.   Did you do that?

24   A.   Yes.

25   Q.   Did you sign documents under penalty of perjury saying

M. Walker – D

1    that you lived at the Santa Rosalia address?

2    A.    Yes.

3    Q.    Why did you do that?

4    A.    Because I thought that was required for the interview.

5    I was told that that's what was required.

6    Q.    For the immigration interview?

7    A.    Right.

8    Q.    And why were you helping him with this immigration

9    interview?

10   A.    So he could finish school.

11   Q.    Did you -- did you agree to help him to become a United

12   States citizen?

13   A.    No.

14   Q.    Did you know that you were signing paperwork that

15   would -- or applications to become a naturalized citizen?

16   A.    No.

17   Q.    How could it come about that you would sign

18   documents -- paperwork reflecting that you were supporting

19   him to become a naturalized citizen if you didn't know that?

20   How would that come about?

21   A.    He would tell me that I was signing paperwork that was

22   following up with his school visa, and those were the

23   paperwork that I thought I was signing for.

24   Q.    So did there -- did that process continue?  I mean, did

25   you start that process immediately after getting married or

M. Walker – D

```
 1   sometime after getting married?

 2   A.   I believe he started the process soon after getting

 3   married, but once we were married, I didn't really hear much

 4   more about what was going on until he needed a signature or

 5   me to be present at a meeting with either the lawyer or our

 6   interview.

 7   Q.   What would he tell you about the meetings?  Did he tell

 8   you anything about what to say?

 9   A.   For the interview, yes.

10   Q.   What did he say?

11   A.   To state that we lived together.  He made me aware that

12   they would be asking detailed questions about our living

13   arrangement and our activities together.  So he told me that

14   I needed to be familiar with the arrangement of the

15   apartment, and he even said that we needed to -- they might

16   ask me what side of the bathroom his toothbrush is on.

17   Q.   Did you know at any time that you were on the gas and

18   water and electric bills for the Santa Rosalia apartment?

19   A.   Did I know that at the time?

20   Q.   Did you know that you were -- did you know that you

21   were on the gas bills and the electric bills for the Santa

22   Rosalia apartment?

23   A.   No.

24   Q.   When did you -- did you ever find that out?

25   A.   Yes.
```

M. Walker – D

1    Q.   When did you find that out?

2    A.   Probably 2009, 2008; around that time.

3    Q.   How did you find that out?

4    A.   Yusuf made me aware.

5    Q.   Did you ever pay any utility bill?

6    A.   No.

7    Q.   Did you pay any rent for the Santa Rosalia apartment?

8    A.   No.

9    Q.   Now, besides the Washington Mutual Bank account that

10   you mentioned, that later became Chase, did you open any

11   other credit card accounts or bank accounts with the

12   defendant?

13   A.   No.

14   Q.   To your knowledge -- so if I were to tell you that

15   there was a Target account that had you on it, at the time

16   you -- did there come a time when I showed you documents

17   that reflected other bank accounts where I showed them to

18   you?

19   A.   Yes.

20   Q.   Okay.  So during that time, did I show you Target

21   credit cards with your name on it?

22   A.   Yes.

23   Q.   Prior to me showing that to you, did you know that

24   there were -- there was a Target account in your name, with

25   the defendant?

M. Walker – D

```
 1   A.    No.
 2   Q.    The only credit account that you knew about prior to
 3   our meeting was the Washington Mutual/Chase account.  Is
 4   that right?
 5   A.    No.
 6   Q.    Okay.  What is right?
 7   A.    I was made aware upon filing for a divorce by Yusuf
 8   that there was a Wells Fargo account that I was associated
 9   with, and I believe there was another, like, Sears or
10   something that I was associated with outside of the Chase
11   account.
12   Q.    So through the divorce proceedings, you learned of
13   other accounts?
14   A.    Yes.
15   Q.    And when did that take place?
16   A.    February 2011.
17   Q.    Did you file for divorce?
18   A.    Yes.
19   Q.    In February 2011?
20   A.    Yes.
21   Q.    Did you know that there was a car that was registered
22   jointly in your names?
23   A.    Not prior to February 2011.
24   Q.    Did you at some point become aware that the defendant
25   had a girlfriend?
```

1    A.    Yes.

2    Q.    And who was that?

3    A.    I believe her name was Monica.

4    Q.    Did you ever meet her?

5    A.    No.

6          MS. SARTORIS:  I have no further questions.

7          THE COURT:  All right.  Why don't you start,

8    Mr. Reed.

9          MR. REED:  Pardon, Your Honor?

10         THE COURT:  Go ahead and start.  I'm assuming

11   you're not going to finish today, though.

12         MR. REED:  No.

13         THE COURT:  Okay.

14                     CROSS-EXAMINATION

15   BY MR. REED:

16   Q.   Good afternoon, Ms. Walker.

17   A.   Hello.

18   Q.   Now, before coming to testify today, have you spoken

19   with other people who you know to be witnesses about the

20   facts of this case?

21   A.   No.

22   Q.   Have you spoken, for example, to your mother, Rochelle,

23   about any of the facts of this case?

24   A.   No.

25   Q.   For example, have you told her -- before you came to

M. Walker - X

```
 1    court, have you ever told your mother, Rochelle, "This is
 2    what I did in this relationship I have with Mr. Abakar"?
 3    A.    No.
 4    Q.    Did you ever tell your father, Darrell Walker, "This is
 5    what I did with my relationship with Mr. Abakar"?
 6    A.    No.
 7    Q.    Did you ever tell your stepmother, "This is what I did
 8    with respect to my relationship with Mr. Abakar"?
 9    A.    No.
10    Q.    And same question with Laura Walker, would the same
11    answer be no, you never talked about the facts of the case
12    either?
13    A.    That's my stepmother.
14    Q.    Stepmother?
15    A.    Right.
16    Q.    You never talked to her, either, about the facts?
17    A.    Right.
18              THE COURT:  Let -- I just want a point of
19    clarification.  Did you tell them at some point in time that
20    you had married Mr. Abakar?
21              THE WITNESS:  My father didn't find out that I was
22    married or my stepmother didn't find out that I was married
23    until they were contacted by --
24              THE COURT:  By law enforcement?
25              THE WITNESS:  Right.
```

 1          THE COURT:  So after law enforcement officers

 2  contacted them, did you speak with your parents and

 3  acknowledge that you had married Mr. Abakar?

 4          THE WITNESS:  Yes.

 5          THE COURT:  And your father and your stepmother?

 6          THE WITNESS:  Yes.

 7          MR. REED:  All right.  I see.

 8          THE COURT:  Go ahead, Mr. Reed.

 9  BY MR. REED:  (Continuing)

10  Q.   Did you give them details, your dad and your

11  stepmother, details with respect to why you had married

12  Mr. Abakar?

13  A.   No.

14  Q.   Basically, you just told them that you had done so,

15  correct?

16  A.   Right.

17  Q.   And that you didn't tell them about it?

18  A.   Right.

19  Q.   Was your dad mad at you?

20  A.   Yes.

21  Q.   How about your stepmom?

22  A.   Yes.

23  Q.   Did they lead you to believe, after you told them this

24  information, that you were in trouble with law enforcement?

25          MS. SARTORIS:  Objection.

```
 1              THE COURT:  Overruled.  Goes to this witness's
 2   state of mind.
 3              MR. McKESSON:  May I approach?
 4              THE COURT:  Pardon me.
 5              MR. McKESSON:  May I approach?
 6              THE COURT:  On what basis?
 7              By the way, Mr. McKesson is counsel for the
 8   witness.
 9              MR. McKESSON:  Just to advise the Court of
10   something that he may not be aware of.
11              THE COURT:  I think my clerk has made me aware.
12              MR. McKESSON:  Okay.  That's fine.
13              THE COURT:  Go ahead.
14   BY MR. REED:  (Continuing)
15   Q.   Getting back to the question, after you had this
16   conversation with your parents in which they were angry, did
17   they lead you to believe, your parents now -- they lead you
18   to believe that you could be in trouble with the federal
19   government for having committed crimes?
20   A.   No.
21   Q.   Did they say anything to you about the fact that you
22   were looking at criminal charges as a result of your
23   activities of what you had done in this case?
24   A.   No.
25   Q.   Then did there come a point in time in which you had a
```

 1   lawyer hired for you?

 2   A.   Yes.

 3   Q.   And, now, I don't want to get into the conversations

 4   between you and him, direct conversations, but as a result

 5   of those conversations, did you become aware that you could

 6   be in trouble with the federal government as a result of

 7   your activities?

 8         MR. McKESSON:  Your Honor, may I impose an

 9   objection?

10         THE COURT:  You may.  That intrudes into the

11   privilege, in my opinion.  You can ask a different kind of

12   question, but that potentially invades the attorney-client

13   privilege, which you can't do, Mr. Reed.  I wouldn't allow

14   anyone to invade in yours, either.

15   BY MR. REED:  (Continuing)

16   Q.   Did there come a point in time when, after Mr. McKesson

17   was hired, that you were going to meet with federal

18   prosecutors to tell them your side of the story?

19   A.   Yes.

20   Q.   Prior to going to that interview, did you have a state

21   of mind that you could be prosecuted for the crimes that you

22   committed?

23   A.   No.

24   Q.   You didn't think you were in any trouble at all when

25   you were going into that first meeting with them?

```
 1   A.    No.

 2   Q.    You realized that you had signed, don't you, a lot of

 3   documents under penalty of perjury which were submitted to

 4   the INS?  Don't you?

 5   A.    Yes.

 6   Q.    And did that series of activities cause you to believe

 7   that you had perhaps broken some laws of the federal

 8   government?

 9   A.    Prior to meeting with the investigators, no, I never

10   considered it.

11   Q.    You didn't think there was anything wrong with signing

12   documents under penalty of perjury which were false?

13   A.    No.

14   Q.    That was perfectly fine an activity; nothing wrong with

15   it?

16   A.    No, because my intent wasn't for the purpose in which

17   it was used.

18   Q.    What about tax returns, did you sign, also, tax returns

19   that were submitted to the Internal Revenue Service?

20   A.    Yes.

21   Q.    And you were aware of that before you went to this

22   meeting with federal prosecutors, as well, right?

23   A.    Yes.

24   Q.    And you know that when you sign a tax return, that that

25   is signed under the penalty of perjury, correct?
```

```
 1    A.    I know that now.
 2    Q.    You didn't know that then, when you were signing them?
 3    A.    No.
 4    Q.    Now, your mother is Rochelle Walker, correct?
 5    A.    Yes.
 6    Q.    And your dad, your biological dad, is Darrell Walker,
 7    right?
 8    A.    Yes.
 9    Q.    Did there come a point in time when you went to school
10    in Atalanta --
11    A.    Yes.
12    Q.    -- college there?  Did you go to college?
13    A.    Yes.
14    Q.    And what year was that that you went to college?
15    A.    In 2000, 2001.
16    Q.    Did you only stay for about one year in college?
17    A.    Yes.
18    Q.    Did you take out a student loan?
19    A.    Yes.
20    Q.    Were you aware that after you became married to
21    Mr. Abakar, that the funds that would come from tax returns
22    that were owed to both of you as a couple were being
23    diverted to pay off your student loans?
24    A.    Yes.
25    Q.    Tell us about how you found out about that.
```

M. Walker - X

```
 1   A.   After filing for -- filing our taxes jointly, when he

 2   was -- when Yusuf was anticipating the return, he was upset

 3   that there was money that was garnished from the tax return

 4   to pay off an existing loan.

 5   Q.   Did he ever discuss with you just how much this loan

 6   was so that he could find out how big a debt it was?

 7   A.   Yeah.  I remember him asking me how much was owed.

 8   Q.   Do you remember how much was owed on the student loan?

 9   A.   At the time I believe it was 9,000.

10   Q.   Now, when your biological mother -- that's Rochelle --

11   divorced your father, did she move to the residence there at

12   Hubert Avenue at that time?

13   A.   They already lived there.

14   Q.   Okay.  And is it a single-family residence or an

15   apartment?  What's the structure look like there at Hubert

16   Avenue?

17   A.   It's a single-family home.

18   Q.   Now, may I have your permission just to refer to that

19   as the Hubert address, as I ask you questions about it?

20   A.   Sure.

21   Q.   We won't cover the actual number or address.  I'm just

22   going to say Hubert Avenue.  Okay?

23   A.   That's fine.

24   Q.   When I do that, I mean that's Rochelle Walker's home.

25   Okay?
```

M. Walker – X

```
1   A.   Yes.

2   Q.   Now, how far from the Hubert residence was it up to the

3   Wellington residence, where you were staying with your dad?

4   A.   Oh, a number of blocks.

5   Q.   Would it take very long to drive between the two

6   residences?

7   A.   About five minutes.

8   Q.   And this made it kind of easy to go back and forth

9   between Hubert and Wellington for you, correct?

10  A.   Yes, but I was primarily at the Hubert address, based

11  on the fact that I went to school close, so it was more

12  commuter friendly to go to school from the Hubert address as

13  opposed to commuting back and forth from 1847 and there.

14  Q.   After you came back from college in Atalanta, did you

15  go directly to live with your parents there at Wellington

16  Avenue?

17  A.   Yes.

18  Q.   And how long did you stay there before you actually

19  moved out?

20  A.   About two and a half years.

21  Q.   So you moved out before 2004.  Isn't that true?

22  A.   No.

23  Q.   You believe you moved out in 2004 from Wellington?

24  A.   No.  I believe I left after 2004.

25  Q.   And where did you go from there?
```

1  A.   I went to the 3920 Sixth Avenue address.

2  Q.   Did you ever reside over at your mother's house on

3  Hubert Avenue at any time?

4  A.   I live there now.

5  Q.   Well, okay.  But during the time period between 2004

6  and 2009, did you ever live over at the Hubert Avenue

7  residence?

8  A.   No.

9         THE COURT:  Mr. Reed, we'll cut it off there with

10  that answer, and we'll resume tomorrow morning.

11         Ladies and gentlemen, I'll remind you, over the

12  course of the evening not to discuss the case between or

13  amongst yourselves or with any other person; not to form or

14  express any opinions on the matters pending before this

15  Court; not to read, listen to, or watch any reports that may

16  exist regarding the case or to conduct any independent

17  investigation research or inquiry.

18         The jury is excused until tomorrow morning at

19  8:30.

20         Counsel, stand by.  I have -- I'll take a very

21  short recess, and then I have a couple things I want to talk

22  to you about.  And then we'll be done.

23         All right.

24         (Recess:  2:40 - 2:46 p.m.)

25         (End of excerpt.)

1                    C E R T I F I C A T E

2

3           I hereby certify that the foregoing is a true and

4    correct transcript from the stenographic record of the

5    proceedings in the foregoing matter.

6

7    /s/Bridget R. Montero
     Bridget R. Montero              Date:  January 20, 2012
8    Official Court Reporter
     CSR No. 10020
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25