UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. CR 11-388(A)-GAF |
| | ) | |
| v. | ) | |
| | ) | |
| YUSUF ABDALLAHI ABAKAR, | ) | |
| | ) | |
| Defendant. | ) | |


TRANSCRIPT OF PROCEEDINGS

THE HONORABLE GARY ALLEN FEESS

U.S. DISTRICT JUDGE PRESIDING

LOS ANGELES, CALIFORNIA

DECEMBER 8, 2011


JURY TRIAL – DAY 3

EXCERPTED P.M. SESSION


BRIDGET R. MONTERO, CSR 10020, CRR
United States Courthouse
312 North Spring Street, Room 435
Los Angeles, California 90012
www.bridgetmontero.com
Internal File No. 11096

```
 1   APPEARANCES OF COUNSEL:

 2

 3   For the Plaintiff:

 4

 5   Office of the United States Attorney
     BY:  MELANIE SARTORIS
 6   1300 United States Courthouse
     312 North Spring Street
 7   Los Angeles, CA 90012

 8

 9   For the Defendant:

10

11   Law Offices of David R. Reed
     BY:  DAVID R. REED
12   3699 Wilshire Boulevard, Suite 850
     Los Angeles, CA 90010
13

14

15

16

17                            - - - - -

18

19

20

21

22

23

24

25
```

```
1                           INDEX

2

3                                    D      X      ReD      ReX

4   For the Defendant:

5

6   YUSUF ABDALLAHI ABAKAR         154    200

7   ERIC RENELT                    214

8

9                                                          Page

10  Plaintiff rests                                         218

11  Defendant rests                                         218

12

13

14                      EXHIBIT INDEX

15        Exhibit No.              Received

16          305                      155

17

18

19

20

21

22

23

24

25
```

```
 1              THURSDAY, DECEMBER 8, 2011; 12:59 P.M.

 2                          - - - - -

 3

 4         (Begin excerpt.)

 5         THE CLERK:  Please be seated and come to order.

 6   This United States District Court is again in session.

 7         THE COURT:  All right.  We're back on the record

 8   now with the jurors present and in their seats.

 9         Mr. Reed, please continue.

10

11              YUSUF ABDALLAHI ABAKAR,

12   called as a witness in behalf of the Defendant, having been

13   previously duly sworn, is examined and testifies as follows:

14

15              DIRECT EXAMINATION

16   BY MR. REED:

17   Q.   Mr. Abakar, you did get a degree in business.  Is that

18   correct?

19   A.   Yes.

20   Q.   And I'd like you to take a look at Exhibits 305 in

21   front of you.  It's a group exhibit.  Do you see it?

22   A.   Yes.

23   Q.   We've gone through that prior to trial, correct?

24   A.   Yes.

25   Q.   Is that an accurate reflection of the classes that you
```

```
 1   took at the various schools and your degree that you were

 2   eventually awarded?

 3   A.   Yes.

 4          MR. REED:  I'd move that into evidence at this

 5   time, Your Honor.

 6          THE COURT:  Any objection?

 7          MS. SARTORIS:  No objection.

 8          THE COURT:  Received.

 9          (Exhibit 305 received.)

10   BY MR. REED:  (Continuing)

11   Q.   Did you pay Morgann Walker to marry you?

12   A.   Absolutely not.

13   Q.   Did you marry her because you were intending on getting

14   immigration benefits from her?

15   A.   No.

16   Q.   Did you have to pay a woman to gain immigration

17   benefits?

18   A.   No.

19   Q.   Why not?

20   A.   I mean, I have no reason to do that.  I come here.  I

21   was still young.  I have enough money.  I was supporting

22   myself.  My family was helping me.  I say, I'm not the

23   best-looking man, but I think I look all right, so why do

24   you need to find somebody to pay to marry?  And I was at

25   school, and I have so many young women around me that I can
```

```
 1   either date or marry.
 2   Q.   After Morgann moved into the Rosalia apartment, did you
 3   two sleep in the same bed?
 4   A.   Yes.
 5            MS. SARTORIS:   Objection; foundation.
 6            THE COURT:   Overruled.
 7   BY MR. REED:  (Continuing)
 8   Q.   Did you have sex, like any other married couple?
 9   A.   Yes.
10   Q.   Did you try to be polite and not disturb Mr. Kebbeh?
11   A.   Yes.
12   Q.   How did you do that?
13   A.   Usually when -- let's say, if you have people coming
14   over or something, we try to give them privacy, like maybe
15   regular, what do you call it, courtesies or roommate's
16   rules, and, you know, just respect each other's privacy.  So
17   we stay quiet.
18            Even sometime we went in the room, watching TV and
19   something like that.  Most of the time, you know, I know
20   they don't really get along with Morgann.  So most of the
21   time we spend most of the time in our room, especially when
22   he has guests or some people come and visit him.
23   Q.   Did you start to see that arguments started to occur
24   between Mr. Kebbeh and your wife, as she lived there?
25   A.   Honestly, in the beginning, Morgann was doing really
```

```
 1  good.  She wasn't causing problems.  We put some, like,
 2  certain rules and stuff, how we're going to manage to live
 3  with each other, and she was -- she tried.  She did well.
 4  And also Aziz, like, from his part, he's kind of
 5  controlling, too.  Even before, they didn't get along.
 6         At some point, when she had to leave from her
 7  father's house and then we got married, at that point we sat
 8  there and we talked, and we agreed that we're going to get
 9  along.
10  Q.  Did there come a point when Mr. Kebbeh asked her to get
11  out of the apartment?
12  A.  Kebbeh?  No.
13  Q.  Did there come a time when she just left?
14  A.  She would go and come back, but not just left, I mean,
15  permanently.
16  Q.  What were the problems between her and Mr. Kebbeh?
17  A.  Like, it's something that maybe even before.  Morgann,
18  for some reason, she doesn't --
19         MS. SARTORIS:  Objection.
20         THE WITNESS:  -- get along --
21         THE COURT:  Hold on.
22         What's the objection?
23         MS. SARTORIS:  Hearsay.
24         THE COURT:  Hearsay?
25         Overruled.  The question was what were the
```

1    problems between Mr. Kebbeh and -- and Ms. Walker.  And I

2    will -- I will indicate that you should testify based on

3    what you personally observed.

4              THE WITNESS:  Okay.

5    BY MR. REED:  (Continuing)

6    Q.   Go ahead.

7    A.   Morgann has problem, like, following rules.  She likes

8    to do things in her way whenever she likes to.  Sometimes,

9    for some reason, she didn't get along with any of the other

10   men that her mother was married to or even most of her

11   mother's friends.  So she always judge her mother with,

12   like, her marriages, her friends, and people that she hangs

13   on, stuff like that.

14             MS. SARTORIS:  Objection.

15             THE COURT:  Hold on.

16             Grounds?

17             MS. SARTORIS:  It's not based on personal

18   observations.  Hearsay.

19             THE COURT:  It sounds like it's hearsay, Mr. Reed.

20   I'm not going to strike what's in at this point, but go on

21   to another topic.

22   BY MR. REED:  (Continuing)

23   Q.   Did Morgann go over to stay somewhere else?

24   A.   When?

25   Q.   Did there come a point in time when she didn't stay

1    every day at your apartment and went to -- someplace else?

2    A.   After 2005, after grandma passed away.

3    Q.   Was she staying over at your place, residing over at

4    your place?

5    A.   Yes.

6    Q.   Between 2003 and 2005?

7    A.   Yes.

8    Q.   Were there times when she would go and stay at other

9    people's houses during that period of time?

10   A.   Not -- not really go and stay at some people's houses.

11   If I travel or something, she will go and stay at her

12   mother's house for some times, because she doesn't want to

13   be there with Aziz by himself.  That's about it.

14   Q.   Did you go travel between 2003 and 2005?

15   A.   Yes.

16   Q.   Did you ask, "Where did you go?"

17   A.   Most of my trips, around that time was, I remember --

18   between 2003, you said, and --

19   Q.   From 2003 to 2005.  Two years.

20   A.   Yeah.  Saudi Arabia -- most of the time I go from Saudi

21   Arabia.  And then when I go to Saudi Arabia -- most of the

22   time my family has some kind of -- although they want me to

23   go and do for them in Nigeria.  So most of the time I went

24   from Saudi Arabia, and from Saudi Arabia I would go to

25   Nigeria and go back to Saudi --

```
 1              (Interruption by reporter.)

 2              THE COURT:  You need to slow down.

 3              Saudi Arabia to Nigeria.  Is that right?

 4              THE WITNESS:  Right.

 5              THE COURT:  And Nigeria then --

 6              THE WITNESS:  Usually when I go from here, I went

 7   to Saudi Arabia, and then from Saudi Arabia I go to Nigeria

 8   for a couple of weeks.  Then go back to Saudi Arabia and

 9   come back to the U.S.

10   BY MR. REED:  (Continuing)

11   Q.   Did you ask your wife to go with you on these trips?

12   A.   On separate occasions I ask her if she wants to come

13   and meet my family in Saudi Arabia.  She told me, No, I

14   don't want to go to Saudi Arabia.  A couple of times she

15   would laugh about it.  The same thing I ask her --

16              MS. SARTORIS:  Objection.

17              THE COURT:  Hold on.  He's answered the question.

18   Everything after the end of that last sentence is out.  It's

19   stricken.  Nonresponsive.

20              Next question.

21   BY MR. REED:  (Continuing)

22   Q.   Did you ask her to go to Nigeria with you?

23   A.   Yes.

24   Q.   What did she say?

25   A.   I don't want to go to Africa.
```

1    Q.   Did that bother you?

2    A.   For knowing the person she is, it bothers me that she

3    doesn't want to see my background, the rest of my family,

4    but I understood.

5    Q.   Now, there came a point in time when you retained

6    immigration lawyers to help you get your citizenship.  Isn't

7    that true?

8    A.   Yes.

9    Q.   Now, would you agree that the process of getting

10   citizenship requires that you go through steps?

11   A.   Yes.

12   Q.   And were these attorneys that helped you the same

13   attorneys that represented you all the way through these

14   steps?

15   A.   Yes.

16   Q.   Was that the law firm of Judith Wood?

17   A.   Yeah.  From 2003 to 2009.

18   Q.   In this immigration process, were you also advised by

19   any member of the Walker family?

20   A.   My mother-in-law, Rochelle Walker.

21   Q.   Was she advising you concurrently --

22   A.   Yes.

23   Q.   -- with going to see the lawyers?

24   A.   Yes.

25   Q.   What types of documents did the lawyers generally say

```
 1    the INS needed in order to successfully complete a
 2    citizenship?
 3    A.    Supporting documents.  Like first, when we first come
 4    to apply, we went and talked to the lawyer, and she said
 5    that because I'm not a U.S. citizen, I need a financial
 6    sponsor.  And my mother-in-law agreed -- she said she will
 7    do it for us, to help me and Morgann to get the -- the
 8    process.  And then the lawyer asked me for my, like, birth
 9    certificate, my passport, Morgann's birth certificate, and
10    these kind of legal documents.
11    Q.    Did you have to obtain documents that show that you
12    lived together at the same residence?
13    A.    Yeah, after -- that was after we got married; before we
14    went for the interview.
15    Q.    Okay.  Now, we've seen a lot of these documents
16    already, and I don't want to spend a lot of time on them,
17    Mr. Abakar.
18    A.    Okay.
19    Q.    I'm going to go through them quickly.  Okay?
20    A.    Okay.
21    Q.    This -- take a look at Exhibit -- just take a look at
22    the screen.
23    A.    Okay.
24    Q.    Once --
25               MR. REED:  These documents all come from
```

 1   Exhibit 1, Your Honor.

 2   BY MR. REED:   (Continuing)

 3   Q.   This is Exhibit 1, page 115.   Do you see the name

 4   Rochelle Walker on that?

 5   A.   Yes.

 6   Q.   Is this the affidavit of support that Ms. -- that your

 7   mother-in-law signed for you?

 8   A.   Yes.

 9   Q.   As she was helping you with the process?

10   A.   Yes.

11   Q.   You see that it's signed right there?

12   A.   Yeah; signed and notarized.

13   Q.   Did she sign this at the lawyer's office?

14   A.   Yes.

15   Q.   Was Morgann Walker with you that day?   Did she also

16   sign a document like this?

17   A.   Morgann did.   But I remember the first -- at one point,

18   I went -- me and my mother-in-law, and then some other

19   occasions I went with Morgann.

20   Q.   Take a look at Exhibit 1, page 344.   Do you see that

21   document?

22   A.   Yes.

23   Q.   That's the same kind of document, the affidavit of

24   support, that you're talking about, right?

25   A.   Yes.

1   Q.   See the signature of Morgann Walker on there?

2   A.   Yes.

3   Q.   And that's on the same date, July 16th, 2003, correct?

4   A.   Yes.

5   Q.   Is that approximately when you first started going to

6   the lawyer's office to start the process?

7   A.   Yes.  About the same, yeah.  Around this time, yes.

8   Q.   Now, before actually going to that actual first meeting

9   where you were interviewed by Ms. Concepcion -- remember

10  that interview?

11  A.   Before this or after this?

12  Q.   Well, let me back up.

13           When you went to the attorney's office --

14  A.   Yes.

15  Q.   -- did you go with Morgann?

16  A.   Yes.

17  Q.   Did she appear to you to act like your wife?

18  A.   Yes.

19  Q.   What kinds of things would she do when you were there?

20  A.   Well, you know, sit next to each other.  She would be

21  touching, like, my -- what do you call it, my legs, you

22  know.  Just regular, like any other regular couples.

23  Q.   Did there come a point in time when you were told that

24  you would be going for an interview on June -- strike that,

25  on May 18th, 2004, with Agent -- I'll withdraw that.

```
 1              Did there come a point in time that you knew you

 2    were going to an interview with Morgann Walker at the INS

 3    offices in May of 2004?

 4    A.   Yeah.  At some point I -- we received a letter from the

 5    INS.

 6    Q.   Before that, did they ask you to bring certain kinds of

 7    documents with you?

 8    A.   Yeah.  They list.  They have, on the bottom, a list

 9    of -- they say to provide, like, not limited, but stuff,

10    like, you know, certain documents, supporting documents.

11    Q.   And had you already submitted a lot of supporting

12    documents?

13    A.   At that point, no, but after we received the letter,

14    then -- also the lawyer's office call me, because when they

15    send you a copy to your address, then they send a copy to

16    your lawyer's.  Also they call me to make sure if I received

17    it, and they told me to bring -- also they tell me certain

18    kinds of documents that they want me to bring.  And also my

19    mother-in-law helped me to bring -- to prepare the rest.

20    Q.   Now, in the year 2004, was a lease submitted to the INS

21    showing that Morgann Walker was on the lease there where you

22    lived at Rosalia?

23    A.   Yes.

24    Q.   Is there any document that that document was filed with

25    the INS before 2004?
```

1    A.    There is no doubt.

2    Q.    Tell us about that.  How did that come about, your

3    getting Morgann Walker -- her signature on another lease?

4    A.    When we received the letter, we start preparing for the

5    documents.  My lawyer told me that one of the things that we

6    need to do -- she asked me if Morgann is already on our

7    lease.  I told her no.  But at the time that we got married,

8    I was already an established roommate with someone else, but

9    Morgann is not on the lease.  So she asked me to go to the

10   leasing office and ask to add Morgan on to the lease.

11   Q.    Did you do that?

12   A.    Yes, I did.

13   Q.    Did you go with Morgann?

14   A.    When I went and talked with them, no.

15   Q.    Did there come a point in time when you did go with

16   her?

17   A.    Yes.

18   Q.    So describe the process.  What did you do when you went

19   to the leasing office the first time?

20   A.    I went to them and -- before that, they were aware that

21   Morgann is staying at the apartment.  At the time that she

22   came, I went to the leasing office, and I told them that I

23   got married and my wife is moving to the apartment.  And at

24   that point they asked us if we want her to be in the lease.

25   They said that we don't have to, but if we -- if we decide

```
 1   to do that, it's something that we can do.

 2   Q.   Who did you speak with?

 3   A.   Her name is Carol.

 4   Q.   Carol?

 5   A.   Yeah.

 6   Q.   You didn't speak with Mr. Dan Morabito (ph)?

 7   A.   No.

 8   Q.   You saw him testify in this case, right?

 9   A.   Yes.

10   Q.   There was a person you dealt with -- I'm sorry.  Dan

11   Monette.

12            THE COURT:  Don.  Donald.

13            MR. REED:  I'm sorry, Your Honor.  Donald Monette.

14   BY MR. REED:  (Continuing)

15   Q.   You saw him in the court, right?

16   A.   Yeah.  I know him very well.

17   Q.   You've seen him from day to day?

18   A.   Yeah.  He works at that office for almost all the years

19   that I was living there.

20   Q.   But the lady that serviced you on this second lease was

21   named Carol?

22   A.   Yes.

23   Q.   Do you remember a last name?

24   A.   No, I don't.

25   Q.   What happened when you went in there?
```

1   A.   I went and I told them that -- the situation, that now

2   we need Morgann to be added to the lease, and they told me

3   at that point that I need to talk to Carol.  This Carol was

4   the manager at that time.

5          So I talked to her, and I explained to her -- I

6   even showed her the letter that I have.  And she told me

7   that in order for them to add Morgann on the lease, they're

8   going to have to raise the rent 10 percent; almost -- at

9   that time, maybe, about 100, almost maybe $200.  And I told

10  her, honestly, it's not like we're going to use a third room

11  or anything like that.  She's been there, and they knew that

12  she was there.

13         And even when I went and told them that she moved

14  there, they made a note, and they put it in the file that we

15  have third person living at that apartment.  And they said

16  it's fine, but as long as -- if you want to add her into the

17  lease, they are going to have to charge us additional fees,

18  just to add her into the lease.

19  Q.   Then what?

20  A.   And I try -- like, I tell them -- talk to them, you

21  know.  Just because, I said -- honestly, at that time, I was

22  going to school.  I have -- I just tried to maybe ask them

23  if they can maybe help me or something.  And she said that's

24  the company's policy.

25         She knows that -- she feels sorry for me, and,

1    honestly, she doesn't -- in particular, she doesn't

2    understand.  People have lives.  They have children.  They

3    get married.  She doesn't know why the company is making it

4    so complicated.  And she told me to go and maybe give her

5    sometime, just to see what she can do for me.

6    Q.   Then what happened?

7    A.   And I said fine.  And then I just left.  I think the

8    next day or two days later, I came back, and she told me --

9    she said she has the lease ready for us to sign.  So I went

10   to the apartment, and I brought Morgann.  We came to the

11   apartment -- leasing office, and we signed the -- we signed

12   the lease.

13   Q.   I'd like to show you now from Exhibit 1.  It's page

14   401.  And you submitted this document to the INS sometime in

15   2004, correct?

16   A.   Yeah.  I took the other documents to my lawyer's

17   office.  And when we went to the interview with our

18   lawyer -- me, Morgann, and the lawyer -- the lawyer

19   submitted it, but in our presence.

20   Q.   Now, take a look at these signatures down here.  Was

21   this lease prepared, already with the typing of the

22   different people's names, when you got back?

23   A.   Yeah.  We gave them -- I gave -- they already have my

24   information and Aziz's information from the original lease.

25   All they needed, just -- they even have Morgann's name

 1    and -- from the note that they made and put in the -- what

 2    they call it, on the file.  So she just prepared it, and we

 3    just went and signed.

 4    Q.   Now, take a look at Morgann Walker's signature there.

 5    Did you see her sign there?

 6    A.   Yes.

 7    Q.   Now, what about Abdoul Aziz Kebbeh?  Was he in there,

 8    in the office, with you to sign this?

 9    A.   No, he wasn't.

10    Q.   How did that signature get there?

11    A.   After we signed -- they knew that Aziz also lives

12    there.  So she gave us the -- she gave it to us.  I took it

13    to Aziz.  I just signed it and I brought it back.

14    Q.   Did he sign it?

15    A.   Yes, he did.

16    Q.   Is there any doubt, in your mind, that he signed it?

17    A.   No, there is no doubt.

18    Q.   Take a look at the signature of Mr. Abdoul Kebbeh.  Do

19    you see it?

20    A.   Yes.

21    Q.   Would you say it's pretty distinctive?

22    A.   Yeah.  And, also, you can compare with the other -- his

23    signature and the other, what they call the original lease,

24    the one that we -- we got when we first got there, before I

25    got married.  You can compare with that signature.

1          Also, you have copy of the driver's license.  You

2     can compare that signature also with that -- with that, too.

3     Q.   Did you forge his signature?

4     A.   No, I didn't.

5     Q.   You know what forgery means, don't you?

6     A.   Yes.

7     Q.   The English word "forgery" means to cheat.

8     A.   I know.

9     Q.   Did you forge Mr. Monette's signature there?

10         THE COURT:  Monette.

11    BY MR. REED:  (Continuing)

12    Q.   Did you forge his signature?

13    A.   No, I didn't.

14    Q.   Now, did you break into the office there, at the

15    leasing office, and go back into the interior offices that

16    were back behind the window, separated from the public?  Did

17    you break in, commit a burglary one night, and look for

18    leases through books so that you could steal copies of

19    leases?

20    A.   No, I didn't.

21    Q.   You didn't do that?

22    A.   No, I didn't.

23    Q.   You didn't go in the middle of the night with the

24    flashlight --

25         THE COURT:  He said no.  He said no.

```
 1              MR. REED:  Yes, Your Honor.
 2   BY MR. REED:  (Continuing)
 3   Q.   Was there any way that these leases were available to
 4   customers out there in the lobby, as you go into the leasing
 5   office?
 6   A.   Absolutely not.
 7   Q.   So Carol did this for you, huh?  She did this lease for
 8   you?
 9   A.   I don't know who did it, but she gave it for -- to us.
10   I don't know who prepared it.  Honestly, I don't know.
11   Q.   Then what happened?  What did you do with the second
12   lease that you had signed?
13   A.   They -- after Aziz signed, we took it back, she made a
14   copy of it, and she put the copy on the file, and she gave
15   us a copy, and I took it to the lawyer's office.
16   Q.   Now, in the process of submitting INS documents to --
17   in this process, did you also provide tax returns and bills
18   and gas -- utility things; things like that?
19   A.   Yes, we did.
20   Q.   Now, I notice that a lot of these are in -- not a lot,
21   but all of them are in Morgann Walker and yours name.  Do
22   you know that?
23   A.   Yes.
24   Q.   Was Morgann aware that you were putting lease
25   documents -- not lease, but utility bills and DMV documents
```

1    and triple A insurance policies in her name?

2    A.   Yes, we did.  Even she's the one that made some,

3    like -- then or -- either the gas company or electrical

4    company, she's the one that called, because, like I told

5    you, at that point, my English wasn't really good.  So she's

6    the one that was -- I don't know if she called either one of

7    them.

8             Sometimes stuff like that, even though I tried not

9    to do it, she would make me do it.  She said, That's the

10   only way you have more confidence and have, like, better

11   communication in your language.  So sometimes she would

12   just -- just not do things, just to make me do it.

13            So, yeah, we did.  I think she called -- she did

14   one and I did one.

15   Q.   Did you acquire your permanent residency card by

16   committing any kind of fraud?

17   A.   Absolutely not.

18   Q.   Did you acquire your permanent residency card by making

19   false statements to the INS?

20   A.   Absolutely not.

21   Q.   Now, after you received your permanent residency card,

22   did there come a point in time when you were getting close

23   to citizenship and you had to go to an actual interview with

24   the INS in 2009?

25   A.   Yes.

1    Q.   And you saw Ms. Thomas testify in this case, correct?

2    A.   Yes.

3    Q.   You remember her?

4    A.   Yes.

5    Q.   Now, in that process, that 2009 process, did you

6    receive a letter, again, telling you the types of things

7    that you needed to bring to prove that you were married?

8    A.   Yes.

9    Q.   For example, Exhibit 1, page 131, is this the kind of

10   letter that you would receive through this process

11   repeatedly, just telling you the types of things that you

12   would need to bring to the INS to prove these various

13   allegations that you're making to them?

14   A.   Could you repeat that again?  I'm sorry.

15   Q.   That was a bad question.

16        Look at this letter, for example.  This letter is

17   dated June 30th, 2009.  Do you see that?

18   A.   Yes.

19   Q.   It tells you when your interview is going to be; on

20   June 30th, right?

21   A.   Yes.

22   Q.   And what's it say?  What kinds of things?  You don't

23   have to read them out loud, but does it say that you're

24   supposed to get an updated rental agreement from your

25   leasing agency?

1    A.    Yes.

2    Q.    Did you know what that even meant, an updated rental

3    leasing agreement from your --

4    A.    I really didn't.  I honestly didn't really understand

5    what it exactly says, "updated."  I was surprised, because

6    we already have our lease in the file.  But, again, I took

7    the letter to them and they provide us with one.

8    Q.    That's what I want to talk to you about now.

9    A.    Oh, okay.

10   Q.    So now you're going to this meeting, and you've

11   received this letter.  What did you do to get an updated

12   lease or some kind of letter or anything?

13   A.    Actually, I didn't even receive it, because at the time

14   that mail -- they mailed this letter, I was overseas.  I was

15   in Nigeria at that point.

16          And Morgann, usually the way that we communicate

17   when I'm in Nigeria, like, if I want to talk to her or

18   something, I will just -- I don't know what they call it.

19   We call it in Nigeria "flashings."  I will just call

20   sometimes, and when it rings two or three times, I will hang

21   up, because of -- it's a lot cheaper to call from here.  So

22   she will call me.

23          So when I talked to her, she told me that we

24   received a letter from the immigration regarding my

25   citizenship and they ask me for some documents, because they

1    didn't even state that it was for the interview.  And she

2    told me the date.  And I even came maybe like a week or two

3    weeks ahead of the time that I was supposed to come.

4    Q.    See this letter here, the Janet Sharif letter?

5    A.    Yes.

6    Q.    Did you deal with Janet Sharif earlier in 2004 in

7    getting that second lease?

8    A.    She wasn't there in 2004.

9    Q.    Did you deal with Carol in 2004?

10   A.    Yes.

11   Q.    And now we're in 2009, and I see that there's a letter

12   here written from Janet Sharif.  Who got that letter?

13   A.    I got it.

14   Q.    Tell us how you got it.

15   A.    Again, when I came back, I look at the list of the

16   stuff that they want, and I was preparing the documents.

17   And when it got to that, I took it -- I didn't really

18   understand what "updated" means at that -- what -- I know

19   updated things.  That means up to now.  But it didn't make

20   sense for me, for a lease, and, also, since we'd been living

21   there for almost seven, eight years.

22          So, anyway, I took it to them, and they said maybe

23   it means just -- sometimes, maybe, if you move or something.

24   So they want to make sure you still live in the same place,

25   or if you live somewhere else, then they need a new -- a new

1   lease.

2   Q.   What did you do to get this letter?

3   A.   I gave her the -- the copy of the letter that they send

4   me.

5   Q.   The letter I just showed you?

6   A.   Yeah.  Earlier.

7        And then she went through it, and she said -- she

8   wrote me a letter.  Because one of the options that they

9   have, it's -- what they call it?  Either bring copy of your

10  lease or just a letter from the leasing company.

11  Q.   And did you have to pay for that procedure?

12  A.   She asked me for -- she said there is -- there is

13  processing fees of either 40 or $50.  Honest to God, I'm not

14  sure exactly how much she said.  And I agreed to it.

15       And she said when it's ready, maybe come back --

16  the next day or something, it will be ready, because maybe

17  at that time they were busy.  And so I just -- I went the

18  next day, and I paid her 50 -- I think it's either 50 or 40

19  in cash, and --

20  Q.   Did you pick up the letter?

21  A.   And she gave me the letter and -- she attached her

22  business card with it and she gave it to me.

23  Q.   Now, did you forge this signature?

24  A.   No.  Absolutely not.

25  Q.   Where it says Janet Sharif?

1    A.    Absolutely not.

2    Q.    Did you go out and prepare phony letterhead documents

3    on the Crenshaw Village stationery -- apartments -- and

4    make -- create this document?

5    A.    Absolutely not.

6    Q.    You'll notice it says on July 12th, 2003 --

7    A.    Yes.

8    Q.    -- Morgann Blair Walker moved into the aforementioned

9    apartment to live there with her husband, Mr. Abakar.

10          Was July 12th the approximate time you went to go

11   get that second lease?

12   A.    No.  That's the time that Morgann moved into the

13   apartment.

14   Q.    Okay.  Is this a fraudulent document, in your mind?

15   A.    Absolutely not.

16   Q.    You didn't create any of this?

17   A.    I didn't.

18   Q.    Now, tax returns were filed jointly between you and

19   Morgann Walker, as well, correct?

20   A.    Correct.

21   Q.    Throughout the years 2003 all the way up through 2008,

22   correct?

23   A.    Correct.

24   Q.    And they were submitted to the INS, too, right?

25   A.    Yes.

```
 1   Q.    Did Morgann Walker sign her tax returns?
 2   A.    Yes.
 3   Q.    Did you want to share your income with Morgann Walker?
 4   A.    Yes.
 5   Q.    Why?
 6   A.    Because, you know, she's my wife and that's the way of
 7   living in the U.S., and I think -- and she wasn't working
 8   and I was working.  Where I was born and grow up, that's the
 9   way we live, so man take care of their wives and children.
10   And even if the women don't want to work, they don't have to
11   work, unless if they choose to.
12   Q.    Did you open joint bank accounts with her?
13   A.    Yes, we did.
14   Q.    Did she know she was opening joint bank accounts?
15   A.    Of course.  We went together to the -- no, we didn't go
16   together -- yeah, we went together the first time to open
17   the joint account, but they said maybe she can't be part of
18   it, in the beginning, because she had bad credit.  So the
19   clerk suggested I will open it and then later on, we'll add
20   her into that account.
21   Q.    Did you pay joint insurance for the cars that you
22   owned?
23   A.    Yes.
24   Q.    Tell us about some of the cars that you had over the
25   course of the marriage.
```

```
 1   A.    In the beginning, we -- before I got married -- as I
 2   say, when I first got here, I got the Honda Accord.  I was
 3   using it.  After I got married, my brother-in-law was using
 4   it, and then later on my wife was using it.  Until some
 5   point -- I don't know.  In 2006 or at some point, Morgann
 6   was driving the car, and she got pulled over by the police
 7   and the car got -- the Honda got impounded.
 8   Q.    Did you get it out of impound?
 9   A.    At that point I ask her, I said, What exactly happened,
10   and she said, because the car --
11            MS. SARTORIS:  Objection; hearsay.
12            THE COURT:  Sustained.
13   BY MR. REED:  (Continuing)
14   Q.    In any case, Morgann was driving joint cars that you
15   had purchased, correct?
16   A.    Yes.
17   Q.    Not only the Honda, but what other kinds of cars?
18            THE COURT:  You mean cars that they had jointly
19   purchased --
20            MR. REED:  No, Your Honor.
21            THE COURT:  -- as opposed to joint cars?  Because
22   I don't know what that is.
23            MR. REED:  I'm sorry, Your Honor.  It's been a
24   long day.  I'll go slower.
25            THE COURT:  No.  Go to subjects that are relevant.
```

```
 1            MR. REED:  Very good, Your Honor.  Jump right to

 2  it.

 3            THE COURT:  We don't care how many cars they

 4  owned.

 5            MR. REED:  Very well, Your Honor.

 6  BY MR. REED:  (Continuing)

 7  Q.   Did money get taken out of your IRS refund checks and

 8  state refund checks to pay for any separate debts of

 9  Morgann?

10  A.   From the time we start filing together, yes.

11  Q.   Was she aware that you were paying off her student

12  loan?

13  A.   Yeah, she was.

14  Q.   And those documents are clearly reflected in the INS

15  filings.  Isn't that true?

16  A.   Yes.

17  Q.   Did you give gifts to the Morgann Walker -- to the

18  Walker family as you two lived together?

19  A.   To her family?

20  Q.   Yeah, to her family.

21  A.   Yeah, mostly when I traveled.  Whenever I'm going, most

22  of the time Morgann makes her own lists, and then the rest

23  of the family, they make their own lists, because there are

24  certain kinds that they like.  If I go to Africa, there are

25  certain kinds that they like to bring for them, or also if
```

```
 1   I'm going to Saudi Arabia, also the same thing.  So --
 2   Q.   When you went to the INS that first time, and you went
 3   with Morgann, were both of you placed under oath?
 4   A.   Yes.
 5   Q.   Did you hear Morgann, as she was interviewed by the INS
 6   official?
 7   A.   Yes.
 8   Q.   Did she state that she did reside at the Rosalia
 9   apartment?
10   A.   Yes.  It was me, Morgann; and our lawyer, too, was
11   there, and then the officer that was interviewing us.
12   Q.   Did you give a key to the apartment to Morgann?
13   A.   From even before she moved in.  When we decided --
14   maybe sometime if I'm at work or Aziz is at work, she can
15   come and bring her stuff into the house.
16   Q.   Could she come and go as she pleased?
17   A.   Yes.
18   Q.   When Morgann's grandfather was living over there on --
19   at the Hubert home, would you go over and try to help to
20   take care of him?
21   A.   Could you repeat?
22   Q.   Morgann's grandfather, Mr. Baker, Sr. --
23   A.   Yeah, he was living on the Sixth Avenue, not --
24   Q.   We're going to get to that in a second -- no, let's get
25   to that now.
```

```
 1   A.    Yeah, he never lived on Hubert Avenue.

 2   Q.    Did there come a point in time where Morgann did reside

 3   at another location after 2005?

 4   A.    Yes.

 5   Q.    Would she still come back to the Rosalia apartment from

 6   time to time?

 7   A.    Yeah.  Our official address was our apartment.  She's

 8   not -- it wasn't that it wasn't her formal address.  She

 9   would go there and take care of grandpa.  Because grandpa,

10   he has a nurse that come between nine o'clock in the morning

11   until five in the afternoon, and he needed somebody to take

12   care of him during the night, so most of the time she would

13   go there in the evening.

14   Q.    But her formal address was at your place?

15   A.    Yes.  Our apartment, yes.

16   Q.    Now, did you go over there and help her care for her

17   grandfather?

18   A.    Yes.

19   Q.    Did he die in your presence?

20   A.    Yes.

21   Q.    Were you one of his pallbearers?

22   A.    Yes.

23   Q.    Would you say you've had a loving relationship with

24   your wife over these past years, up until around 2009?

25   A.    Yes.
```

1    Q.   Did something happen in approximately 2009 that started

2    to develop some tension between you and Ms. Morgann Walker?

3    A.   We start having problems in 2007.

4    Q.   What were the nature of the problems?

5    A.   My mother-in-law told me that Morgann got pregnant with

6    my child and -- and -- and got an abortion.

7    Q.   And when you were interviewed by the agent --

8              THE COURT:  Hold on one second.

9              Your mother-in-law, being Rochelle Walker?

10             THE WITNESS:  Yes.

11             THE COURT:  Rochelle Walker told you --

12             THE WITNESS:  Yes.

13             THE COURT:  -- that Morgann had an abortion?

14             THE WITNESS:  Yes.

15   BY MR. REED:  (Continuing)

16   Q.   Did you confront Morgann after that, when --

17   A.   She told me -- she told me not to tell her at that

18   point.  And it took me awhile, maybe, not to tell her, but

19   it really hurts me.

20             And Morgann knew that the most -- there is nothing

21   that I wanted like having a child.  And where I'm from,

22   like, when you get married, after a certain time, if you

23   don't have children, people start questioning.  Like maybe

24   they think something is wrong with you or why you're not

25   having children.

1          So, like, maybe after a year, by me getting

2     married, all my family -- everybody in my family knew I was

3     married, so they were asking me what's going on, why are you

4     not having children.  So at some point I have to give them

5     excuses.  I'm still going to school.  I'm going to school.

6     My wife is going to school.  We're still building our life.

7     And the way of life in America is not just like back home,

8     and those kinds of things.

9     Q.   You were placed under oath by Ms. Thomas from the INS

10    in 2009, when you had that citizenship application, correct?

11    A.   Yes.

12    Q.   And she asked you about children and things of that

13    nature.  Isn't that true?

14    A.   True.

15    Q.   Did you --

16          THE COURT:  Don't put that on that, his statement,

17    prior statement out of court.

18          MR. REED:  To the INS, on the documents.

19          THE COURT:  It's hearsay as to this witness if

20    you're asking the questions.  It can't come in.  You can ask

21    him about any topics that were covered.

22          MR. REED:  Very well, Your Honor.

23          THE COURT:  But you can't put that on the ELMO.

24    BY MR. REED:  (Continuing)

25    Q.   In any case, after the situation -- what was the nature

```
 1   of your relationship between Morgann Walker and you after
 2   that?
 3   A.   After that, I was there.  I mean, later on, like, I
 4   confronted her about the abortion, but she told me it wasn't
 5   an abortion, it was a miscarriage, and she didn't want to
 6   tell me because she knew how --
 7              MS. SARTORIS:  Objection.
 8              THE WITNESS:  -- important it was for me to have a
 9   child.
10              THE COURT:  Excuse me.
11              Counsel?
12              MS. SARTORIS:  Objection; hearsay.
13              THE COURT:  Sustained.
14   BY MR. REED:  (Continuing)
15   Q.   Just as a result of these conversations you had with
16   her about this event, did that create tension and distance
17   in your marriage?
18   A.   Yeah.
19   Q.   You wanted to have a child, correct?
20   A.   As she's testified -- I started changing somehow,
21   because, honestly, it's really bad for me.  Like an abortion
22   for me, I'm Muslim, and I believe --
23   Q.   Mr. Abakar, you can't talk about that now.  The judge
24   has prevented us from going into that a little bit.  Okay?
25   A.   Okay.
```

1   Q.   What I'm trying to get to, is that as a result of these

2   conversations about this event, did it cause tension between

3   you and Ms. Walker?

4   A.   Yes.

5   Q.   Now, did there come a point in time -- before we get to

6   that, though, had you always had a loving relationship with

7   your wife up until that approximate period of time?

8   A.   Yes.

9   Q.   Would you get her presents, Valentine gifts, all the

10  things that a husband would do?

11  A.   Everything that -- ahead of time, most of the time.  My

12  mother-in-law even remind me, even though most of the time,

13  I know what to do, but she keeps always telling me what I'm

14  supposed to do.

15  Q.   Did you want to go to Texas?

16  A.   Yes.

17  Q.   What were the nature -- why did you want to go to

18  Texas?

19  A.   Because, like, my -- sorry.  My mother -- my

20  mother-in-law's family, like, they have a really huge land

21  in Texas they inherited, maybe, from their grandparents or

22  someone like that.  And some of their family members are

23  practicing some kind of farming, and it's something I really

24  have passion for.  So that's one of the things that we

25  planned, that maybe we can go there, maybe, and get part of

```
 1    the land, and we start doing business there.

 2    Q.   Did Morgann want to go to Texas with you?

 3    A.   Yes.  Yeah.

 4    Q.   Did Morgann Walker pay rent at the apartment?

 5    A.   No.

 6    Q.   Did you split it with your roommate, Mr. Kebbeh?

 7    A.   Yes.

 8    Q.   Did there come a point in time in 2006, when you were

 9    coming back from Saudi Arabia, that customs stopped you at

10    LAX, and they wanted to call your relatives to see if you

11    were telling the truth about the address of your wife?

12              MS. SARTORIS:  Objection; foundation.

13              THE COURT:  Sustained.

14    BY MR. REED:  (Continuing)

15    Q.   Did you come back from a trip from Europe or the Middle

16    East in approximately 2006?

17    A.   Yeah.  I travel almost every year, at least once in a

18    year.

19    Q.   Did customs agents stop you?

20    A.   Every time I come back.

21    Q.   When they stopped you, was there one particular agent

22    that was asking you questions about where your wife lived

23    and where your roommate lived?

24    A.   They started asking me about -- before, they weren't

25    asking me about my wife.  They were just asking me about
```

```
 1   every single step I took from the time I left my house in LA
 2   until the time I put my leg again back into LAX.
 3   Q.   During this interview -- how long did the whole
 4   interview take place?
 5   A.   How long they hold me there?
 6   Q.   Yeah.
 7   A.   At some point, seven hours.
 8   Q.   How long?
 9   A.   Seven hours.
10   Q.   Now --
11          MR. REED:  Is there an objection?
12          MS. SARTORIS:  I was about to object to relevance.
13          THE COURT:  Overruled.
14          MR. REED:  I'm laying the foundation for this
15   other thing we talked about, Your Honor.
16          THE COURT:  Well, I understand that, but -- I
17   mean, look, it's in.  Just --
18   BY MR. REED:  (Continuing)
19   Q.   Did you -- did there come a point in time in this
20   interview when this agent specifically wanted to phone
21   relatives of yours to confirm your story?
22          MS. SARTORIS:  Objection; foundation.
23          THE COURT:  Overruled.
24          THE WITNESS:  I can answer?
25   BY MR. REED:  (Continuing)
```

```
1    Q.   Yeah.

2              THE COURT:  Yes.

3              THE WITNESS:  The first time I was asked about my

4    wife was in 2009.

5              THE COURT:  The question that the lawyer has asked

6    is:  Did this agent say to you, words to the effect, that he

7    wanted to make contact with your wife?

8              THE WITNESS:  Yes; in 2009.

9              THE COURT:  In 2009?

10             THE WITNESS:  Yes.

11             THE COURT:  Did you provide him with any

12   information that would allow him to do that?

13             THE WITNESS:  Yeah.  He asked me for my address

14   and phone numbers, and I gave them --

15             THE COURT:  Did you give that to him?

16             THE WITNESS:  Yes.

17             THE COURT:  Mr. Reed.

18   BY MR. REED:  (Continuing)

19   Q.   Did you give the accurate phone number for your --

20   A.   Yes.

21   Q.   -- residence on Rosalia?

22   A.   Yes.

23   Q.   Did you give the accurate cell phone number for your

24   wife?

25   A.   Yes.
```

1   Q.   Did you see him actually get on a telephone and make

2   the telephone call?

3   A.   Yes.

4   Q.   Did you -- could you hear the conversation that was

5   occurring on the other end of the line, while he was talking

6   to the people?

7   A.   No, but -- I can see him, but I can't hear what he is

8   saying, but I cannot hear what the other party is saying.

9   Q.   Could you hear what he was saying?

10  A.   Yes.

11  Q.   Was the nature of what he was saying, asking these

12  people where they live and where they worked?

13  A.   Yes.

14  Q.   Then after that occurred, were you allowed to go

15  through and go to baggage after that?

16  A.   Yes.

17  Q.   Did you also show that agent your driver's license to

18  see if it matched the address of where you told them your

19  wife lived?

20  A.   They didn't -- you didn't have to show them.  When they

21  come, they will ask you to take everything out of your

22  pocket.  They will go through every single piece of paper I

23  have, make copies, and so they will eventually see whatever

24  I have.

25  Q.   Did you give them truthful information?

```
1    A.    Yes, I did.

2              MS. SARTORIS:  Objection.

3              THE COURT:  Sustained.

4    BY MR. REED:  (Continuing)

5    Q.    Did you lie about the phone numbers of your --

6    A.    I didn't --

7              MS. SARTORIS:  Objection.

8              THE COURT:  Asked and answered.

9              MR. REED:  Very well, Your Honor.

10             THE COURT:  Sustained.

11   BY MR. REED:  (Continuing)

12   Q.    Did there come a point in time when you started to date

13   another woman?

14   A.    Yes.

15   Q.    What was her name?

16   A.    Monica.

17   Q.    Did Morgann find out about that?

18   A.    She found out the first time in 2009.

19   Q.    What happened?

20   A.    Sometime in 2009, maybe early 2009, I went to -- there

21   is a perfume shop down the street, on Crenshaw, that some

22   people -- people that -- they sell perfumes and incense and

23   stuff like that, and those people are friends.  I met them

24   through my mother-in-law, Rochelle Walker.

25             So most of the time I go there -- sometimes I go
```

1   with Morgann to buy oil, like body oil, and stuff like that.

2   So they knew who I was.  They knew that I was married to

3   Morgann.  They knew that Rochelle Walker was my

4   mother-in-law.

5           So as soon as I walked into the store with Monica,

6   one of the guys said, Oh, my God, Abakar.  Who is this?  Who

7   is this woman?  So I tried just to ignore him.  I don't want

8   to talk about it.  He keep pushing, and I just ignored him.

9   And then she was asking what kind of oil she wants.  And

10  then at some point, when he realized I was ignoring him, he

11  start asking her questions like, Who are you?  Blah, blah,

12  blah.  So I told him she's my friend.  And that was it.  We

13  left.

14          A couple of days later, Morgann told me that her

15  mother went to the perfume store, and the guy -- as soon as

16  she walked into the store, the guy told her, Your

17  son-in-law, Abakar, come in with a very, very, very

18  beautiful woman, and things of this nature.  And --

19  Q.   Then what happened?

20          THE COURT:  You've answered the question.

21  BY MR. REED:  (Continuing)

22  Q.   Did Morgann confront you eventually?

23  A.   Yeah.  My mother-in-law told Morgann and --

24          THE COURT:  Hold on.  The question was, did she

25  confront you eventually.  The answer was yes.  Go on to the

1    next question.

2    BY MR. REED:  (Continuing)

3    Q.   Tell us what happened.  What did she say to you?  What

4    was her temper like?

5    A.   She was really angry and --

6              MS. SARTORIS:  Objection; foundation and hearsay.

7              THE COURT:  Overruled.

8              THE WITNESS:  She was angry, and she was asking me

9    questions, and -- but there is, honestly, one good thing

10   about Morgann.  It doesn't matter whoever tells her anything

11   about me, she comes and asks me questions first.  And most

12   of the time, I tell her -- most of the time I get to

13   convince her, like -- so she asked me and I told her exactly

14   what happened.

15             I told her this girl that I knew since even before

16   we got married, when I was in college, in East LA College,

17   and what her name was, and the time -- from the time that we

18   got married, I stopped seeing her, and I start seeing her

19   again in 2007, around the time that Morgann got the

20   abortion.

21   Q.   All right.  Did she lose her temper at you at that

22   time?

23   A.   I was able to --

24             THE COURT:  That's --

25             THE WITNESS:  -- calm her down and she understood.

```
 1            THE COURT:  Excuse me.  The answer is a yes --
 2    it's a yes or no question.  Did she lose her temper?
 3            THE WITNESS:  She did.
 4            THE COURT:  Go ahead.
 5    BY MR. REED:  (Continuing)
 6    Q.   What did she say when she was losing her temper?
 7    A.   She said, You better not be cheating on me.  She said
 8    the guy -- when the guy ask her who she was, she said that
 9    she was my fiancée, which is not true.
10    Q.   Now, did there come a point in time when the lease was
11    eventually up there, for you at least, at the Rosalia
12    apartment, sometime in 2010?
13    A.   The lease was up in 2004, because it was one-year
14    lease, but after that, it became month to month.
15    Q.   Did there come a point in time when you moved out,
16    basically, from the Rosalia residence and moved somewhere
17    else?
18    A.   Yes.
19    Q.   Approximately when was that?
20    A.   Like, when we really moved out of the apartment, it was
21    in late 2009, if I'm not mistaken.
22    Q.   Could it have been early 2010?
23            Did you receive a check back from Jones and Jones
24    sometime in April, a return of your deposit?
25    A.   No.  They gave it to Aziz Kebbeh, because he just moved
```

```
 1    from one apartment into another one-bedroom apartment.  So
 2    they gave it to Aziz, and Aziz later told me that they gave
 3    him the check.  So then I met him later.  We went to the
 4    bank and we cashed it.
 5    Q.   So your recollection is that it was the last part of
 6    2009; December, something like that?
 7    A.   Yeah.  Late 2009, early 2010 -- no, 2009.  It should be
 8    sometime late 2009, if I'm not mistaken.
 9    Q.   Okay.  Then did you go somewhere after that?  Did you
10    reside somewhere?
11    A.   Yes.
12    Q.   Where?
13    A.   I went to my -- what they call it, my in-laws' house,
14    Sixth Avenue.
15    Q.   The Grandfather Baker who had died?
16    A.   Yes, yes.
17    Q.   And you saw James Baker, Jr., testify in this case,
18    right?
19    A.   Yes.
20    Q.   Was he living there at the time?
21    A.   Yes.
22    Q.   Was Morgann living there at the time?
23    A.   Back and forth, yeah.
24    Q.   But this time, when you move into the Hubert house over
25    there, did you have a separate bedroom?
```

```
 1   A.   Yeah.  What happened is that at that point, we were
 2   having problems, even prior to that, but yes, I got a
 3   separate room.
 4   Q.   The sex stopped, essentially, at that point, right?
 5   A.   Not stop and start, but kind of -- you know, we slowed
 6   down.  It's not as much as before.
 7   Q.   You didn't sleep in the same room, correct?
 8   A.   No, we didn't.
 9   Q.   Now, I'm just about ready to finish my direct,
10   Mr. Abakar, and I just have to do something, and that is go
11   through these counts.  Okay?  Just bear with me.  I need to
12   get the indictment.
13           I'm going to ask you some specific questions.
14   Okay?  Ready?
15   A.   Yes.
16   Q.   On August 19th, 2009, when you took that oath before
17   that immigration officer, Stephanie Thomas, and she was
18   asking you questions, and you told her that your wife,
19   Morgann Walker, resided at 4123 Santa Rosalia Drive,
20   California, was that a lie?
21   A.   Absolutely not.
22   Q.   Was that true, in your mind?
23   A.   Hundred percent.
24   Q.   On August 19th, 2009 -- that would have been the same
25   day when this same officer, this official, Thomas, was
```

```
1    asking you questions, and she asked you whether you ever had

2    given false testimony or misleading information to the

3    United States Government, the officials, or to them

4    personally, in the past; you said you had not ever given

5    them false information specifically in that regard; that in

6    March 2006 -- that's previous -- when you signed the

7    document that stated that your wife was residing at 4123

8    Santa Rosalia Avenue, that -- that was true and not a lie?

9    A.   Yes, it was true.

10   Q.   It's a little convoluted, that question, because --

11              MR. REED:  I'll withdraw it, Your Honor.

12   BY MR. REED:  (Continuing)

13   Q.   Count Three:  On March 28th, 2007 -- this is about two

14   years before --

15   A.   Okay.

16   Q.   -- when you were interviewed, did you file any

17   documents or state to officials there at the immigration

18   service that -- and you signed something under penalty of

19   perjury on an immigration document specifically, an N-400,

20   containing the statement that your wife lived -- Morgann

21   Walker resided at 4123 Santa Rosalia Drive, A, Los Angeles,

22   was that a true statement you gave?

23   A.   Yes.

24   Q.   It wasn't a lie?

25   A.   It wasn't a lie.  She lived there.  All her personal
```

1    stuff was there.  She had a key.  She comes and goes

2    whenever she feels.  I never stopped her from coming or

3    leaving.

4    Q.   On March 28th, 2007 -- that would be the same day --

5    when you were subscribing documents under penalty of perjury

6    that they were true, did you state -- in this N-400

7    application, did you state that you had never given false

8    information to the immigration officials before, knowing

9    that in the past, in 2006, you'd signed under penalty of

10   perjury an I-75 form claiming that your wife resided at 4123

11   Santa Rosalia Drive, Los Angeles -- were you giving false

12   statement on that form when you submitted that to the INS in

13   2007?

14   A.   Absolutely not.

15   Q.   All throughout this period of time, Morgann Walker was

16   residing at that address, correct?

17   A.   Absolutely.  Yes.

18   Q.   Now, let's just talk about Counts Five through Seven,

19   just a little bit.  You obtained what are called these

20   add-it stamps.  They're put into your passport.  We saw this

21   in the trial, right?

22   A.   I know.

23   Q.   You also obtained a permanent residency card, correct?

24   A.   Yes.

25   Q.   Did you obtain those documents by lying about the

```
 1    residence of where your wife lived?
 2    A.    Absolutely not.
 3    Q.    Did you obtain those documents as a result of
 4    submitting fraudulent leases or letters to the INS?
 5    A.    Absolutely not.
 6    Q.    Did you obtain those travel documents based on any kind
 7    of fraud that you committed?
 8    A.    Absolutely not.
 9              MR. REED:  I have nothing further, Your Honor.
10              THE COURT:  All right.  Cross-examine.
11                        CROSS-EXAMINATION
12    BY MS. SARTORIS:
13    Q.    You testified that starting in 2002, you began working
14    for a company called FTR.  Is that correct?
15    A.    Yes.
16    Q.    And what was your job responsibility at that time?
17    A.    I was doing deliveries.
18    Q.    And isn't it true that you also drove visitors from
19    Saudi Arabia around for the company and showed them the
20    city?
21    A.    That wasn't until 2009 or 2010, when I was unemployed.
22    Q.    When you were unemployed?
23    A.    Yeah.  It was in 2010, I think.  It wasn't in 2002.
24    Q.    So you were employed by FTR to do that or unemployed
25    by --
```

1    A.    I was employed for FTR from 2002 all the way until 2008

2    or early 2009.  I forgot exactly.

3    Q.    And when did you do the job that you said, driving

4    people around visiting from Saudi Arabia?

5    A.    That was some point in 2010.

6    Q.    So when you started working for FTR, they gave you a

7    nice car in 2002?

8    A.    Yes.

9    Q.    And what was that car?

10   A.    It was a Toyota Tundra; 2002 Toyota Tundra, pickup

11   truck.

12   Q.    And you worked for them from about seven o'clock in the

13   morning until about 3:00, 3:30 in the afternoon.  Is that

14   right?

15   A.    Yes.

16   Q.    Monday through Friday?

17   A.    Yes.

18   Q.    And in 2002, you were in the United States on a student

19   visa.  Is that correct?

20   A.    Yes.

21   Q.    Now, how much did you get paid by FTR during that time?

22   A.    When I first start, I was making maybe about 13.50, $14

23   per hour.  Plus if I work overtime, then they pay me for --

24   Q.    Oh.  So sometimes you worked more hours than that?

25   A.    No.  That's what I'm saying.  The actual rate was about

1    14; 13-something to $14.

2    Q.   But you worked Monday through Friday from 7:00 to 3:30,

3    and sometimes you worked longer?

4    A.   Most of the time, I don't, because at that point I was

5    a student, so I wasn't doing any extra work.

6    Q.   I thought you said you sometimes worked overtime.

7    A.   No.  I said my rate was 13.50, and then they have other

8    rates for --

9    Q.   Did -- let me just stop you.  Did you sometimes work

10   overtime?

11   A.   No.

12   Q.   So if I could -- I'm going to display here -- and this

13   is the exhibit -- let's see if I can figure out how to do

14   this.

15        This is Defense Exhibit 304.  This is a copy of

16   your student visa application.

17        Do you see that part that's highlighted in yellow,

18   the part that says, "I certify that I seek to enter or

19   remain in the United States temporarily and solely for the

20   purpose of pursuing a full course of study at the school

21   named on page 1 of this form"?

22   A.   Yeah, I see it.  Uh-huh.

23   Q.   And then do you see here, on your student visa over

24   here, where it says, "This student is eligible to work on

25   campus not more than 20 hours a week with a full-time

```
 1    status -- was FTR on campus at the university?

 2    A.    What's that form?  Can I see that form again, please?

 3    Q.    Oh, sure.

 4              THE COURT:  The question was:  Was FTR on campus?

 5              THE WITNESS:  No, it wasn't on campus.

 6    BY MS. SARTORIS:  (Continuing)

 7    Q.    So did you have permission from INS to work at FTR in

 8    2002?

 9              MR. REED:  Objection; relevancy.

10              THE COURT:  Overruled.

11              THE WITNESS:  From the INS?

12    BY MS. SARTORIS:  (Continuing)

13    Q.    From the INS.

14    A.    No, I didn't.

15    Q.    From CIS?

16    A.    I didn't.

17    Q.    But your student visa said that you could work on

18    campus 20 hours a week.  Isn't that right?

19    A.    Where does it say?  I didn't -- that's not in my

20    student visa.  Is this part of my I-20?

21    Q.    This is Defense Exhibit 304.  It's your certificate of

22    eligibility for nonimmigrant F-1 student status for academic

23    and language students.

24    A.    Okay.

25    Q.    And it has student employment authorization and other
```

 1   records.  And it says the student is eligible to work on

 2   campus not more than 20 hours a week with a full-time

 3   status.

 4   A.    Okay.  What was the question then?

 5   Q.    The question is:  Was FTR on campus?

 6   A.    No.  It's off campus.

 7   Q.    What is FTR?

 8   A.    It's a construction company.

 9   Q.    Where was that located?

10   A.    The main office is Irvine, California, but they have

11   different projects all over California.

12   Q.    But it definitely wasn't in East Los Angeles College?

13   A.    It wasn't.

14   Q.    You worked at FTR until 2006?

15   A.    Until maybe late 2008, 2009.

16   Q.    2008 or 2009?

17   A.    Yeah.

18   Q.    I'm going to turn to Defense Exhibit 305.  This is a

19   page that's marked 2353 at the bottom.  And there's a copy

20   of an employment authorization card.  Do you see that?

21   A.    Yes.

22   Q.    What day was that issued?

23   A.    I think 9-29, 2003.

24   Q.    That was after you got married to Ms. Walker, isn't it?

25   A.    Yes.

 1   Q.   And how did you obtain this employment authorization

 2   card?

 3   A.   After I filed for my immigration benefits.

 4   Q.   Once you became an LPR resident.  Isn't that correct?

 5   A.   Would you repeat that?

 6   Q.   Once you received LPR status?

 7        THE COURT:  Counsel.  Counsel, I can't understand

 8   some of what you're saying, and I have been listening to you

 9   for several days.  Slow down.

10        MS. SARTORIS:  Thank you, Your Honor.

11   BY MS. SARTORIS:  (Continuing)

12   Q.   Was that after you obtained LPR status?

13   A.   After I obtained what?

14   Q.   Your legal, lawful, permanent resident status.

15   A.   That I worked?

16   Q.   That you received this employment authorization card.

17   A.   No.  This was the first document I received from the

18   INS after I -- we applied for my immigration documents.

19   Q.   After you filed for LPR status?

20   A.   I don't know what that term is.

21   Q.   Once you filed your I-485 form and your I-130 form with

22   Ms. Walker, after your marriage?

23   A.   Yeah.  After they, my mother-in-law and my wife,

24   petitioned me and we filed the papers, I received letter

25   from the INS telling me to come in a certain day and certain

1    time to process the work authorization.

2    Q.    And that's when you received authorization to work?

3    A.    Yes.

4    Q.    And that was based on your marriage to Ms. Walker?

5    A.    Yes.

6    Q.    Without that, you weren't able to lawfully work at FTR

7    in the United States, were you?

8    A.    I didn't know that.

9    Q.    There's an exhibit binder in front of you that says

10   Volume I of III.  Do you have that in front of you?

11   A.    I think it's this one, yeah.

12   Q.    If I could ask you to turn to page 129.

13   A.    129?

14   Q.    Yes.

15         Do you have that in front of you?

16   A.    129?  Yes.

17   Q.    What is that a photocopy of?

18   A.    That's my Social Security card.

19   Q.    Did you provide that to CIS?

20   A.    At that time, I think -- I'm not sure if I have it at

21   that time, but if I had it, then I provide it, but I'm not

22   sure if I had it at the time that I applied.

23   Q.    And can you see the part highlighted in yellow on the

24   screen?  What does that say?

25   A.    Valid for work only with INS authorization.

1    Q.    Did you have INS authorization to work at FTR?

2    A.    I didn't.

3    Q.    Remember that day that you were talking about that you

4    went in and you signed a lease in 2004, that you went into

5    the leasing office to obtain a lease adding Morgann in 2004?

6    Do you remember that day?

7    A.    Yes, I do.

8    Q.    And you said you spoke to a woman named Carol?

9    A.    Yes.

10   Q.    Where was Carol's desk in the office?  Do you know?

11   A.    When you first walk into the office, they have, like,

12   some kind of band here, and it was, like, on -- like on that

13   side.

14   Q.    And did you have access to the Jones and Jones files in

15   the office?

16   A.    Absolutely not.

17   Q.    But didn't you say that Carol put a copy of the lease

18   in the file?

19   A.    Yes.

20   Q.    Did you see the file?

21   A.    Usually, when somebody goes there -- let's say if you

22   need a copy of whatever, one of them will go inside the

23   office.  They will bring the file.  Either they will put

24   something on it or they take something out of it, and then

25   that's it.

```
 1   Q.   You had a lot of experience with that at that rental
 2   office?
 3   A.   Yeah, I've been there.  I lived there for almost ten
 4   years, so I go there back and forth.  I go there every
 5   month.  I was the one paying the rent for the entire time I
 6   was living there.
 7   Q.   When did you start dating Monica?
 8   A.   Not dating.  I met her in late 2002.
 9   Q.   When did you start dating her?
10   A.   Maybe around 2007.
11   Q.   Did you have a physical relationship with her starting
12   in 2007?
13   A.   Yes.
14   Q.   When you were in the country on your student visa,
15   would you have had to leave if you stopped attending school?
16   A.   If I stop attending school?
17   Q.   Yes.
18   A.   If you stop attending for certain usual, like -- it
19   depends.  But if you don't go for a year, or four or five
20   semesters or something like that, sometimes -- after 9/11,
21   the INS, they have, like, certain kind of system that's
22   connected with --
23   Q.   Let me just ask you this question:  Did your student
24   visa require you to stay in school in order to stay in the
25   United States?
```

```
 1   A.    Yes.
 2   Q.    So if you stopped attending school, you would have to
 3   leave?
 4   A.    For, like, certain time, not just if you skip one
 5   semester or two semesters.
 6   Q.    If you stopped attending school for some certain period
 7   of time, you would be in violation of your student visa?
 8   A.    If you --
 9   Q.    It's a yes or no question.  If you stopped --
10   100 percent stopped attending school for a certain period of
11   time, you would be in violation of your student visa.  Is
12   that right?
13   A.    If you take time off, no.  If you stop, yes.
14   Q.    I'm sorry.  Let me ask that question again.
15           MS. SARTORIS:  I'm going to move to strike that
16   answer as nonresponsive.
17   BY MS. SARTORIS:  (Continuing)
18   Q.    If you stop attending school 100 percent for a period
19   of time, you would be in violation of your student visa.  Is
20   that right?
21   A.    Right.
22           MR. REED:  Objection; ambiguous.
23           THE COURT:  Overruled.
24   BY MS. SARTORIS:  (Continuing)
25   Q.    And if you flunked out of school, you would also be in
```

```
 1   violation of your student visa.  Is that correct?
 2   A.   That is my understanding.
 3   Q.   You're also in violation of your student visa if you
 4   work anywhere other than on the campus.  Is that correct?
 5   A.   I wasn't aware of that, either.
 6   Q.   You didn't know that?
 7   A.   I didn't.
 8   Q.   Your document is two pages.  Did you look at your
 9   student F-1 visa application?
10   A.   Yeah.  At the time that -- I wasn't even able to read
11   English when I received that document.  That was the first
12   document.  They mail it to me from here, and then I took
13   that to the embassy and I got my -- what do you call it?  I
14   gave them copy, maybe, at the school, and maybe I have a
15   copy in my records, and I never went back and go over it
16   anymore.  I mean, I have no reason to do that.
17   Q.   So I understand you may have not been proficient in
18   English as you are now, but didn't you attend East Los
19   Angeles College in order to get a -- in order to get an
20   English-speaking degree?
21   A.   Yes.  Not English speaking, but I was taking classes
22   there, just to get a college degree.
23   Q.   College level classes in English.  Is that right?
24   A.   One more time?
25   Q.   When you came to the United States on your F-1 student
```

```
 1   visa, you enrolled in college level classes in English.  Is
 2   that correct?
 3   A.   You just take -- usually take so many different
 4   classes.  It's not -- I wasn't taking all English classes.
 5   I would take English, math, and some other --
 6             THE COURT:  That's not the question.  The question
 7   is:  Were your classes taught in English?
 8             THE WITNESS:  Yes.
 9   BY MS. SARTORIS:  (Continuing)
10   Q.   At the college level?
11   A.   Yes.  I was taking classes in English, yes.
12   Q.   And you graduated -- you -- you -- did you stay in
13   school until -- when did you quit attending school?
14   A.   I -- at some point, I don't know, in 2004 or 2005, I
15   took, I think, one semester off, if I'm not mistaken.
16   Q.   And then did you go back to college?
17   A.   Yes, I went back.
18   Q.   And then when did you -- did you -- when did you stop
19   going to school the next time?
20   A.   2006, after I graduated.
21   Q.   Is that the last time you went to college?
22   A.   I've taken classes.  From the time I graduated, I
23   didn't -- I don't remember, like, going there -- I went
24   sometime in early this year, just to -- I went back again to
25   East LA College just to take some extra -- because I was
```

```
 1    unemployed.  I wasn't doing anything.  And at that point I
 2    was, after we -- my wife filed for divorce, I was staying at
 3    Monica's house, which is across the street from --
 4              MS. SARTORIS:  Your Honor, I would ask --
 5              THE WITNESS:  I was going there, and I was
 6    planning to take some classes, but I didn't take any
 7    classes.
 8    BY MS. SARTORIS:  (Continuing)
 9    Q.  So for how many years did you say you took college
10    level classes in the United States?
11              MR. REED:  Objection; relevancy, Your Honor.
12              THE COURT:  Well, I'll sustain that objection.
13              Let me ask you a different question.  Did you get
14    a degree at some point?
15              THE WITNESS:  Yes.
16              THE COURT:  What degree did you receive?
17              THE WITNESS:  What they call it, bachelor degree
18    in business administration, international business,
19    import/export.
20              THE COURT:  Was that from East LA College?
21              THE WITNESS:  From Cal State LA.
22              THE COURT:  What year did you get the degree?
23              THE WITNESS:  2006, I graduated.  I think June 10,
24    2006.
25              THE COURT:  All right.  Counsel.
```

```
 1              MS. SARTORIS:  Thank you.
 2   BY MS. SARTORIS:  (Continuing)
 3   Q.   And -- I'm sorry.  I just -- I know you answered it.  I
 4   had a hard time understanding.
 5              What was the degree in?  I just couldn't --
 6              THE COURT:  Bachelor of business administration.
 7   Something about international --
 8              THE WITNESS:  International business.
 9              THE COURT:  International business.
10              MS. SARTORIS:  Thank you.  I have no further
11   questions.
12              THE COURT:  Anything further, Mr. Reed?
13              MR. REED:  No, Your Honor.
14              THE COURT:  All right.  You may step down.  Thank
15   you, sir.
16              Mr. Reed, any further witnesses?
17              MR. REED:  Very quick one, Your Honor.  Agent
18   Renelt.
19              THE COURT:  All right.
20              THE CLERK:  Please raise your right hand.
21              (The oath was administered.)
22              THE WITNESS:  Yes.
23              THE CLERK:  Please have a seat.  Please state your
24   name, spelling your last name for the record.
25              THE WITNESS:  My name is Eric Renelt.  That's
```

```
 1    R-E-N-E-L-T.

 2              THE COURT:  Go ahead, Mr. Reed.

 3

 4                        ERIC RENELT,

 5    called as a witness in behalf of the Defendant, having been

 6    first duly sworn, is examined and testifies as follows:

 7

 8                        DIRECT EXAMINATION

 9    BY MR. REED:

10    Q.   How are you employed, Mr. Renelt?

11    A.   I currently work for the Customs and Border Protection.

12    Q.   How long have you been doing that?

13    A.   Since the merge, and prior to that -- the merge in

14    2004, and prior to that, with INS since 1993.

15    Q.   In a nutshell, do you ask people questions concerning

16    where they're coming from when they come into the United

17    States at LAX if there's -- withdraw.

18              What types of things do you do for the customs

19    service?

20              THE COURT:  Hold on.  Where do you work?

21              THE WITNESS:  I work at LAX International Airport.

22              THE COURT:  Al right.  What are your duties there?

23    BY MR. REED:  (Continuing)

24    Q.   What do you do there?

25    A.   I'm an inspector.
```

1    Q.    What do you inspect?

2    A.    Passengers and baggage.

3    Q.    On August 10th, 2009, did an individual come into

4    contact with you on that day by the name of Yusuf Abakar?

5    A.    Yes, sir.

6    Q.    Now, did there come a point in time, after you had

7    asked him some questions, that you wanted to call his

8    roommate and his wife?

9    A.    I believe that I was instructed by the lead officer to

10   make those calls, to see who was waiting for him and who was

11   available to pick him up.

12   Q.    Did you have his driver's license at that time to see

13   what the address was on his driver's license?  I'm talking

14   about Mr. Abakar now.

15   A.    Yes.  I -- if I didn't have it in my possession at that

16   particular time, I had already copied it, per the

17   instructions of the lead inspector.

18   Q.    Did you tell Mr. Abakar that you wanted to call his

19   wife and his roommate to just confirm some information

20   concerning where they lived?

21   A.    I believe the -- that was taken care of by the lead

22   inspector.

23   Q.    Were you the person who actually made the call,

24   however?

25   A.    Yes.

1    Q.   Did you call a person purported to be his wife at area

2    code (213)361-8260?  Do you recall making that telephone

3    call?

4    A.   I recall making a call to a woman purported to be his

5    wife.

6    Q.   Did you make a call to a person purporting to be his

7    roommate also at that time?

8    A.   I believe so.

9    Q.   Now, the first person -- strike that.

10          The person who was purported to be his wife,

11   did -- when you made that telephone call, did a female

12   answer on the telephone?

13   A.   Yes, sir.

14   Q.   Can you tell us what she told you at that time, when

15   you were asking information about where she was and where

16   she lived?

17   A.   She indicated, as far as -- as far as where she lived,

18   she indicated that she was at home, and that she was waiting

19   for a call from her husband to pick her up -- to pick him

20   up.

21   Q.   And when she indicated that she was home, that home

22   address matched the address that was on the driver's license

23   of Mr. Abakar?

24   A.   The nature of it.  I believe that's correct.

25   Q.   And did she also indicate other information about where

```
 1   she would be returning to -- withdraw that.
 2           She indicated that she was home, you say?
 3   A.   No, sir.  I believe she was on her way home at that
 4   time.
 5   Q.   From work, correct?
 6   A.   Correct.
 7   Q.   Did she indicate that she was returning to her and her
 8   husband's address there at Santa Rosalia after work?
 9   A.   I believe so, yes.
10   Q.   Did she say that Mr. Abakar and her lived alone, but
11   that Abakar was still abroad, and she was unsure when he was
12   returning and didn't -- did not know his itinerary?
13   A.   Correct.
14           MR. REED:  I have no further questions, Your
15   Honor.
16           THE COURT:  Anything from the government?
17           MS. SARTORIS:  No, Your Honor.
18           THE COURT:  All right.  Thank you, sir.  You may
19   step down.
20           THE WITNESS:  Thank you.
21           THE COURT:  Long way for very little, right?
22           All right.  Next witness?
23           MR. REED:  We're going to rest, Your Honor.
24           THE COURT:  All right.  Defense rests.
25           Does the government have any rebuttal?
```

```
1              (Defendant rests.)

2              MS. SARTORIS:  No, Your Honor.

3              THE COURT:  All right.  The government rests in

4    rebuttal?

5              MS. SARTORIS:  Yes.

6              (Plaintiff rests.)

7              THE COURT:  All right.

8              (End excerpt.)

9

10

11

12              C E R T I F I C A T E

13

14         I hereby certify that the foregoing is a true and

15   correct transcript from the stenographic record of the

16   proceedings in the foregoing matter.

17

18   /s/Bridget R. Montero
     Bridget R. Montero              Date:  January 20, 2012
19   Official Court Reporter
     CSR No. 10020
20

21

22

23

24

25
```